U. S. DISTRICT COURT
WESTERN DISTRICT ARKANSAS
FILED

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS

APR 2 5 2012

CHRIS R. JOHNSON, CLERK

DEPUTY CLERK

|  |  |
|---|---|
| JOHN COTTRELL, DERIVATIVELY AND ON BEHALF OF WAL-MART STORES, INC., ) | Case No. _12-4041_ |
| PLAINTIFF, ) |  |
| VS. ) |  |
| MICHAEL T. DUKE, AIDA M. ALVAREZ, JAMES W. BREYER, M. MICHELE BURNS, JAMES I. CASH, JR., ROGER C. CORBETT, DOUGLAS N. DAFT, GREGORY B. PENNER, STEVEN S. REINEMUND, H. LEE SCOTT, JR., ARNE M. SORENSON, JIM C. WALTON, S. ROBSON WALTON, CHRISTOPHER J. WILLIAMS AND LINDA S. WOLF ) |  |
| DEFENDANTS, ) | JURY TRIAL DEMANDED |
| AND ) |  |
| WAL-MART STORES, INC. ) |  |
| NOMINAL DEFENDANT. |  |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff JOHN COTRELL ("Plaintiff"), by and through his attorneys, derivatively on behalf of nominal defendant Wal-Mart Stores, Inc. ("Wal-Mart" or the "Company"), submit this Verified Shareholder Derivative Complaint against the Defendants named herein. Plaintiff's allegations are based upon personal knowledge as to himself and his own acts, and upon information and belief developed from the investigation and analysis of his counsel, which includes, among other things, public filings by Wal-Mart with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, matters of public record available from various state and federal government websites, complaints pending against the Company in state and federal courts, and other information available in the public domain. To the best of Plaintiff's knowledge, information, and belief, the allegations herein not based on personal knowledge are likely to have evidentiary support after a reasonable opportunity for further investigation, discovery, and analysis.

The crux of the Plaintiff's complaint against the officers and directors of Wal-Mart is that they were intentionally derelict and/or consciously disregarded their fiduciary duty of loyalty to the company by making several decisions for which there was no valid business justification, including, but not limited to: (a) permitting operation of a widespread and systematic scheme to bribe Mexican officials for the purpose of obtaining various government permits; and (b) failing to adequately and properly investigate such bribery scheme following its disclosure. As a result of defendants' breaches of loyalty owed to Wal-Mart, the company is now the subject of numerous investigations and potential lawsuits by the Department of Justice and shareholders. All of which has caused and will continue to cause significant financial damage to the Company, and perhaps most importantly, irrevocable injury to Wal-Mart's reputation.

## I. **NATURE OF THE ACTION**

1.      This is a shareholders' derivative action brought by Plaintiff for the benefit of Wal-Mart against Defendants, who are current members of the Company's Board of Directors (the "Board"). This action seeks to recover for Wal-Mart and its shareholders the hundreds of millions of dollars of financial and reputational damages caused by the Defendants' DESCRIBE BRIBES. As a result the Company is now subject to serious legal liability.

2.      This legal liability, which includes Wal-Mart being the subject of federal and private investigations, lawsuits, settlements and consent orders, with additional actions against the Company and certain key officers likely to come, is the direct and proximate cause of the Board members' breaches of their fiduciary duty of loyalty owed to Wal-Mart.

## II. **JURISDICTION AND VENUE**

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) because Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interest and costs. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one intended to confer jurisdiction on a court of the United States that the Court would otherwise lack.

4.      Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein, including all or primarily all of Defendants' participation in the wrongful acts detailed herein, occurred in this District. One or more of the Defendants either resides in or maintains executive offices in this District, and Defendants have received substantial compensation in this District by engaging in numerous activities and conducting business here, which had an effect in this District.

3

## III. PARTIES

**Plaintiff**

5.      Plaintiff, JOHN COTRELL, as set forth in the accompanying verification, is, and was at all relevant times, a shareholder of nominal defendant Wal-Mart. He is a citizen of the state of Texas.

**Nominal Defendant**

6.      Nominal Defendant Wal-Mart is a Delaware corporation with its principal executive offices located at 702 SW 8th Street, Bentonville, Arkansas 72716. Wal-Mart operates retail stores in various formats worldwide. It operates retail stores, restaurants, discount stores, supermarkets, supercenters, hypermarkets, warehouse clubs, apparel stores, Sam's Clubs, and neighborhood markets, as well as walmart.com; and samsclub.com.

**Defendants**

7.      The biographical information for each of the Defendants below has been taken from the Company's proxy statements and website:

8.      Defendant Michael T. Duke ("Duke") has been President and Chief Executive Officer ("CEO") of Wal-Mart since February 1, 2009 and a director since November 2008. Previously, Duke served as Vice Chairman with responsibility for Walmart International beginning in September 2005 and Executive Vice President and President and CEO of Walmart US beginning in April 2003. Duke joined Wal-Mart in 1995. On information and belief Mr. Duke is a citizen of Arkansas.

4

9.      Defendant Aida M. Alvarez has been a director of Wal-Mart since 2006. As described in the Company's Proxy Statement issued April 18, 2011, Ms. Alvarez "is the former Administrator of the U.S. Small Business Administration and was a member of President Clinton's Cabinet from 1997 to 2001. She was the founding Director of the Office of Federal Housing Enterprise Oversight (the "OFHEO") from 1993 to 1997. Ms. Alvarez was a vice president in public finance at First Boston Corporation and Bear Stearns & Co., Inc. prior to 1993. She is Chair of the Latino Community Foundation of San Francisco and has served as a director of UnionBanCal Corporation and Union Bank, N.A. since 2004."

10.     Defendant James W. Breyer has been a director of Wal-Mart since 2001. As described in the Company's Proxy Statement issued April 18, 2011, Mr. Breyer "is a Partner of Accel Partners, a venture capital firm, and has been an investor in numerous consumer internet, media, and technology companies, many of which have successfully completed public offerings or mergers. He has served as a director of Dell Inc. since 2009. He also served as a director of Marvel Entertainment, Inc. from 2006 to 2009, and RealNetworks, Inc. from October 1995 to June 2008. He also serves as a director of several private companies and on the boards of various non-profit organizations."

11.     Defendant M. Michelle Burns has been a director of Wal-Mart since June 2003. As described in the Company's Proxy Statement issued April 18, 2011, Ms. Burns "is the Chairman and CEO of Mercer LLC ("Mercer"), a subsidiary of Marsh & McLennan Companies, Inc. She joined Marsh & McLennan Companies, Inc., a global professional services and consulting firm, in March 2006 and served as its Executive Vice President and CFO until September 2006. She is the former Executive Vice President, CFO, and Chief Restructuring Officer of Mirant Corporation, an energy company, where she served from May 2004 to January

5

2006. She served as the Executive Vice President and CFO of Delta Air Lines, Inc., an air carrier, from August 2000 through April 2004. She has also served as a director of Cisco Systems, Inc. since 2003."

12.     Defendant James I. Cash, Jr. has been a director of Wal-Mart since 2006. As described in the Company's Proxy Statement issued April 18, 2011, "Dr. Cash is the James E. Robison Emeritus Professor of Business Administration at Harvard Business School, where he served from July 1976 to October 2003. Dr. Cash served as the Senior Associate Dean and Chairman of HBS Publishing while on the faculty of the Harvard Business School, and also served as Chairman of the MBA Program. While on the faculty of Harvard Business School, Dr. Cash's research focused on the strategic use of information technology in the service sector, and specifically the development of a performance measurement system for large information technology organizations. Dr. Cash holds an advanced degree in accounting and has been published extensively in accounting and information technology journals. He currently provides management development and consulting services through The Cash Catalyst, LLC, which Dr. Cash formed in 2009. He has served as a director of The Chubb Corporation since 1996 and of General Electric Company since 1997. Dr. Cash has served as a director of a number of other public companies, including Phase Forward Incorporated from October 2003 to May 2009, and Microsoft Corporation from May 2001 to November 2009, and has served on the audit committees of several public companies."

13.     Defendant Roger C. Corbett has been a director of Wal-Mart since December 2006. As described in the Company's Proxy Statement issued April 18, 2011, Mr. Corbett "is the retired CEO and Group Managing Director of Woolworths Limited, the largest retail company in Australia, where he served from 1990 to 2006. Mr. Corbett remains an advisor to the

board of Woolworths Limited. He is a director of The Reserve Bank of Australia and Deputy Chairman of PrimeAg Australia (a major Australian farming enterprise). He is the Chairman of Fairfax Media Limited (a major Australian newspaper, magazine and internet publisher), where he also serves as Chairman of that company's Nominations Committee and formerly served as Chairman of that company's Audit and Risk Committee. He also is a director and non-executive Chairman of Mayne Pharma Group Limited, an Australian specialist pharmaceutical company and a former member of the Prime Minister's Community Business Partnership. He is a former founding director of Outback Stores, a commercial venture supported by the government to provide retail facilities for communities in remote Australia. He is a member of the Advisory Council of the Australian Graduate School of Management for the University of New South Wales, and is also the former Chairman of CIES Food Business Forum (France). Mr. Corbett is also Chairman of the Salvation Army Advisory Board, is Chairman of the Sydney Children's Hospitals Network (Randwick & Westmead) Advisory Board, and is a member of the Dean's Advisory Group of the Faculty of Medicine at the University of Sydney."

14. Defendant Douglas N. Daft has been a director of Wal-Mart since 2005. As described in the Company's Proxy Statement issued April 18, 2011, Mr. Daft "is the retired Chairman and CEO of The Coca-Cola Company, a beverage manufacturer, where he served in that capacity from February 2000 until May 2004 and in various other capacities, including responsibility for various international markets, since 1969. Mr. Daft has served as a director of The McGraw-Hill Companies, Inc. since 2003 and served as a director of Sistema-Hals from September 2006 until December 2009. He has also served as a director of Green Mountain Coffee Roasters, Inc. since December 2009, where he is a member of that company's compensation committee. Among additional endeavors, Mr. Daft is a member of the European

Advisory Council for N.M. Rothschild & Sons Limited and a member of the advisory boards of Longreach, Inc., Tisbury Capital, and Thomas H. Lee Partners."

15.     Defendant Gregory B. Penner has been a director of Wal-Mart since 2008. Mr. Penner is the son-in-law of defendant S. Robson Walton. As described in the Company's Proxy Statement issued April 18, 2011, Mr. Penner has been a General Partner of Madrone Capital Partners, an investment management firm, since 2005. From 2002 to 2005, he served as Walmart's Senior Vice President and CFO - Japan. Before serving in that role, Mr. Penner held the position of Senior Vice President of Finance and Strategy for Walmart.com. Prior to working for Walmart, Mr. Penner was a General Partner at Peninsula Capital, an early stage venture capital fund, and a financial analyst for Goldman, Sachs & Co. Mr. Penner has been a member of the board of directors of Baidu, Inc. since 2004 and of Hyatt Hotels Corporation since 2007. He also serves on the boards of directors of 99Bill Corporation and eHarmony, Inc.

16.     Defendant Steven S. Reinemund has been a director of Wal-Mart since 2010. As described in the Company's Proxy Statement issued April 18, 2011, "Mr. Reinemund is the Dean of Business and Professor of Leadership and Strategy at Wake Forest University, positions he has held since July 2008. Prior to joining the faculty of Wake Forest University, Mr. Reinemund had a distinguished 23-year career with PepsiCo, Inc. ("PepsiCo"), where he served as that company's Chairman of the Board from October 2006 to May 2007, and Chairman and CEO from May 2001 to October 2006. Prior to becoming Chairman and CEO, Mr. Reinemund was PepsiCo's President and Chief Operating Officer from 1999 to 2001 and Chairman and CEO of Frito-Lay's worldwide operations from 1996 to 1999. Mr. Reinemund has served as a director of Exxon Mobil Corporation, American Express Company, and Marriott International, Inc., all

8

since 2007. He previously served as a director of Johnson & Johnson from 2003 to 2008. Mr. Reinemund is also a member of the board of trustees for The Cooper Institute."

17.     Defendant H. Lee Scott, Jr. has been a director of Wal-Mart since 1999. As described in the Company's Proxy Statement issued April 18, 2011 Mr. Scott "was Walmart's President and CEO from January 2000 through his retirement from that position on January 31, 2009. Mr. Scott served as an executive officer of Walmart and as the Chairman of the Executive Committee until January 31, 2011, when he retired from the company. Prior to serving as President and CEO of Walmart, he held other positions with Walmart since joining our company in September 1979, including Vice Chairman and Chief Operating Officer from January 1999 to January 2000, and Executive Vice President and President and CEO, Walmart US from January 1998 to January 1999. Mr. Scott has been a member of the board of directors of The Goldman Sachs Group, Inc. since May 2010. Mr. Scott serves on the advisory board of the Tsinghua University School of Economics and Management in Beijing, China.

18.     Defendant Arne M. Sorenson has been a director since 2008. As described in the Company's Proxy Statement issued April 18, 2011, Mr. Sorenson "is the President and Chief Operating Officer of Marriott International, Inc. ("Marriott"), a position he has held since May 2009, and has served as a member of the Marriott board of directors since February 2011. Prior to assuming his current role with Marriott, Mr. Sorenson served as Marriott's Executive Vice President and CFO from 1998 to 2009. He also previously held the additional title of Marriott's President, Continental European Lodging, in which capacity he was responsible for lodging operations and development in the continental European region. Mr. Sorenson joined Marriott in 1996 as Senior Vice President of Business Development. He also co-chairs Marriott's Green Council, whose mission is to integrate environmental sustainability into Marriott's business

9

strategy. Prior to joining Marriott, he was a partner in the law firm of Latham & Watkins in Washington, D.C. Mr. Sorenson also serves as a member of the Board of Regents of Luther College."

19.     Defendant Jim C. Walton has been a director of Wal-Mart since 2005. He is the brother of defendant S. Robson Walton. As described in the Company's Proxy Statement issued April 18, 2011, Mr. Walton "is the Chairman and CEO of Arvest Bank Group, Inc., a group of banks operating in the states of Arkansas, Kansas, Missouri, and Oklahoma. Mr. Walton also serves as Chairman of Community Publishers, Inc., which operates newspapers in Arkansas, Missouri, and Oklahoma."

20.     Defendant S. Robson Walton has been a director of Wal-Mart since 1978, and is currently chairman of the board. S. Robson Walton is the brother of defendant Jim C. Walton and the father-in-law of defendant Gregory B. Penner. As described in the Company's Proxy Statement issued April 18, 2011, Mr. Walton "joined the company in 1969 and, prior to becoming Chairman in 1992, held a variety of positions with our company, including Senior Vice President, Corporate Secretary, General Counsel and Vice Chairman. Before joining Walmart, Mr. Walton was in private law practice as a partner with the law firm of Conner & Winters in Tulsa, Oklahoma. In addition to his duties at Walmart, Mr. Walton is involved with a number of non-profit and educational organizations, including Conservation International, where he serves as Chairman of that organization's executive committee, and the College of Wooster, where he is an Emeritus Life Trustee for the college."

21.     Defendant Christopher J. Williams has been a director of Wal-Mart since 2004. As described in the Company's Proxy Statement issued April 18, 2011, Mr. Williams "is the Chairman and CEO of The Williams Capital Group, L.P., an investment bank. Since 2003, he

10

has also served as the Chairman and CEO of Williams Capital Management, LLC, an investment management firm. Mr. Williams also serves as a trustee of the Williams Capital Management Trust, a registered investment company. He has served as a director of Caesars Entertainment Corporation (formerly Harrah's Entertainment, Inc.) from November 2003 to January 2008, and from April 2008 to the present. He is also a board member of several educational institutions and non-profit organizations, including the Lincoln Center for the Performing Arts and the Tuck School of Business at Dartmouth College."

22.     Defendant Linda S. Wolf has been a director of Wal-Mart since 2005. As described in the Company's Proxy Statement issued April 18, 2011, Ms. Wolf "is the former Chairman and CEO of Leo Burnett Worldwide, Inc. ("Leo Burnett"), a global advertising agency and division of Publicis Groupe S.A. Ms. Wolf served in various positions with Leo Burnett and its predecessors from 1978 to April 2005, including as Chairman and CEO from January 2001 until April 2005. She serves as a trustee for investment funds advised by the Janus Capital Group Inc. and has served on the board of InnerWorkings, Inc., a provider of managed print and promotional procurement solutions, since November 2006. Among other endeavors, Ms. Wolf serves on the boards of the Field Museum, Children's Memorial Hospital, and The Chicago Council on Global Affairs."

23.     The Defendants named above in paragraphs 9 through 22 may collectively be referred to as "Individual Defendants," and the defendants named above in paragraphs 9 through 22 may be referred to as "Director Defendants."

## IV. DUTIES OF INDVIDUAL DEFENDANTS

24.     By reason of their positions as officers, directors and/or fiduciaries of Wal-Mart and because of their ability to control the business and corporate affairs of Wal-Mart, the

11

Defendants owe and owed Wal-Mart and its shareholders fiduciary duty of loyalty and were and are required to use their utmost ability to control and manage Wal-Mart in a fair, just, honest and equitable manner, and were and are required to act in furtherance of the best interests of Wal-Mart and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

25.    To discharge their duties, the officers and directors of Wal-Mart were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial and business affairs of Wal-Mart.

## V. SUBSTANATIVE ALLEGATIONS

### Summary of Bribery Scheme.

26.    As detailed by reporters for the New York Times, in September 2005, Maritza I. Munich, then general counsel of Wal-Mart International received an e-mail from Sergio Cicero Zapata at the company's largest foreign subsidiary, Wal-Mart de Mexico. The email, and subsequent conversations, detailed how Wal-Mart had orchestrated a widespread campaign of bribery in Mexico. This bribery scheme involved payments throughout the country and was devised primarily to insure the expeditious granting of building permits.

27.    Mr. Cicero, the lawyer in charge of obtaining construction permits for Wal-Mart de Mexico, provided Ms. Munich with volumes of evidence regarding the bribes, including dates and amounts. Initially, the Times reports that,

> Wal-Mart dispatched investigators to Mexico City, and within days they unearthed evidence of widespread bribery. They found a paper trail of hundreds of suspect payments totaling more than $24 million. They also found documents showing that Wal-Mart de Mexico's top executives not only knew about the payments, but had taken steps to conceal them from Wal-Mart's headquarters in

12

> Bentonville, Ark. In a confidential report to his superiors, Wal-Mart's lead investigator, a former F.B.I. special agent, summed up their initial findings this way: 'There is reasonable suspicion to believe that Mexican and USA laws have been violated.'

28.    Based upon such preliminary findings, the lead investigator recommended that Wal-Mart expand the investigation. Instead however, Wal-Mart's leaders referred the matter to those responsible for the misduct to conduct the inquiry. Not surprisingly, the general counsel promptly exonerated his fellow Wal-Mart de Mexico executives.

29.    Based upon in extensive investigation, the Time reports that,

> Neither American nor Mexican law enforcement officials were notified. None of Wal-Mart de Mexico's leaders were disciplined. Indeed, its chief executive, Eduardo Castro-Wright, identified by the former executive as the driving force behind years of bribery, was promoted to vice chairman of Wal-Mart in 2008. Until this article, the allegations and Wal-Mart's investigation had never been publicly disclosed.

30.    The inadequacy of the investigation is confirmed by the comments of Wal-Mart's director of Corporate Investigations — a former top F.B.I. official — who labeled it "truly lacking," in an e-mail to his boss. Remarkably Wal-Mart's leaders accepted the report as final, and the matter was swept under the carpet.

31.    It was only December, after learning of The Times's investigation, that Wal-Mart informed the Justice Department that it had begun an internal investigation into possible violations of the Foreign Corrupt Practices Act, "We do not believe that these matters will have a material adverse effect on our business," the company said in a filing with the Securities and Exchange Commission.

13

**The Allegations Emerge**

32.     As the Times details in its investigative report, "On Sept. 21, 2005, Mr. Cicero sent an e-mail to Ms. Munich telling her he had information about (irregularities) authorized )by the highest levels) at Wal-Mart de Mexico. 'I hope to meet you soon,' he wrote."

33.     Faced with such information, Ms. Munich engaged Juan Francisco Torres-Landa, a prominent lawyer in Mexico City, to debrief Mr. Cicero. The Times reports that "during hours of questioning, Mr. Torres-Landa's notes show, Mr. Cicero described how Wal-Mart de Mexico had perfected the art of bribery, then hidden it all with fraudulent accounting. Mr. Cicero implicated many of Wal-Mart de Mexico's leaders, including its board chairman, its general counsel, its chief auditor and its top real estate executive."

34.     While Mr. Cicero identified a number of actors in the bribery scheme, he noted that Eduardo Castro-Wright was the driving force. As evidence, Mr. Cicero stated that while bribes were occasionally paid before Mr. Castro-Wright's arrival, their use soared after Mr. Castro-Wright ascended to the top job in 2002.

35.     In an interview with The Times, Mr. Cicero said "Mr. Castro-Wright had encouraged the payments for a specific strategic purpose. The idea, he said, was to build hundreds of new stores so fast that competitors would not have time to react. Bribes, he explained, accelerated growth. They got zoning maps changed. They made environmental objections vanish. Permits that typically took months to process magically materialized in days. What we were buying was time, he said."

36.     Mr. Cicero explained the mechanics of the bribery scheme which utilized trusted

fixers, known as "gestores." The Times reports that,

> Gestores are a fixture in Mexico's byzantine bureaucracies, and
> some are entirely legitimate. Ordinary citizens routinely pay
> gestores to stand in line for them at the driver's license office.
> Companies hire them as quasi-lobbyists to get things done as
> painlessly as possible. But often gestores play starring roles in
> Mexico's endless loop of public corruption scandals. They operate
> in the shadows, dangling payoffs to officials of every rank. It was
> this type of gestor that Wal-Mart de Mexico deployed, Mr. Cicero
> said.

37. Remarkably, the gestores submitted actual invoices for their services, which
included coded references of the specific "irregular act" performed. These codes, for example,
indicated a bribe to speed up a permit, obtain confidential information or eliminate fines.

38. Most damning, the investigation revealed that "each month, Mr. Castro-Wright
and other top Wal-Mart de Mexico executives "received a detailed schedule of all of the
payments performed," he said, according to the lawyer's notes. Wal-Mart de Mexico then
"purified" the bribes in accounting records as simple legal fees."

**The Bribery Scheme Was A Symptom of a Culture of Misconduct.**

39. In light of the historical business practices of Wal-Mart de Mexico, Mr. Cicero's
allegations of misconduct at Wal-Mart's most important foreign subsidiary were impossible to
ignore. For example, a confidential investigation, conducted for Wal-Mart in 2003 by Kroll Inc.,
a leading investigation firm, uncovered that Wal-Mart de Mexico had increased its sales by
helping favored high-volume customers evade sales taxes.

40. The Times reports that a draft of Kroll's report, "concluded that top Wal-Mart de
Mexico executives had failed to enforce their own anticorruption policies, ignored internal audits

15

that raised red flags and even disregarded local press accounts asserting that Wal-Mart de Mexico was "carrying out a tax fraud." (The company ultimately paid $34.3 million in back taxes.)"[1]

**The Initial Response**

41.     Ms. Munich forwarded memos describing the bribery scheme to Wal-Mart's senior management, including Thomas A. Mars, Wal-Mart's general counsel, Thomas D. Hyde, Wal-Mart's executive vice president and corporate secretary; Michael Fung, Wal-Mart's top internal auditor; Craig Herkert, the chief executive for Wal-Mart's operations in Latin America; and Lee Stucky, a confidant of Lee Scott's and chief administrative officer of Wal-Mart International.

42.     Wal-Mart initially retained Willkie Farr & Gallagher, a law firm with extensive experience in Foreign Corrupt Practices Act cases, who recommended tracing all payments to anyone who had helped Wal-Mart de Mexico obtain permits for the previous five years. However, Wal-Mart's leaders instead opted for a limited, preliminary inquiry by in-house personnel. This limited examination would take only a few weeks, not the multi-month inquiry suggested by Willkie Farr.   Such plan of action vested complete and direct control over the investigation.

---

[1] Wal-Mart then asked Kroll to evaluate Wal-Mart de Mexico's internal audit and antifraud units. Kroll wrote another report that branded the units "ineffective." Many employees accused of wrongdoing were not even questioned; some "received a promotion shortly after the suspicions of fraudulent activities had surfaced."

**Wal-Mart's Investigation Was Inadequately Staffed and Adversely Influenced by Senior Management and Current Board of Directors Members.**

43.     The group charged with conducting the internal investigation, the Corporate Investigations unit, was ill-equipped to handle a major corruption investigation. The Times reports "it had fewer than 70 employees, and most were assigned to chasing shoplifting rings and corrupt vendors. Just four people were specifically dedicated to investigating corporate fraud, a number Joseph R. Lewis, Wal-Mart's director of corporate investigations, described in a confidential memo as "wholly inadequate for an organization the size of Wal-Mart.'"

44.     Moreover, notwithstanding the existence of the Corporate Investigations unit, Wal-Mart repeatedly stripped it of authority and referred cases to others for investigation. For example,

> In October, Wal-Mart's vice chairman, John B. Menzer, intervened in an internal investigation into a senior vice president who reported to him. According to internal records, Mr. Menzer told Mr. Senser he did not want Corporate Investigations to handle the case "due to concerns about the impact such an investigation would have." One of the senior vice president's subordinates, he said, "would be better suited to conduct this inquiry." Soon after, records show, the subordinate cleared his boss.
>
> The other case involved the president of Wal-Mart Puerto Rico. A whistle-blower had accused the president and other executives of mistreating employees. Although Corporate Investigations was supposed to investigate all allegations against senior executives, the president had instead assigned an underling to look into the complaints — but to steer clear of those against him.

45.     This failure to conduct an adequate and proper investigation violates venerable duties owed to shareholders.

**The Inquiry Begins**

46.     On Nov. 12, 2005, the Corporate Investigations unit, led by a former FBI agent,

began work at Wal-Mart de Mexico's corporate headquarters. In particular, the team obtained a

database of Wal-Mart de Mexico payments and began searching the payment description field

for the word "gestoria." Shockingly, they found 441 gestor payments - -each a potential bribe.

47.     During the early states of the investigation, Mr. Cicero had identified his main

gestores as Pablo Alegria Con Alonso and Jose Manuel Aguirre Juarez. The database reviewed

by the Corporate Investigations unit found that nearly half the payments were to Mr. Alegria and

Mr. Aguirre, which together totaled $8.5 million in payments. The Times reports that,

> Mr. Halter's team confirmed detail after detail from Mr. Cicero's
> debriefings. Mr. Cicero had given specifics — names, dates, bribe
> amounts — for several new stores. In almost every case,
> investigators found documents confirming major elements of his
> account. And just as Mr. Cicero had described, investigators found
> mysterious codes at the bottom of invoices from the gestores.
>
> The documentation didn't look anything like what you would find
> in legitimate billing records from a legitimate law firm, a person
> involved in the investigation said in an interview.
>
> Mr. Lewis sent a terse progress report to his boss, Mr. Senser:
> "FYI. It is not looking good."
>
> Hours later, Mr. Halter's team found clear confirmation that Mr.
> Castro-Wright and other top executives at Wal-Mart de Mexico
> were well aware of the gestor payments.
>
> In March 2004, the team discovered, the executives had been sent
> an internal Wal-Mart de Mexico audit that raised red flags about
> the gestor payments. The audit documented how Wal-Mart de
> Mexico's two primary gestores had been paid millions to make
> "facilitating payments" for new store permits all over Mexico.

18

48.     Critically, the Times investigation revealed that "the audit recommended notifying corporate headquarters of the payments. However, this recommendation was removed by Wal-Mart de Mexico's chief auditor, whom Mr. Cicero had identified as one of the executives who knew about the bribes. Moreover, the auditor described other examples of Wal-Mart de Mexico's leaders withholding from Bentonville information about suspect payments to government officials. The auditor singled out José Luis Rodríguezmacedo Rivera, the general counsel of Wal-Mart de Mexico."

49.     Mr. Cicero told the Times that Mr. Rodríguezmacedo, took "significant information out" of an audit of Wal-Mart de Mexico's compliance with the Foreign Corrupt Practices Act. The original audit had described how Wal-Mart de Mexico gave gift cards to government officials in towns where it was building stores. "These were only given out until the construction was complete," Mr. Ainley wrote. "At which time the payments ceased.""

50.     Remarkably, the Corporate Investigation unit learned that Mr. Castro-Wright, upon review of the audit, did not object o the bribery scheme but expressed concern that too few gastores had been retained to spread Wal-Mart dollars among government employees.

51.     The Times reports that the Corporate Investigation unit

> made one last discovery — a finding that suggested the corruption might be far more extensive than even Mr. Cicero had described.
>
> In going through Wal-Mart de Mexico's database of payments, investigators noticed the company was making hefty "contributions" and "donations" directly to governments all over Mexico — nearly $16 million in all since 2003.
>
> "Some of the payments descriptions indicate that the donation is being made for the issuance of a license," Mr. Ainley wrote in one report back to Bentonville.

> They also found a document in which a Wal-Mart de Mexico real
> estate executive had openly acknowledged that "these payments
> were performed to facilitate obtaining the licenses or permits" for
> new stores. Sometimes, Mr. Cicero told The Times, donations
> were used hand-in-hand with gestor payments to get permits.

## Deflecting Blame

52.     The Corporate Investigation unit hoped Mr. Rodríguezmacedo would explain how

two lawyers came to be paid $8.5 million to "facilitate" permits.   The Times reports that Mr.

Rodríguezmacedo "responded with evasive hostility, records and interviews show. When

investigators asked him for the gestores' billing records, he said he did not have time to track

them down. They got similar receptions from other executives." In response to the questioning,

the general counsel charged that Mr. Cicero was the wrongdoer, speculation the he had pocketed

the gestor payments.

53.     Regrettably, the response by Wal-Mart executives was hostility to the pending

investigation. The Times notes that,

> The persistent questions and document requests from Mr. Halter's
> team provoked a backlash from Wal-Mart de Mexico's executives.
> After a week of work, records and interviews show, Mr. Halter and
> other members of the team were summoned by Eduardo F.
> Solórzano Morales, then chief executive of Wal-Mart de Mexico.
>
> Mr. Solórzano angrily chastised the investigators for being too
> secretive and accusatory. He took offense that his executives were
> being told at the start of interviews that they had the right not to
> answer questions — as if they were being read their rights.
>
> "It was like, 'You shut up. I'm going to talk,' " a person said of
> Mr. Solórzano. "It was, 'This is my home, my backyard. You are
> out of here.' "
>
> Mr. Lewis viewed the complaints as an effort to sidetrack his
> investigators. "I find this ludicrous and a copout for the larger

concerns about what has been going on," he wrote.

Nevertheless, Mr. Herkert, the chief executive for Latin America, was notified about the complaints. Three days later, he and his boss, Mr. Duke, flew to Mexico City. The trip had been long-planned — Mr. Duke toured several stores — but they also reassured Wal-Mart de Mexico's unhappy executives.

They arrived just as the investigators wrapped up their work and left.

## A Push to Dig Deeper

54. Back in Bentonville, Mr. Halter and Mr. Ainley wrote confidential reports to Wal-Mart's top executives in December 2005 laying out all the evidence that corroborated Mr. Cicero — the hundreds of gestor payments, the mystery codes, the rewritten audits, the evasive responses from Wal-Mart de Mexico executives, the donations for permits, the evidence gestores were still being used.

"There is reasonable suspicion," Mr. Halter concluded, "to believe that Mexican and USA laws have been violated." There was simply "no defendable explanation" for the millions of dollars in gestor payments, he wrote.

55. Mr. Halter proposed a thorough investigation of the two main gestores. He had not tried to interview them in Mexico for fear of his safety. ("I do not want to expose myself on what I consider to be an unrealistic attempt to get Mexican lawyers to admit to criminal activity," he had explained to his bosses.) Now Mr. Halter wanted Wal-Mart to hire private investigators to interview and monitor both gestores.

56. He also envisioned a round of adversarial interviews with Wal-Mart de Mexico's senior executives. He and his investigators argued that it was time to take the politically sensitive

step of questioning Mr. Castro-Wright about his role in the gestor payments.

57.     By January 2006, the Times reports that "the case had reached a critical juncture.

Wal-Mart's leaders were again weighing whether to approve a full investigation that would

inevitably focus on a star executive already being publicly discussed as a potential successor to

Mr. Scott."

58.     The Times reports the internal conflicts as follows,

> As if to underscore the problem, Wal-Mart's leaders were
> confronted with new corruption allegations at Wal-Mart de Mexico
> even as they pondered Mr. Halter's action plan. In January, Mr.
> Scott, Mr. Duke and Wal-Mart's chairman, S. Robson Walton,
> received an anonymous e-mail saying Wal-Mart de Mexico's top
> real estate executives were receiving kickbacks from construction
> companies. "Please you must do something," the e-mail implored.
>
> Yet at the same time, records and interviews show, there were
> misgivings about the budding reach and power of Corporate
> Investigations.
>
> In less than a year, Mr. Lewis's beefed-up team had doubled its
> caseload, to roughly 400 cases a year. Some executives grumbled
> that Mr. Lewis acted as if he still worked for the F.B.I., where he
> had once supervised major investigations. They accused him and
> his investigators of being overbearing, disruptive and naïve about
> the moral ambiguities of doing business abroad. They argued that
> Corporate Investigations should focus more on quietly
> "neutralizing" problems than on turning corrupt employees over to
> law enforcement.
>
> Wal-Mart's leaders had just witnessed the downside of that
> approach: in early 2005, the company went to the F.B.I. with
> evidence that the disgraced former vice chairman, Mr. Coughlin,
> had embezzled hundreds of thousands of dollars. The decision
> produced months of embarrassing publicity, especially when Mr.
> Coughlin claimed he had used the money to pay off union spies for
> Wal-Mart.
>
> Meanwhile, Wal-Mart de Mexico executives were continuing to

complain to Bentonville about the investigation. The protests "just
never let up," a person involved in the case said.

Another person familiar with the thinking of those overseeing the
investigation said Wal-Mart would have reacted "like a chicken on
a June bug" had the allegations concerned the United States. But
some executives saw Mexico as a country where bribery was
embedded in the business culture. It simply did not merit the same
response.

"It's a Mexican issue; it's better to let it be a Mexican response,"
the person said, describing the thinking of Wal-Mart executives.

In the midst of this debate, Ms. Munich submitted her resignation,
effective Feb. 1, 2006. In one of her final acts, she drafted a memo
that argued for expanding the Mexico investigation and giving
equal respect to Mexican and United States laws.

"The bribery of government officials," she noted dryly, "is a
criminal offense in Mexico."

She also warned against allowing implicated executives to interfere
with the investigation. Wal-Mart de Mexico's executives had
already tried to insert themselves in the case. Just before
Christmas, records show, Mr. Solórzano, the Wal-Mart de Mexico
chief executive, held a video conference with Mr. Mars, Mr.
Senser and Mr. Stucky to discuss his team's "hypothesis" that Mr.
Cicero had stolen gestor payments.

"Given the serious nature of the allegations, and the need to
preserve the integrity of the investigation," Ms. Munich wrote, "it
would seem more prudent to develop a follow-up plan of action,
independent of Walmex management participation."

## The Chief Weighs In

59.    Mr. Scott called a meeting for Feb. 3, 2006, to discuss revamping Wal-Mart's

internal investigations and to resolve the question of what to do about Mr. Cicero's allegations.

60.    The newspaper investigation reveals that,

Along with Mr. Scott, the meeting included Mr. Hyde, Mr. Mars
and Mr. Stucky, records show. The meeting brought the grievances

23

> against Corporate Investigations into the open. Mr. Senser described the complaints in Mr. Lewis's performance evaluation, completed shortly after the meeting. Wal-Mart's leaders viewed Mr. Lewis's investigators as "overly aggressive," he wrote. They did not care for Mr. Lewis's "law enforcement approach," and the fact that Mr. Scott convened a meeting to express these concerns only underscored "the importance placed on these topics by senior executives."
>
> By meeting's end, Mr. Senser had been ordered to work with Mr. Mars and others to develop a "modified protocol" for internal investigations.
>
> Mr. Scott said he wanted it done fast, and within 24 hours Mr. Senser produced a new protocol, a highly bureaucratic process that gave senior Wal-Mart executives — including executives at the business units being investigated — more control over internal investigations. The policy included multiple "case reviews." It also required senior executives to conduct a "cost-benefit analysis" before signing off on a full-blown investigation.
>
> Under the new protocol, Mr. Lewis and his team would only investigate "significant" allegations, like those involving potential crimes or top executives. Lesser allegations would be left to the affected business unit to investigate.

61. Despite overwhelming evidence of criminal conduct, "Four days after Mr. Scott's

meeting, with the new protocol drafted, Wal-Mart's leaders began to transfer control of the

bribery investigation to one of its earliest targets, Mr. Rodríguezmacedo. Mr. Mars first sent Mr.

Halter's report to Mr. Rodríguezmacedo. Then he arranged to ship Mr. Halter's investigative

files to him as well. In an e-mail, he sought Mr. Senser's advice on how to send the files in "a

secure manner.""

**Case Closed**

62. Unremarkably, Mr. Rodríguezmacedo, the man now in charge, wrapped up the

case in a few weeks, with little additional investigation.

24

"There is no evidence or clear indication," his report concluded, "of bribes paid to Mexican government authorities with the purpose of wrongfully securing any licenses or permits."

That conclusion, his report explained, was largely based on the denials of his fellow executives. Not one "mentioned having ordered or given bribes to government authorities," he wrote.

63.     Further, while his report conceded that Wal-Mart de Mexico executives had authorized years of payments to gestores, it never explained what these executives expected the gestores to do with the millions of dollars they received to "facilitate" permits.

### The Individual Defendants have caused damages to Wal-Mart

64.     As a result of the Individual Defendants breaches of loyalty and misconduct, Wal-Mart has been and continues to be subject to civil liability, regulatory fines and penalties, investigation costs, legal fees and possibly criminal liability.

65.     However, the biggest threat to Wal-Mart may not be the large sums of money it will have to pay in penalties and legal settlements, the biggest threat may be the potential impact of the whole affair on its reputation, client relationships and employee morale. The actions of the Individual Defendants have caused and will continue to cause significant harm to Wal-Mart's reputation. Therefore, the true damage to Wal-Mart resulting from the Individual Defendant's breaches of fiduciary duties and misconduct will easily measure in the billions of dollars and have long term, negative effects on the Company.

### DERIVATIVE ACTION ALLEGATIONS

66.     Plaintiff brings this action derivatively on behalf of and for the benefit of Wal-Mart to redress injuries suffered, and yet to be suffered, by it as a direct and proximate result of

the breaches of fiduciary duty alleged herein. The Company is named as a nominal defendant solely in a derivative capacity.

67.     Plaintiff purchased shares of Wal-Mart common stock during the relevant period and they have held such shares continuously since they purchased them. Thus, Plaintiff was a Wal-Mart shareholder at the time of the wrongdoing complained of herein. Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in this litigation, and intends to retain their shares of Wal-Mart throughout the duration of this litigation.

68.     The wrongful acts complained of herein subject, and will persist in subjecting Wal-Mart to continuing harm because the adverse consequences of the injurious actions are still in effect and ongoing.

69.     The wrongful actions complained of herein were unlawfully concealed from the Company's shareholders.

## DEMAND EXCUSED ALLEGATIONS

70.     Further, Plaintiff did not make a demand on the shareholders of Wal-Mart to institute this action because such a demand would have been a futile and useless act for at least the following reasons:

a.      Wal-Mart is a publicly-held company with millions of shares that are issued and outstanding;

b.      making a demand on such a number of shareholders would be impracticable and impossible for Plaintiff, who has no way of determining the names, addresses or phone numbers of such shareholders;

c.      making a demand on all shareholders would force Plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

71.    A majority of the Board is interested and lacks independence and all current Board members have demonstrated their unwillingness and inability to address the claims alleged herein seeking pecuniary and other relief to compensate the Company for the wrongdoing alleged herein. Thus, Plaintiff did not make a demand on the current Board before instituting this action because the factual allegations herein create a reasonable doubt that a majority of the Director Defendants could have properly exercised independent and disinterested business judgment in responding to such a demand.

## COUNT I
## DERATIVELY ON BEHALF OF WAL-MART

### (Against the Individual Defendants For Breach of Fiduciary Duty of Loyalty)

72.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

73.    At all relevant times the Individual Defendants owed the utmost fiduciary duty of loyalty to the Company and its shareholders.

74.    The Individual Defendants' duty of loyalty required that they act in good faith to protect the best interests of the Company and its shareholders.

75.    Accordingly, the Individual Defendants breached their duties of loyalty by acting unfaithfully to the Company and its shareholders in numerous ways as described above.

76.    The Individual Defendants are not entitled to any protections that may otherwise have been afforded by the business judgment rule.

## COUNT II

## CONTRIBUTION AND INDEMINFICATION

### (Against the Individual Defendants)

77.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

78.     Wal-Mart is alleged to be liable to various persons, entities and/or classes by virtue of the same facts and circumstances as are alleged herein which gives rise to the individual Defendants' liability to Wal-Mart.

79.     Wal-Mart's alleged liability on account of the wrongful acts and practices related to the misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of the Individual Defendants in connection with all such claims that have been, are, or may be in the future asserted against Wal-Mart by virtue of the Individual Defendants' misconduct and breaches of fiduciary duty.      Plaintiff on behalf of Wal-Mart have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, on behalf of Wal-Mart, Plaintiff prays for judgment as follows:

A.     A judgment finding that a shareholder demand on the Wal-Mart Board would have been a futile and useless act;

B.     A judgment finding that the Individual Defendants have breached their fiduciary duties to the Company;

C.     A judgment against all of the Individual Defendants in favor of Wal-Mart for the amount of damages sustained by Wal-Mart as a result of the breaches of fiduciary duties by each Individual Defendant as alleged herein, jointly and severally, in an amount to be determined at trial, together with pre- and post-judgment interest at the maximum legal rate allowable by law;

28

D.      A judgment requiring the Individual Defendants to return to Wal-Mart all compensation and remuneration of whatever kind paid to them by Wal-Mart during the time that they were in breach of the fiduciary duties they owed to Wal-Mart;

E.      Directing the Individual Defendants to establish, maintain, and fully fund effective compliance programs to ensure that Wal-Mart'sdirectors, officers and employees do not engage in wrongful and illegal practices;

F.      Granting appropriate equitable and/or injunctive relief to remedy the Individual Defendant's misconduct, as permitted by law;

G.      Awarding to Plaintiff the costs and disbursements of this consolidated action, including reasonable attorneys' and experts' fees and expenses;

H.      Granting any such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all applicable issues.

Dated: April 25, 2012

Respectfully submitted,

/s/ JAMES C. WYLY

WYLY~ROMMEL, PLLC
James C. Wyly
Arkansas Bar No. 90158
jwyly@wylyrommel.com
Sean F. Rommel
Arkansas Bar No. 94158
srommel@wylyrommel.com
4004 Texas Boulevard
Texarkana, Texas 75503
(903) 334-8646 (Telephone)
(903) 334-8645 (Facsimile)


EMERSON POYNTER LLP
John G. Emerson

29

jemerson@emersonpoynter.com
830 Apollo Lane
Houston, TX 77058-2610
Tel: (281) 488-8854
Fax: (281) 488-8867

Scott E. Poynter
scott@emersonpoynter.com
500 President Clinton Ave., St. 305
Little Rock, AR 72201
Tel: (501) 907-2555
Fax: (501) 907-2556

CARNEY  WILLIAMS BATES PULLIAM
& BOWMAN, PLLC
Allen Carney
Randall K. Pulliam
11311 Arcade Dr., Suite 200
Little Rock, AR 72211
Phone: (501) 312-8500
Fax: (501) 312-8505

## VERIFICATION

I, John Cottrell, am a Plaintiff in this shareholder derivative action and I was a
Wal-Mart Stores, Inc. shareholder during  relevant times that events alleged to have taken
place in this Complaint occurred.  Also, I continue to hold my shares.  I believe the
factual allegations in the Complaint to be true based upon my own personal knowledge
and my counsel=s investigation.  Having received a copy of this Complaint, having
reviewed it with my Counsel, I hereby authorize its filing.

JOHN COTTRELL