**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**TEXARKANA DIVISION**

| | |
|---|---|
| IN RE WAL-MART STORES, INC. SHAREHOLDER DERIVATIVE LITIGATION )<br><br>This Document Relates To:<br>   ALL ACTIONS | Master Docket No. 4:12-cv-4041 SOH |

## CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## TABLE OF CONTENTS

**Page**

PROLOGUE ................................................................................................................1

I.     INTRODUCTION .........................................................................................1

II.    JURISDICTION AND VENUE ...................................................................8

III.   PARTIES .......................................................................................................8

    A. Plaintiffs................................................................................................8

    B. Nominal Defendant...............................................................................9

    C. Director Defendants..............................................................................9

    D. Former Director Defendant.................................................................12

    E. Executive Defendants..........................................................................13

IV.   DEFENDANTS' FIDUCIARY DUTIES ...................................................14

V.    GOVERNANCE AND REPORTING SYSTEMS....................................16

    A. Corporate Guidelines and Statements of Ethics.................................16

    B. Committee Charters.............................................................................19

VI.   THE DEFENDANTS' WRONGFUL CONDUCT .....................................22

    **A.** Wal-Mart's History.............................................................................22

    **B.** It Was Common Knowledge That Walmex Was Vulnerable to Corruption ...................22

    **C.** The Red Flags and Lax Internal Controls at Walmex.........................24

    **D.** Walmex's Bribery Practices are Revealed..........................................24

    **E.** Wal-Mart's Senior Executives Take Secret Control of the Investigatory Process and Keep Everything Inside the Company ...................27

    **F.** The Preliminary Inquiry: "FYI.  It is Not Looking Good"................30

    **G.** Walmex Executives Blame the Whistleblower and Refuse to Cooperate with the Wal-Mart Investigation...................33

**H.** The Preliminary Report: "There is Reasonable Suspicion to Believe That Mexican and USA Laws Have Been Violated" ..............................................................35

**I.** Defendant Scott Assigns Responsibility for the Investigation to One of the Accused Wrongdoers ...........................................................................................38

**J.** The Final Report is Written By One of the Targets of the Investigation ...........41

**K.** *The New York Times* Tells Wal-Mart it is Investigating Mr. Cicero's Claims and the Cover Up Unravels ...................................................................................43

**L.** *The New York Times* Breaks the Story ............................................................45

**M.** Highly Publicized History of Wal-Mart's Ineffective Internal Guidelines and Fast and Loose Manipulation of Investigations of Wrongdoing by High Level Executives ..........................................................................................................46

**N.** Wal-Mart Board Turns a Deaf Ear to Investors' Complaints of Lack of Internal Controls Over Investigations and Unlawful Conduct By Executives ................48

**O.** The Mexico Success Story Has An Ominous Side ............................................51

   VII.   THE DIRECTOR DEFENDANTS CAMPAIGN FOR RETENTION WHILE WITHHOLDING MATERIAL INFORMATION FROM SHAREHOLDERS. .............53

VIII.   DAMAGES ALLEGATIONS .........................................................................57

IX.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS .....................................61

   A.   The Board's Actions Were Not Valid Exercises Of Business Judgment .........61

   B.   Demand is Futile Because the Complaint Alleges Facts Creating a Reasonable Doubt That a Majority of the Board is Independent and Disinterested For Purposes of Considering a Demand. ...................................................................62

   C.   Demand Is Futile Because a Majority of the Board Faces a Substantial Likelihood of Liability for Breaching Their Fiduciary Duty to Wal-Mart .........................64

   D.   Demand Is Futile Because a Majority of Wal-Mart's Board Faces a Substantial Likelihood of Liability for Violating Section 14(a) of the Exchange Act ........65

   E.   Additional Demand Futility Allegations .............................................................65

FIRST CLAIM FOR RELIEF ...............................................................................69

SECOND CLAIM FOR RELIEF ..........................................................................70

THIRD CLAIM FOR RELIEF ..............................................................................71

FOURTH CLAIM FOR RELIEF ................................................................................72

REQUEST FOR RELIEF ..........................................................................................72

JURY DEMAND .....................................................................................................73

## PROLOGUE

"Doing what is right is mandatory at all levels, and integrity is rooted in our decisions and our culture.  Sam Walton understood the link between integrity and reputation.  Our strength in doing what's right and good for business is a competitive advantage."

Letter from Michael T. Duke, President and Chief Executive Officer, Wal-Mart Stores, Inc. to Shareholders, Associates and Customers appearing on page 5 of Wal-Mart 2012 Annual Report.

Co-Lead Plaintiffs John Cottrell and Louisiana Municipal Police Employees' Retirement System (collectively, "Plaintiffs") on behalf of Wal-Mart Stores, Inc. ("Wal-Mart" or the "Company"), derivatively, allege upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based upon a review of publicly available information, including Securities and Exchange Commission ("SEC") filings by Wal-Mart, and media reports about Wal-Mart and Defendants, the following:

## I.      INTRODUCTION

1.      This is a shareholder derivative action brought by Plaintiffs against current and former directors and officers of Wal-Mart during the Relevant Period[1] and alleges that the individual defendants (defined *infra* at ¶42) breached their fiduciary duties of loyalty, good faith, candor and trust owed to the Company and all of its shareholders under Delaware law and violated Sections 14(a) and 29(b) of the Securities Exchange Act of 1934.  Plaintiffs also allege a claim for contribution and indemnification against the Individual Defendants.

2.      At all times during the Relevant Period, Wal-Mart and its board of directors (the "Board") sanctioned the corporate policy of rapid-fire domination of the Mexican market by any means necessary, including rampant bribery, and when faced with strong evidence of the bribery, decided to cover it up.  As alleged more fully below, the Board:

- Learned that high-level Company executives fostered the Company's dramatic growth in Mexico by unlawfully engaging in widespread bribery across Mexico;

- Replaced independent outside counsel with extensive experience in Foreign

---

[1]      The Relevant Period is defined as September 2005 to Present.

Corrupt Practices Act (FCPA) cases, who recommended an extensive investigation work plan, with Wal-Mart lawyers and in-house investigators whose independence was at best questionable with orders to conduct a far more limited preliminary inquiry;

- Ignored the in-house investigators' confirmation of whistleblower allegations and findings that there was a likelihood that Mexican and U.S. laws had been violated;

- Covered up these problems in violation of, among other things, Wal-Mart's own ethics policy;

- Ordered the investigation closed on May 10, 2006;

- Suppressed the truth about the FCPA violations, and the cover-up while annually seeking shareholder action, until *The New York Times* broke the news on April 21, 2012 in an article entitled "Wal-Mart Hushed Up a Vast Mexican Bribery Case"; and

- Rewarded, rather than prosecuting, certain executives who were directly involved in the bribes and cover-up.

3.      For more than six years, from September 2005 until December 2011, the Individual Defendants breached their fiduciary duties by covering up credible evidence of widespread bribery at Wal-Mart's largest subsidiary, Wal-Mart de Mexico ("Walmex"), carried out at the direction of the head of Walmex and a rising star within the Company, Eduardo Castro-Wright ("Castro-Wright").  This bribery scheme violated Mexican law and the FCPA and was not reported until December 2011, only after Individual Defendants learned that investigative reporting by *The New York Times* had uncovered their web of wrongdoing and it would soon be made public.  The *New York Times* exposé was printed on April 23, 2012.

4.      Beginning in September 2005, Wal-Mart's top management, including its CEO and Board of Directors, began to learn that the Company's success in Mexico had been fueled by, in the words of *The New York Times*,[2] an "orchestrated [] campaign of bribery to win market

---

[2]      *The New York Times'* investigation included the review of hundreds of relevant documents and 15 hours of interviews with one of the main witnesses, Sergio Cicero Zapata, a former Walmex executive who had participated in Walmex's bribery scheme and who brought the issue to the attention of Wal-Mart in September 2005.  Many of the findings of this investigation were reported in the article "Wal-Mart Hushed Up a Vast Mexican Bribery Case," *New York Times* (Apr. 21, 2012) (hereinafter "*New York Times* article").  Furthermore, attached

dominance" that had been implemented by Mr. Castro-Wright, the CEO of Walmex and an individual considered to be a potential future CEO of Wal-Mart itself. *However, rather than act on the accumulating evidence of wrongdoing, Defendants promoted Mr. Castro-Wright and obstructed Wal-Mart's investigation by putting it in the hands of Walmex's general counsel, Mr. José Luis Rodríguezmacedo Rivera ("Rodriguezmacedo,"), one of the individuals accused of orchestrating Walmex's bribery campaign.*

5.     The evidence of widespread bribery at Walmex began to emerge on September 21, 2005 when Sergio Cicero Zapata ("Cicero"), a former Walmex executive and Mexican lawyer who had retired in 2004 after nearly a decade in Walmex's real estate department, sent an email to Maritza Munich ("Munich") the general counsel of Wal-Mart International, telling her that he had information about "irregularities" authorized "by the highest levels" at Walmex. Ms. Munich responded quickly, hiring Juan Francisco Torres-Landa, a prominent Harvard-trained lawyer in Mexico City, to debrief Mr. Cicero. The two men met three times in October 2005, with Ms. Munich flying in from Wal-Mart headquarters in Bentonville, Arkansas for the third debriefing. During hours of questioning, Mr. Cicero detailed how Walmex CEO Castro-Wright, and General Counsel Rodriguezmacedo and other top Walmex officials had funneled millions of dollars to fixers, known as "gestores," to bribe local government officials to approve plans to build new Walmex stores, allowing Walmex to build hundreds of new stores in record time. According to people involved in Wal-Mart's investigation, Mr. Cicero's account of criminality at Walmex was impossible to dismiss because, as a Walmex executive working directly with the gestores, he had clearly been in a position to witness the events he described

6.     Ms. Munich sent memos describing Mr. Cicero's account to Wal-Mart's senior management, including Thomas Mars ("Mars"), Wal-Mart's general counsel. Wal-Mart, like many other large companies, typically hires reputable outside law firms to conduct an

---

as Exhibits A-I, and incorporated herein for all purposes, are copies of excerpted Wal-Mart documents related to the wrongdoing complained of herein. These documents were published by the *New York Times* on its website.

investigation of serious charges of wrongdoing, such as those made by Mr. Cicero.  For example, Wal-Mart had hired an outside firm in 2005 to investigate charges that a Wal-Mart vice president and director, Thomas Coughlin, had been embezzling from the Company.  At first, Wal-Mart took this approach, turning to Willkie Farr & Gallagher, a large firm with extensive experience in Foreign Corrupt Practices Act cases.  Willkie Farr formulated an "investigation work plan" that called for tracing all payments to anyone who had helped Walmex obtain permits in the past five years.  The law firm said it would scrutinize "any and all payments" to government officials and interview every person who might know about the payoffs, including "implicated members" of Walmex's Board of Directors.

7.    However, rather than allow Willkie Farr to conduct an arms-length investigation, Wal-Mart's leaders opted in favor of a far more limited "preliminary inquiry" that was to be conducted by Wal-Mart's understaffed Corporate Investigations unit, under the supervision of Wal-Mart's own executives.  Instead of the four-month investigation proposed by Willkie Farr, the Corporate Investigations unit's inquiry would take only two weeks.  The Company would consider conducting a full investigation only if the inquiry found a "likelihood" that laws had been violated.

8.    Ronald Halter ("Halter"), a recent hire to the Wal-Mart Corporate Investigation Unit, was assigned to lead Wal-Mart's inquiry, which commenced on November 12, 2005. Within days, Mr. Halter's investigation uncovered substantial evidence supporting Cicero's account of high-level bribery and pointing to Mr. Castro-Wright and Mr. Rodriguezmacedo as primary participants in the bribery scheme.  Among other things, Mr. Halter's investigation uncovered that:

- In 2004 and 2005 alone, Walmex had made 441 gestor payments, each one a potential bribe;

- Walmex had paid $8.5 million to two obscure lawyers whom Mr. Cicero had described as his main gestores, confirming Mr. Cicero's account;

- The specific names, dates and bribe amounts described by Mr. Cicero were

largely confirmed by Walmex's records and, as Mr. Cicero had stated, investigators found mysterious codes at the bottom of invoices from the gestores that did not "look anything like what you would find in legitimate billing records";

- Mr. Castro-Wright and other top Walmex executives knew about the gestor payments because, in March 2004, they had been sent an internal Walmex audit that raised red flags about the gestor payments and showed how Walmex's two primary gestores had been paid millions to make "facilitating payments" for new store permits all over Mexico.

- Mr. Castro-Wright definitely read and responded to the audit report with appalling instructions: he directed Mr. Cicero to find even more gestores to reduce Walmex dependence on the two named in the report;

- Mr. Rodriguezmacedo, Walmex's general counsel, had squelched the report by removing the recommendation that the gestor payments be reported to Wal-Mart's management in Bentonville and by firing the auditor responsible for the report; and

- The corruption at Walmex was potentially even more widespread than Mr. Cicero had indicated because Walmex records showed that in 2004 and 2005, Walmex made $16 million in other "contributions" or "donations" directly to government officials, with some payment descriptions indicating that the payment had been made in exchange for the "issuance of license."

9.      In addition to the convincing documentary evidence, the hostile response of Walmex's executives to Mr. Halter's investigation was highly suspicious.   For example, Walmex's General Counsel Rodriguezmacedo refused to provide Mr. Halter's investigators with the gestor billing records.   Other executives stonewalled in response to questioning by the investigators and largely confined themselves to self-serving attacks on Mr. Cicero's credibility (which frequently conflicted with the documentary evidence).   As Mr. Halter concluded in a December 2005 report, "There is reasonable suspicion to believe that Mexican and USA laws have been violated" and "no defendable explanation" for the millions of dollars in gestor payments.  *See* Ex. E.

10.     This powerful evidence of wrongdoing was presented directly to Wal-Mart's top management, including its CEO, H. Lee Scott Jr. ("Scott"), its general counsel, Mr. Mars and its Board of Directors.   Documentary evidence shows that because of the importance of the Walmex

operations, Mr. Castro-Wright's prominence and the gravity of the allegations of bribery and cover-up at the highest levels of Walmex, Mr. Cicero's allegation and Mr. Halter's investigative conclusions were quickly brought to the Board's attention. For example, a document entitled "Investigation and Audit Plan" in connection with the preliminary investigation conducted by Mr. Halter states: "On November 16, 2005, a progress report will be given to Bentonville management *and the Chairman of the Audit Committee*. Additional progress reports will be given as appropriate." *See* Ex. C; *see also* Ex. E (stating that Wal-Mart's Internal Audit charter required that Internal Audit reviews be reported to management). The Audit Committee Charter required the Audit Committee to discuss this evidence of serious wrongdoing with Wal-Mart's management. In turn, the Audit Committee was obligated to "make regular reports to the Board" about what it learned.

11.     CEO Scott and General Counsel Mars were also personally involved in directing Wal-Mart's response to Mr. Halter's findings, and numerous other top Wal-Mart officials were also apprised of the issue. For example, current CEO Michael T. Duke ("Duke"), as head of Wal-Mart International, was also fully aware of Mr. Halter's investigation and its findings and flew to Mexico City in November 2005 to meet with Walmex officials who were unhappy with Mr. Halter's work. Thus, by December 2005, when Mr. Halter made his report, the top echelon of Wal-Mart's management and the Board of Directors was plainly on notice that there was a "reasonable suspicion" that Walmex's top executives had orchestrated an illegal bribery campaign.

12.     Each of these top managers and directors had a fiduciary duty to root out corruption at Wal-Mart and ensure that the Company complied with the law. This fact is underscored by the Company's own Corporate Governance Guidelines, which require Wal-Mart's directors to "review compliance with applicable laws and regulations and adopt corporate conduct to assure compliance with applicable laws and regulations." Similarly, Wal-Mart's Conduct and Ethics Code states that "bribery" must not be tolerated.

13.     Yet, faced with compelling evidence of bribery, Wal-Mart's CEO, General

Counsel and Directors instituted a cover-up.  In February 2006, at CEO Scott's direction and with the Board's acquiescence, Wal-Mart effectively ended the investigation into Walmex and Mr. Castro-Wright by handing off Mr. Halter's investigation to Mr. Rodriguezmacedo, one of the investigation's main suspects, apparently in violation of Wal-Mart's policy concerning internal investigations, which stated that Corporate Investigations should handle investigations of "significant" allegations such as those involving potential crimes and senior executives.  Mr. Rodriguezmacedo compiled a six-page report exonerating himself and his fellow Walmex employees.  The report was largely based on the statements by Walmex officials denying wrongdoing and failed to address the documentary evidence compiled by Mr. Halter showing that Walmex had doled out payments in exchange for licenses.  On May 10, 2006, Mr. Rodriguezmacedo was told to put the report in final form, concluding the investigation.  In 2008, Mr. Castro-Wright was promoted to Vice-Chairman of Wal-Mart.  Defendants effectively concealed the crime and cover-up for more than five years, until December 2011.  Only after learning of the *New York Times*' investigation did Wal-Mart inform the U.S. Department of Justice ("DOJ") and SEC that it had begun an internal investigation into possible violations of the Foreign Corrupt Practices Act.

14.     As a result of the Board's actions, the Company has already suffered, and will continue to suffer, substantial financial damage.  Wal-Mart's goodwill and reputation have also been horribly damaged by the Board's actions in discovering and then "burying" the wrongdoing alleged herein.  Moreover, the Company is now threatened with several serious criminal and regulatory investigations, which will almost certainly result in criminal indictments and/or civil enforcement actions, either of which could impair the Company's ability to gain access to new domestic and international markets.  The Company has also become the target of shareholder and investor lawsuits, which it will be forced to defend.

15.     Since the Company remains under the control and/or influence of the primary wrongdoers who:  (1) have substantial conflicts; and/or (2) are implicated in the commission of the wrongful conduct alleged herein, and/or (3) have familial ties with the wrongdoers that

render them dependent, Wal-Mart is unable to protect itself or remedy the wrongs inflicted upon it. Accordingly, this derivative action must be brought and vigorously prosecuted to protect and vindicate the rights of the Company and for restitution to the Company for, among other things, the costs and expenses that have and will be paid by the Company as a result of the Defendants' wrongdoing.

## II.   JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2). Plaintiffs and Defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interests and costs. This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

17.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331, because the claims asserted arise under §§14(a) and 29(b) of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. §§78n(a) and 78cc(b). This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

18.    The Court has personal jurisdiction over each Defendant because each Defendant has committed acts related to the claims at issue in this Complaint within this District.

19.    Venue is proper in the Western District of Arkansas because Nominal Defendant Wal-Mart is headquartered in this District and a number of the Individual Defendants are citizens of the State of Arkansas. Additionally, venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, occurred in this district.

## III.   PARTIES

**A.    Plaintiffs**

20.  Plaintiff John Cottrell is a shareholder of Wal-Mart and has continuously held his shares at times relevant hereto. Mr. Cottrell is a citizen of Texas.

21.     Plaintiff Louisiana Municipal Police Employees' Retirement System (LAMPERS) is a shareholder of Wal-Mart and has continuously held its shares at times relevant hereto.  LAMPERS is a citizen of Louisiana.

**B.     Nominal Defendant**

22.     Nominal Defendant Wal-Mart is a Delaware corporation with its principal place of business at 702 S.W. 8th Street, Bentonville, Arkansas 72716.  In fiscal year 1992, the Company began its first international initiative when it entered into a joint venture in Mexico, in which it owned a 50% interest along with Cifra, S.A. de C.V. ("Cifra").  In 1998, the Company acquired a controlling interest in Cifra and in February 2000, Cifra officially changed its name to Wal-Mart de Mexico, S.A. de C.V. ("Walmex").  Walmex is a material component of the Company's International Segment, which most recently (as of fiscal year ended 2012) generated approximately 28% of the Company's net sales.  Walmex accounts for 20% of the Company's total stores in both the U.S. and International Segment and has over 200,000 employees, making it the largest employer in Mexico.

**C.     Director Defendants**

23.     Defendant H. Lee Scott has served as a director of Wal-Mart since 1999.  He was Wal-Mart's President and CEO from January 2000 through January 31, 2009.  He continued as an Executive Officer of Wal-Mart and as Chairman of the Executive Committee until his retirement on January 31, 2011.  Prior to serving as President and CEO of Wal-Mart, he held other positions with Wal-Mart since joining the Company in September 1979.  As described herein, Mr. Scott was CEO during the period when Wal-Mart's investigation uncovered credible evidence of pervasive bribery by Mr. Castro-Wright, Mr. Rodriguezmacedo and other senior Walmex officials.  Mr. Scott played a primary role in improperly transferring control of Wal-Mart's investigation to Mr. Rodriguezmacedo so that Mr. Rodriguezmacedo could shut down the investigation and conceal the evidence of wrongdoing.  Upon information and belief, Defendant Scott is a citizen of Arkansas.

24.     Defendant Michael T. Duke has served as a director of Wal-Mart since November

9

2008.  He is currently President and CEO of Wal-Mart.  Mr. Duke has served on the Board's Executive Committee since 2008.  He joined Wal-Mart in July 1995, and has served as the Vice Chairman with responsibility for Wal-Mart International beginning in September 2005 and as Executive Vice President and President and CEO of Wal-Mart U.S. beginning in April 2003.  Mr. Duke was aware of Mr. Halter's bribery investigation and traveled to Mexico in the fall of 2005 to assure Walmex officials who were unhappy with Mr. Halter's work.  Mr. Duke is not "independent" under the NYSE Listed Company Rules. Upon information and belief, Defendant Duke is a citizen of Arkansas.

25.     Defendant S. Robson Walton has served as a director of Wal-Mart since 1978, and as Chairman of the Board since 1992.  He has served on the Board's Executive Committee since 2005.  He joined Wal-Mart in 1969 and, prior to becoming Chairman in 1992, held a variety of positions with the Company, including Senior Vice President, Corporate Secretary, General Counsel and Vice Chairman.   In the course of his work as a Board member, and as described further herein, S. Robson Walton was made aware of the evidence showing that there was reason to believe that Walmex's top officials had engaged in illegal bribery.   He is the son of Wal-Mart's founder Sam Walton, the brother of Defendant Jim C. Walton, and the father-in-law of Defendant Gregory Penner. S. Robson Walton is not "independent" under the NYSE Listed Company Rules. Upon information and belief, Defendant S. Robson Walton is a citizen of Arkansas.

26.     Defendant Jim C. Walton has served as a director of Wal-Mart since September 28, 2005.  He has served on the Board's Strategic Planning and Finance Committee since 2005.  In the course of his work as a Board member, and as described further herein, Jim Walton was made aware of the evidence showing that there was reason to believe that Walmex's top officials had engaged in illegal bribery.   He is the son of Wal-Mart's founder Sam Walton and the brother of Defendant S. Robson Walton.  Jim C. Walton is not "independent" under the NYSE Listed Company Rules. Upon information and belief, Defendant Jim C. Walton is a citizen of Arkansas.

27.    Defendant James W. Breyer has served as a director of Wal-Mart since 2001.  He has served on the Board's Strategic Planning and Finance Committee since 2005.  Upon information and belief, Mr. Breyer is a citizen of California.  Similar to Jim Walton, Mr. Breyer was made aware of the credible evidence against Mr. Castro-Wright and other Walmex executives but acquiesced in the decision to bury the case and promote Mr. Castro-Wright.

28.    Defendant M. Michelle Burns has served as a director of Wal-Mart since 2003. She served on the Board's Audit Committee between 2003 and February 20, 2006, the Compensation, Nominating and Governance Committee during 2007, and on the Strategic Planning and Finance Committee since 2007. In the course of her work as a Board member, and as described further herein, Ms. Burns was made aware of the evidence showing that there was reason to believe that Walmex's top officials had engaged in illegal bribery.   Upon information and belief, Defendant M. Michelle Burns is a citizen of New York.

29.    Defendant Christopher J. Williams has served as a director of Wal-Mart since 2004.  He has served on the Board's Audit Committee since March 4, 2005 and has been its Chairman since 2008.  The Board determined that Mr. Williams is an "audit committee financial expert" as defined by the SEC. In the course of his work as a Board member, and as described further herein, Mr. Williams was made aware of the evidence showing that there was reason to believe that Walmex's top officials had engaged in illegal bribery. Upon information and belief, Defendant Christopher Williams is a citizen of New York.

30.    Defendant Douglas N. Daft has served as a director of Wal-Mart since January 2005.   He has also served on the Board's Compensation, Nominating and Governance Committee since then.  In the course of his work as a Board member, and as described further herein, Mr. Daft was made aware of the evidence showing that there was reason to believe that Walmex's top officials had engaged in illegal bribery. Upon information and belief, Defendant Douglas Daft is a citizen of Florida.

31.    Defendant Linda S. Wolf has served as a director of Wal-Mart since June 2005. She has also served on the Board's Compensation, Nominating and Governance Committee

since 2006. In the course of her work as a Board member, and as described further herein, Ms. Wolf was made aware of the evidence showing that there was reason to believe that Walmex's top officials had engaged in illegal bribery.  Upon information and belief, Defendant Linda Wolf is a citizen of Illinois.

32.     Defendant Gregory B. Penner has been a director of Wal-Mart since 2008. He served on the Board's Strategic Planning and Finance Committee during 2009.  From 2002 to 2005, he served as Wal-Mart's Senior Vice President and Chief Financial Officer-Japan.  He is a son-in-law of Defendant S. Robson Walton.   Mr.  Penner is not "independent" under the NYSE Listed Company Rules.  Upon information and belief, Defendant Gregory Penner is a citizen of California.

33.     Defendant Aida M. Alvarez has been a director of the Company since 2006 and a member of the Board's Audit Committee since 2007.

34.     Defendant James I. Cash has been a director of the Company and served on the Board's Audit Committee since 2006.  The Board determined that Mr. Cash is an "audit committee financial expert" as defined by the SEC.

35.     Defendant Roger C. Corbett has been a director of the Company since 2006.

36.     Defendant Steven S. Reinemund  has been a director of the Company since 2010. He has served on the Board's Compensation, Nominating and Governance Committee since then.

37.   Defendant Arne M. Sorenson has been a director of the Company and a member of the Board's Audit Committee since 2008.  The Board determined that Mr. Sorenson is an "audit committee financial expert" as defined by the SEC.

**D.     Former Director Defendant**

38.  Defendant Roland A. Hernandez ("Hernandez") served as a director of the Company from 1998 through 2008.  Mr. Hernandez was Chairperson of the Audit Committee in 2005 and 2006.   Beginning in November 2005, he began receiving reports from Mr. Halter on Mr. Halter's investigation into bribery at Walmex.  Mr. Hernandez received these reports so that

12

he could share them with the other members of the Audit Committee and report on the issue to the full Board.  Through these reports, Mr. Hernandez, the Audit Committee and Wal-Mart's Board was made aware of (1) the seriousness of the alleged wrongdoing, (2) the fact that Walmex's top executives, including rising Company star Castro-Wright, were implicated in the wrongdoing, and (3) the need to allow a fair investigation to be conducted, take decisive action to end the bribery, and root out the corrupt executives.

### E.    Executive Defendants

39.    Defendant Castro-Wright joined Wal-Mart in 2001 and led its business in Mexico until being promoted to President and CEO of the Company's U.S. operations in 2005.  As described herein, Mr. Castro-Wright was the chief architect of Walmex's bribery scheme.  Until recently, Mr. Castro-Wright was an extremely prominent Wal-Mart executive who was seen as potential future CEO.  Much of his renown was based on his supposed success in growing Walmex rapidly into a large, profitable business.  Mr. Castro-Wright was promoted again in 2008 and named a Vice-Chairman of the Company, which made him a "Named Executive Officer," or "NEO."  Wal-Mart's NEOs were its top five executive officers.  In connection with that promotion, the Compensation, Nominating and Governance Committee of Wal-Mart's Board approved a $2,000,000 special stock-award to Mr. Castro-Wright in November 2008.  As a NEO, he was entitled to receive "performance-based" incentive payments.  Wal-Mart established "total direct payment" targets for Mr. Castro-Wright of $7,212,500 for 2008, $8,560,000 for 2009, $11,400,000 for 2010 and $11,200,000 for 2011.  In January 2010, he received yet another extra $2,000,000 stock award, which was authorized by the Compensation, Nominating and Governance Committee.  All of these lavish payments were illegitimate waste in light of the evidence that Mr. Castro-Wright was a criminal who had deliberately violated Mexican bribery laws and the FCPA.  Mr. Castro-Wright is currently a defendant in a putative securities class action in the District Court for the Middle District of Tennessee alleging that he made misstatements and omissions concerning the existence of bribery at Walmex.  *See City of Pontiac General Employees Retirement System v. Walmart Stores Inc., et al.,* No. 12-457 (M.D.

Tenn.). Upon information and belief, Defendant Castro-Wright is a citizen of Arkansas.

40.    Defendant Thomas A. Mars was Wal-Mart's General Counsel from 2002 to 2009. Mars, along with Mr. Scott, supervised Wal-Mart's response to Mr. Cicero's allegation.   Mr. Mars was one of the people who received Ms. Munich's initial write-up of the October 2005 interviews with Mr. Cicero in Mexico City and, thereafter, Mr. Mars was involved in the major decisions concerning the investigation.   Accordingly, he was fully aware of the strong evidence of bribery at Walmex and the need to conduct an appropriate investigation to root out the corruption.   For example, he received an email from Ms. Munich in January 2006 urging that Wal-Mart's investigation be extended beyond the specific transactions that were uncovered to address "other potentially suspect transactions not yet identified."   Mr. Mars, a member of the bar of the State of Arkansas, had a duty to report these facts to the Audit Committee, as reflected by the Audit Committee Charter.   In early 2006, Mr. Mars was the individual responsible for organizing the transfer of Wal-Mart's investigation from Mr. Halter to Mr. Rodríguezmacedo. He currently serves as Executive Vice President and Chief Administrative Officer for Wal-Mart U.S.  Upon information and belief, Defendant Mars is a citizen of Arkansas.

41.    Defendant Thomas D. Hyde served as Executive Vice President of Legal Compliance Ethics and Corporate Secretary of Wal-Mart from June 2005 to August 1, 2010. From June 2003 to June 2005, he served as Executive Vice President, Legal and Corporate Affairs of Wal-Mart.  Upon information and belief, Defendant Hyde is a citizen of Kansas.

42.    The Defendants set forth in ¶¶23-41 shall be referred to collectively as the "Individual Defendants."   The nine Individual Defendants in ¶¶23-31 shall be referred to collectively as "2005-06 Director Defendants."   Defendants in ¶¶23-37 shall be referred to collectively as "Director Defendants."

## IV.    DEFENDANTS' FIDUCIARY DUTIES

43.    By reason of their positions as directors and fiduciaries of Wal-Mart, and by virtue of their ability to control the business and corporate affairs of the Company, each Individual Defendant owed and owe Wal-Mart and its shareholders fiduciary obligations of trust,

loyalty, good faith, candor and due care, and were and are required to use their utmost ability to control and manage the Company in a lawful, fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Wal-Mart and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

44.     Each of the Individual Defendants owes to Wal-Mart and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

45.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of the Company, and was at all times acting within the course and scope of such agency.

46.     By virtue of their fiduciary duties of loyalty, good faith, trust and candor, each Individual Defendants was required to, among other things:

    a.  exercise good faith to ensure that Wal-Mart's affairs were conducted in an efficient, business-like manner;

    b.  exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations, and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

    c.  when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence; and

    d.  remain informed how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith.

47.     The Individual Defendants who were and are members of the Board committees

assumed the responsibility to carry out the functions of their committees.

48.     By signing Wal-Mart's 2006-2011 Annual Reports on SEC Form 10-K and issuing Wal-Mart's 2006-2011 Proxy Statements without disclosing the FCPA violations and the cover-up, the Individual Defendants Breached their fiduciary duties and violated the federal securities laws by making false and misleading statements to Wal-Mart's shareholders and regulatory authorities.

## V.     GOVERNANCE AND REPORTING SYSTEMS

49.     The Company's bylaws, articles of incorporation, corporate governance guidelines, Code of Ethics, as well as Board committee charters in effect from 2005 to the present, specifically set forth the duties and obligations that Board members are required to fulfill on behalf of the Company.

### A.     Corporate Guidelines and Statements of Ethics

50.     For example, the Company's Corporate Governance Guidelines, that have not changed since January 1, 2005 to the present, require Directors to: "review compliance with applicable laws and regulations and adopt policies of corporate conduct to assure compliance with applicable laws and regulations."  Corporate Governance Guidelines, ¶2.  Each director is also required to familiarize himself or herself with "[the Company's] compliance programs, and its Statement of Ethics."  Corporate Governance Guidelines, ¶6.   Additionally, all directors are also required to participate in an orientation plan upon his or her election to the Board.  This plan includes "familiarizing new directors with the Company's strategic plans, its significant financial, accounting and risk management issues, its compliance programs, its Statement of Ethics, its principal officers, and its internal and independent auditors."

51.     The Statement of Ethics has from January 1, 2005 to the present applied to "all members of the board of directors of Wal-Mart Stores, Inc. . . . and to directors of all Wal-Mart-controlled subsidiaries."  Therefore, each Individual Defendant was bound to follow the dictates of this Statement of Ethics.

52.     Two sections of the Statement of Ethics in effect from January 1, 2005 through

September 2008 specifically prohibit improper payments.  The section entitled "Improper Payments" provides:

> You should not offer anything of value, directly or through third persons, to anyone (including governmental authorities) to obtain an improper advantage in selling goods and services, conducting financial transactions, or presenting the Company's interests.  All countries prohibit bribery of their own public officials, and many also prohibit the bribery of officials of other countries.  Wal-Mart's policy goes beyond these legal requirements and prohibits improper payments in all activities, both with governments and in the private sector.

53.     The Statement of Ethics in effect from January 1, 2005 through September 2008 also warns that "Wal-Mart is subject to several international anti-corruption laws, such as the U.S. Foreign Corrupt Practices Act, which seek to curb dishonesty in international dealings." The Statement of Ethics further provides that "Wal-Mart has adopted a comprehensive International Anti-Corruption policy, CR-02."  With respect to bribes, kickbacks, or payoffs, the Statement of Ethics provides;

> The U.S. Foreign Corrupt Practices Act, other U.S. laws, and similar laws of other countries, prohibit you, on behalf of Wal-Mart, from directly or indirectly making, promising, authorizing or offering anything of value to a government official or employee, political party, or any candidate for political office.  A governmental official includes any person acting in an official capacity on behalf of a government, agency, department or instrumentality, such as a business with government ownership (e.g., a national oil company).

54.     Effective September 2008, Wal-Mart modified its Statement of Ethics purportedly to make it more user-friendly, to reflect Wal-Mart's tone and voice, and to align with Wal-Mart's brand.  The 2008 revisions do not in any way diminish the responsibilities of Wal-Mart employees, directors and executives to comply with the law and not participate in bribery.

55.     As part of its anti-corruption policy, the Revised Statement of Ethics provides: "Bribery of public officials in the U.S. and abroad is illegal under both U.S. law and the local law of the countries in which we operate."  The policy that the Wal-Mart directors, as fiduciaries of the Company were obligated to observe continues to state that "Wal-Mart's policy goes beyond these legal requirements and prohibits corrupt payments in all circumstances, whether in

dealings with public officials or individuals in the private sector."

56.     The anti-corruption policy lays out in even greater detail the prohibited conduct that each Wal-Mart employee, director and officer must observe.  It states:

> Specifically, the Global Anti-Corruption Policy prohibits us from paying, promising, offering, or authorizing a payment, directly, indirectly, or through a third party, money or anything of value to a government official or political party for the purpose of influencing an official act or decision in order to obtain or retain business or secure an improper advantage.  The term "government official" includes any person acting in an official capacity for or on behalf of a government or governmental agency or department, including a business with government ownership (for example, a national oil company); a public international organization (for example, the U.N. or World Bank); or a political party or candidate for political office.  Even when local practices or customs allow behavior that violates our Anti-Corruption Policy, it is not acceptable for us to do so.

57.     Wal-Mart also has a Code of Ethics in effect from November 20, 2003 to the present applicable for the CEO and all Senior Financial Officials.  In particular, the CEO and all Senior Financial Officials (including the CFO and Corporate Controller) are bound by these provisions.  This Code of Ethics assigns certain reporting obligations to the CEO, CFO and Corporate Controller, who fulfill those obligations by reporting specified matters to the Audit Committee of the Board and the Company's Internal Audit Services.  Other Senior Financial Officials may also report such matters to their superior or the Audit Committee.  Senior Financial Officials are defined to be the CFO, Corporate Controller, officers in the Accounting, Finance and Tax departments, Chief Executive Officers who are responsible for an operating division, and officers in operating divisions who are responsible for accounting.

58.     The CEO and each Senior Financial Official is required under the code to "report any information he or she may have concerning any violation of this Code of Ethics, including any actual or apparent conflicts of interest between personal and professional relationships involving any associate who has a significant role in his or her area's financial reporting, disclosures or internal controls."  Furthermore, the CEO and each Senior Financial Official are required to "report any information he or she may have concerning evidence of a material

violation of securities or other laws, rules or regulations applicable to the Company and the operation of its business, by the Company or any agent thereof."

**B.   Committee Charters**

59.   There were five standing committees of the Board between January 31, 2005 and January 31, 2007:  (1) Audit Committee; (2) Strategic Planning and Finance Committee: (3) Compensation, Nominating and Governance Committee; (4) Executive Committee; and (5) Stock Options Committee.  All committees were required to report regularly to the full Board.

**1.   Audit Committee**

60.   The Audit Committee Charter, whose charter has not changed in any meaningful way since 2005, states that the purpose of the Audit Committee is to assist the Board in monitoring (a) the integrity of the financial reporting process, (b) the performance of the Company's global internal audit function, and (c) ***the compliance by the Company with legal and regulatory requirements***.  The Audit Committee is further responsible for overseeing risk assessment and risk management process and policies.  The Audit Committee charter states the Audit Committee is required to "review and discuss with management . . . the Company's major financial and other risk exposures and the steps management has taken to monitor and control such exposures."  Moreover, according to its charter, the Audit Committee is further required to "discuss with management and the Outside Auditor, and advise the Board with respect to, the Company's policies, processes and procedures regarding compliance with applicable laws and regulations and ***the Statement of Ethics, and instances of non-compliance therewith***." (emphasis added).  The Audit Committee has the authority to retain independent legal advisers when necessary to investigate items within the scope of its responsibilities.

61.   As part of the Audit Committee's oversight processes, it regularly meets with management of the Company, its internal auditor, and its independent auditor.  To fulfill its responsibilities during, for example, the Company's 2006 fiscal year, the Audit Committee (a) monitored the progress and results of the testing of internal controls, (b) reviewed a report from management and internal audit regarding the design, operation and effectiveness of internal

19

controls, and (c) received reports from management regarding the Company's policies, processes, and procedures regarding compliance with applicable laws and regulations and the Statement of Ethics.

62.     The Audit Committee's Charter states that the Audit Committee will "Review the significant reports to management prepared by the internal auditing department and management's responses" and "Communicate with management and the Internal Auditors to obtain information concerning internal audits, accounting principles adopted by the Company, internal controls of the Company, management, and the Company's financial and accounting personnel, and review the impact of each on the quality and reliability of the Company's financial statements."

63.     The Audit Committee Charter states that the Audit Committee shall "Discuss with the Company's Chief Legal Officer legal matters that may have a material impact on the financial statements or the Company's compliance policies."

64.     The Audit Committee has a duty to "make regular reports to the Board" and "assist the Board in monitoring . . . (b) the performance of the Company's global internal audit function, [and] (c) the compliance by the Company with legal and regulatory requirements"

**2.     Strategic Planning and Finance Committee**

65.     The Strategic Planning and Finance Committee ("Strategic Planning") Charter gives its committee members "authority and responsibilities to: (1) provide input from the Board to management in the development of the Company's strategic plan; (2) serve as a resource in assisting management in the development of the Company's strategic plan; (3) act in an advisory capacity in assessing the strategies and action plans designed to meet the Company's strategic objectives; and (4) serve as representatives of the Board in evaluating the Company's strategic planning process." These provisions have remained the same from 2005 until the present.  Thus, it was incumbent on Board members serving on the Strategic Planning Committee to probe the Company's strategy for fast-paced expansion into Mexico and ensure that the Company's strategy to win market dominance in Mexico was accomplished in a lawful manner.

20

**3.      Compensation, Nominating and Governance Committee**

66.      The Compensation, Nominating and Governance Committee Charter gives the committee members responsibility to "review the performance of the Board and Company management" and to "develop and recommend to the Board corporate governance principles." Specifically these committee members were given "the following authority and responsibilities: . . . with respect to the CEO, the Chairman or Chairwoman of the Board, and other associates who are directors of the Company ('Inside Directors'), annually review and approve corporate goals and objectives relevant to their compensation, evaluate their performance in light of those goals and objectives and set their compensation accordingly."  It was within the purview of these committee members' direct responsibilities to evaluate whether the CEO at that time, Defendant Scott, was performing one of the core duties – complying with the law.

67.      Another duty of the committee members on the Compensation, Nominating and Governance Committee specifically set forth in the Committee charter is to " review and assess the Company's compliance with the corporate governance requirements established by the New York Stock Exchange, the requirements established under the Sarbanes-Oxley Act and other applicable corporate governance laws and regulations."  Had the committee members performed this responsibility in a faithful and loyal manner, they would have established a process for reviewing the Company's compliance with the FCPA, particularly since the SEC and the Department of Justice were very public in announcing their intention to ramp up enforcement of this law.

68.      An additional duty of the committee members on the Compensation, Nominating and Governance Committee specifically set forth in the Committee charter is to "develop procedures for and conduct the annual review of the performance of the Board, and report annually to the Board with an assessment of the Board's performance."  Had the committee members faithfully and loyally discharged their responsibility, they would not have permitted various committees and the Board as a whole to fail to oversee the Company's compliance with the FCPA and other laws.

4.      **The Executive Committee**

69.     The purpose of the Executive Committee has been to exercise the powers and duties of the Board between Board meetings and while the Board is not in session, and implement the policy decisions of the Board.

## VI.     THE DEFENDANTS' WRONGFUL CONDUCT

A.      **Wal-Mart's History**

70.     Wal-Mart was founded in 1962 with the opening of the first Wal-Mart discount store in Rogers, Arkansas.  On October 31, 1969, the Company incorporated as Wal-Mart Stores, Inc.  Wal-Mart's shares began trading on Over-the-Counter markets in 1970, and were listed on the New York Stock Exchange two years later.

71.     By the end of the decade, Wal-Mart had grown to 276 stores in 11 states.  In 1983, the Company opened its first Sam's Club membership warehouse and in 1988 opened the first supercenter -- now the Company's dominant format -- featuring a complete grocery in addition to general merchandise.

72.     Wal-Mart became an international company in 1991, when it opened its first Sam's Club near Mexico City. Walmex, as the company is known locally, has expanded rapidly since that time.  One out of every five Wal-Mart stores is now in that country.  With 2,100 stores and 209,000 employees in Mexico, it is Mexico's largest private employer.  In 2011, the Walmex unit reported total sales of 379 billion pesos ($29 billion).

73.     Wal-Mart currently operates 10,130 stores and Sam's Club locations in 27 countries, and employs 2.2 million associates, serving more than 176 million customers a year.

B.      **It Was Common Knowledge That Walmex Was Vulnerable to Corruption**

74.     Paying bribes has a long tradition in Mexico, dating back to the colonial era.  The temptation to skirt red tape in Mexico has been encouraged over time by a weak justice system and the relatively low salaries of many lower-level public sector workers.  Mexican police, for example, often earn well below $1,000 a month.

75.     According to Javier Oliva, a political scientist at National Autonomous University

of Mexico ("UNAM"), the payment of corporate bribes began to increase after the North American Free Trade Agreement came into force in Mexico in 1994.  As Mr. Oliva told *Reuters*: "Foreign companies in the main started to look for ways of speeding up official procedures. Regrettably, this is how it works in much of Mexico."  David Graham, Wal-Mart Probe Lifts Lid on Culture of Bribery in Mexico, *Reuters* (Apr. 23, 2012) (available at: http://smallbusiness.yahoo.com/advisor/wal-mart-probe-lifts-lid-culture-bribery-mexico-014522507.html).

76.     A study by anti-corruption watchdog Transparencia Mexicana, the local arm of Transparency International ("TI"), showed Mexicans in 2010 paid a bribe to deal with more than one in 10 items of official paperwork or access to public services.  Illicit payments cover everything from connecting a telephone line to obtaining a driver's license, and average around 165 pesos.  *See id*.  According to TI's director, Eduardo Bohorquez, that figure leaps when big corporations try to operate in Mexico's capital and 31 different states, each of which has its own set of rules on how to set up a business or lease property.  *See id*.

77.     Many bribes are paid through "gestores" (pronounced hes-TORE-ehs) or middlemen, who are used in Mexico to help companies perform a variety of tasks, from obtaining residency permits and resolving tax issues to obtaining planning authorization.  While gestores can be legitimate actors in Mexico's bureaucracy, they often play starring roles in Mexico's public corruption scandals, operating in the shadows, dangling payoffs to officials of every rank.

78.     Wal-Mart executives in charge of growing Walmex were keenly aware of how to expedite building a business in Mexico, as well as the laws against bribing government officials. Nevertheless, the evidence strongly suggests that they chose to violate U.S. and Mexican law in the interest of expediency.  As former Walmex real estate attorney Mr. Cicero told *The New York Times*:

> [T]he payments [were] for a specific strategic purpose.  The idea, he said, was to build hundreds of new stores so fast that competitors would not have time to react.  Bribes, he explained,

23

> accelerated growth.  They got zoning maps changed.  They made environmental objections vanish.   Permits that typically took months to process magically materialized in days.  "What we were buying was time," he said.

*New York Times* article.

## C.    The Red Flags and Lax Internal Controls at Walmex

79.    According to the *New York Times* article, in 2003, Kroll Inc., a leading investigation firm, conducted a confidential investigation for Wal-Mart.  Kroll discovered that Walmex had systematically increased its sales by helping favored high-volume customers evade sales taxes.

80.    A draft of Kroll's report, obtained by *The New York Times*, concluded that top Walmex executives had failed to enforce their own anticorruption policies, ignored internal audits that raised red flags and even disregarded local press accounts asserting that Walmex was "carrying out a tax fraud."  The Company ultimately paid $34.3 million in back taxes.

81.    Wal-Mart then asked Kroll to evaluate Walmex's internal audit and antifraud units.  Kroll wrote another report that branded the units "ineffective." Many employees accused of wrongdoing were not even questioned; some "received a promotion shortly after the suspicions of fraudulent activities had surfaced."

82.    Accordingly, from at least 2003, Wal-Mart and its executives were on notice that top Walmex executives were failing to enforce their own anticorruption policies.

## D.    Walmex's Bribery Practices are Revealed[3]

83.    On September 21, 2005, Mr. Cicero sent an e-mail to Maritza I. Munich ("Munich"), then-General Counsel of Wal-Mart International, telling her he had information about "irregularities" authorized "by the highest levels" at Walmex. "I hope to meet you soon," he wrote.

84.    Ms. Munich was familiar with the challenges of avoiding corruption in Latin

---

[3]    The following Conduct Allegations are based in large part on the *New York Times* article. The *New York Times* article was based on, among other things, the 15 hours of interviews with Mr. Cicero, and the review of hundreds of internal Company documents.

America.  Before joining Wal-Mart in 2003, she had spent 12 years in Mexico and elsewhere in Latin America as a lawyer for Procter & Gamble.

85.     At Wal-Mart in 2004, she pushed the Board to adopt a strict anticorruption policy that prohibited all employees from "offering anything of value to a government official on behalf of Wal-Mart."  It required every employee to report the first sign of corruption, and it bound Wal-Mart's agents to the same exacting standards.

86.     Ms. Munich reacted quickly to Mr. Cicero's e-mail.  Within days, she hired Juan Francisco Torres-Landa ("Torres-Landa"), a prominent Harvard-trained lawyer in Mexico City, to debrief Mr. Cicero.  The two men met three times in October 2005, with Ms. Munich flying in from Bentonville, Arkansas (where Wal-Mart's corporate headquarters are located) for the third debriefing.

87.     During hours of questioning, Mr. Torres-Landa's notes show, Mr. Cicero described how Walmex had perfected the art of bribery, then hidden it all with fraudulent accounting.  *See* Ex. A.  Mr. Cicero implicated many of Walmex's leaders, including its board chairman, its general counsel, its chief auditor and its top real estate executive.

88.     But the person most responsible, he told Mr. Torres-Landa, was the Company's ambitious chief executive, Eduardo Castro-Wright, a native of Ecuador who was recruited from Honeywell in 2001 to become Wal-Mart's Chief Operating Officer in Mexico.

89.     Mr. Cicero said that while bribes were occasionally paid before Mr. Castro-Wright's arrival, their use soared after Mr. Castro-Wright ascended to the top job of Walmex CEO in 2002.  Mr. Cicero described how Walmex's leaders had set "very aggressive growth goals," which required opening new stores "in record times."  Walmex executives, he said, were under pressure to do "whatever was necessary" to obtain permits.

90.     In an interview with *The New York Times*, Mr. Cicero said Mr. Castro-Wright had encouraged the payments for a specific strategic purpose. The idea, he said, was to build hundreds of new stores so fast that competitors would not have time to react. Bribes, he explained, accelerated growth.  They got zoning maps changed.  They made environmental

25

objections vanish.  Permits that typically took months to process magically materialized in days.  "What we were buying was time," he said.

91.    Walmex's stunning growth made Mr. Castro-Wright a rising star at Wal-Mart.  In early 2005, when he was promoted to a senior position in the United States, Defendant Duke would cite his "outstanding results" in Mexico.

92.    Mr. Cicero's allegations were all the more startling because he implicated himself.  He spent hours explaining to Mr. Torres-Landa the mechanics of how he had helped funnel bribes through gestores.

93.    Mr. Cicero told Mr. Torres-Landa it was his job to recruit the gestores.  He worked closely with them, sharing strategies on whom to bribe.  He also approved Walmex's payments to the gestores.  Each payment covered the bribe and the gestor's fee, typically six percent of the bribe.

94.    It was all carefully monitored through a system of secret codes known only to a handful of Walmex executives.

95.    The gestores submitted invoices with brief, vaguely worded descriptions of their services.  But the real story, Mr. Cicero said, was told in codes written on the invoices.  The codes identified the specific "irregular act" performed, Mr. Cicero explained to Mr. Torres-Landa.  One code, for example, indicated a bribe to speed up a permit.  Others described bribes to obtain confidential information or eliminate fines.

96.    Each month, Mr. Castro-Wright and other top Walmex executives "received a detailed schedule of all of the payments performed," he said, according to the lawyer's notes.  Walmex then "purified" the bribes in accounting records as simple legal fees.

97.    Mr. Torres-Landa explored Mr. Cicero's motives for coming forward.

98.    Mr. Cicero said he resigned in September 2004 because he felt underappreciated.  He described the "pressure and stress" of participating in years of corruption, of contending with "greedy" officials who jacked up bribe demands.

99.    As he told the *New York Times*, "I thought I deserved a medal at least."

26

100.    The breaking point came in early 2004, when he was passed over for the job of General Counsel of Walmex.  This snub, Mr. Torres-Landa wrote, "generated significant anger with respect to the lack of recognition for his work."  Mr. Cicero said he began to assemble a record of bribes he had helped orchestrate to "protect him in case of any complaint or investigation," Mr. Torres-Landa wrote.

101.    "We did not detect on his part any express statement about wishing to sell the information," the lawyer added.

102.    According to people involved in Wal-Mart's investigation, Mr. Cicero's account of criminality at the top of Wal-Mart's most important foreign subsidiary was impossible to dismiss.  He had clearly been in a position to witness the events he described.  Nor was this the first indication of corruption at Walmex under Mr. Castro-Wright.  As discussed above, there was the 2003 Kroll investigation.

103.    None of these findings, though, had slowed Mr. Castro-Wright's rise.  Just days before Mr. Cicero's first debriefing, Mr. Castro-Wright was promoted again.  He was put in charge of all Wal-Mart stores in the United States, one of the most prominent jobs in the Company.  He also joined Wal-Mart's Executive Committee, the Company's inner sanctum of leadership.

**E.      Wal-Mart's Senior Executives Take Secret Control of the Investigatory Process and Keep Everything Inside the Company**

104.    Ms. Munich sent detailed memos describing Mr. Cicero's debriefings to Wal-Mart's senior management.  These executives included Thomas A. Mars, Wal-Mart's General Counsel and a former director of the Arkansas State Police; Thomas D. Hyde, Wal-Mart's Executive Vice President and Corporate Secretary; Michael Fung, Wal-Mart's top internal auditor; Craig Herkert, the chief executive for Wal-Mart's operations in Latin America; and Lee Stucky, a confidant of H. Lee Scott's and Chief Administrative Officer of Wal-Mart International.

105.    Wal-Mart typically hired outside law firms to lead internal investigations into

27

allegations of significant wrongdoing.  It did so earlier in 2005, for example, when Thomas M. Coughlin, then Vice Chairman of Wal-Mart, was accused of padding his expense accounts and misappropriating Wal-Mart gift cards.

106.   At first, Wal-Mart took the same approach with Mr. Cicero's allegations. It turned to Willkie Farr & Gallagher, a law firm with extensive experience in Foreign Corrupt Practices Act cases.

107.   Willkie Farr's "investigation work plan" called for tracing all payments to anyone who had helped Walmex obtain permits for the previous five years. The firm said it would scrutinize "any and all payments" to government officials and interview every person who might know about payoffs, including "implicated members" of Walmex's board.  In short, Willkie Farr recommended the kind of independent, spare-no-expense investigation major corporations routinely undertake when confronted with allegations of serious wrongdoing by top executives. *See* Ex. B.

108.   Wal-Mart's leaders rejected this approach.  Instead, they decided to substitute a far more limited "preliminary inquiry" by in-house investigators.  The "preliminary inquiry," a confidential memo explained, would take two weeks, not the four months Willkie Farr proposed. Rather than examining years of permits, the team would look at a few specific stores.  Interviews would be done "only when absolutely essential to establishing the bona fides" of Mr. Cicero. However, if the inquiry found a "likelihood" that laws had been violated, the Company would then consider conducting a "full investigation."

109.   The decision gave Wal-Mart's senior management direct control over the investigation.  It also meant new responsibility for the Company's tiny and troubled Corporate Investigations unit.

110.   The unit was ill-equipped to take on a major corruption investigation, let alone one in Mexico.  It had fewer than 70 employees, and most were assigned to chasing shoplifting rings and corrupt vendors.  Just four people were specifically dedicated to investigating corporate fraud, a number Joseph R. Lewis, Wal-Mart's director of corporate investigations, described in a

28

confidential memo as "wholly inadequate for an organization the size of Wal-Mart."

111.    But Mr. Lewis and his boss, Kenneth H. Senser, vice president for global security, aviation and travel, were working to strengthen the unit.  Months before Mr. Cicero surfaced, they won approval to hire four "special investigators" who, according to their job descriptions, would be assigned the "most significant and complex fraud matters."  Defendant Scott, the chief executive, also agreed that Corporate Investigations would handle all allegations of misconduct by senior executives.

112.    And yet in the fall of 2005, as Wal-Mart began to grapple with Mr. Cicero's allegations, two cases called into question Corporate Investigations' independence and role.

113.    In October, Wal-Mart's vice chairman, John B. Menzer, intervened in an internal investigation into a senior vice president who reported to him.  According to internal records, Mr. Menzer told Mr. Senser he did not want Corporate Investigations to handle the case "due to concerns about the impact such an investigation would have." One of the senior vice president's subordinates, he said, "would be better suited to conduct this inquiry."  Soon after, records show, the subordinate cleared his boss.

114.    The other case involved the president of Wal-Mart Puerto Rico.  A whistle-blower had accused the president and other executives of mistreating employees. Although Corporate Investigations was supposed to investigate all allegations against senior executives, the president had instead assigned an underling to look into the complaints -- but to steer clear of those against him.

115.    In other words, there was a pattern and practice at Wal-Mart of letting senior executives oversee investigations of complaints against them and weakening the authority of the Corporate Investigations unit, when the ultimate responsibility resided with the Board of Directors.  Ms. Munich, Wal-Mart International's General Counsel, objected.  In an e-mail to Wal-Mart executives, she complained that the investigation was "at the direction of the same company officer who is the target of several of the allegations," and that "[w]e are in need of clear guidelines about how to handle these issues going forward."

29

**F.      The Preliminary Inquiry: "FYI.  It is Not Looking Good"**

116.    Ronald Halter, one of Wal-Mart's new "special investigators," was assigned to lead the preliminary inquiry into Mr. Cicero's allegations.  Mr. Halter had been with Wal-Mart only a few months, but he was a seasoned criminal investigator, having spent 21 years at the Federal Bureau of Investigations, and he spoke Spanish.

117.    Mr. Halter also had help.  Bob Ainley, a senior auditor, was sent to Mexico along with several Spanish-speaking auditors.

118.    On November 12, 2005, Mr. Halter's team got to work at Walmex's corporate headquarters in Mexico City.  The team gained access to a database of Walmex payments and began searching the payment description field for the word "gestoria."

119.    By day's end, they had found 441 gestor payments.  Each was a potential bribe, and yet they had searched back only to 2003.

120.    Mr. Cicero had said his main gestores were Pablo Alegria Con Alonso and Jose Manuel Aguirre Juarez, obscure Mexico City lawyers with small practices who were friends of his from law school.  Sure enough, Mr. Halter's team found that nearly half the payments were to Mr. Alegria and Mr. Aguirre.   These two lawyers alone, records showed, had received $8.5 million in payments.  Records showed Walmex routinely paid its gestores tens of thousands of dollars per permit.

121.    "One very interesting postscript," Mr. Halter wrote in an e-mail to his boss, Mr. Lewis, "all payments to these individuals and all large sums of $ paid out of this account stopped abruptly in 2005."  Mr. Halter said the "only thing we can find" that changed was that Mr. Castro-Wright left Walmex for the United States.

122.    Mr. Halter's team confirmed detail after detail from Mr. Cicero's debriefings.  Mr. Cicero had given specifics -- names, dates, bribe amounts -- for several new stores.  In almost every case, investigators found documents confirming major elements of his account.  And just as Mr. Cicero had described, investigators found mysterious codes at the bottom of invoices from the gestores.  Notably, the documentation didn't look anything like what you

would find in legitimate billing records from a legitimate law firm.

123.    Mr. Lewis sent a terse progress report to his boss, Mr. Senser: "FYI.  It is not looking good." *See* Ex. D.

124.    Hours later, Mr. Halter's team found clear confirmation that Mr. Castro-Wright and other top executives at Walmex were well aware of the gestor payments.  In March 2004, the team discovered, the executives had been sent an internal Walmex audit that raised red flags about the gestor payments, for which the Company's Audit Committee had ultimate responsibility.  The audit documented how Walmex's two primary gestores had been paid millions to make "facilitating payments" for new store permits all over Mexico.

125.    The audit did not delve into how the money had been used to "facilitate" permits.  But it showed the payments rising rapidly, roughly in line with Walmex's accelerating growth.  The audit recommended notifying Wal-Mart's senior executives in Arkansas of the payments.

126.    The recommendation, records showed, was removed by Walmex's chief auditor, whom Mr. Cicero had identified as one of the executives who knew about the bribes.  The author of the gestor audit, meanwhile, "was fired not long after the audit was completed," Mr. Halter wrote.

127.    Mr. Ainley arranged to meet the fired auditor at his hotel.  The auditor described other examples of Walmex's leaders withholding from Wal-Mart senior executives information about suspect payments to government officials.   And, the auditor singled out José Luis Rodríguezmacedo Rivera, the general counsel of Walmex.

128.    Mr. Rodríguezmacedo, he said, took "significant information out" of an audit of Walmex's compliance with the Foreign Corrupt Practices Act.  The original audit had described how Walmex gave gift cards to government officials in towns where it was building stores.  "These were only given out until the construction was complete, at which time the payments ceased," Mr. Ainley wrote.

129.    These details were scrubbed from the final version of the audit sent to Wal-Mart's Arkansas headquarters.

130.    Investigators were also struck by Mr. Castro-Wright's response to the gestor audit.  It had been shown to him immediately, Walmex's chief auditor had told them.  Yet, rather than expressing alarm, he had appeared worried about becoming too dependent on too few gestores.  In an e-mail, Mr. Rodríguezmacedo instructed Mr. Cicero to write up a plan to "diversify" the gestores used to "facilitate" permits, and that "Eduardo Castro wants us to implement this plan as soon as possible."

131.    Mr. Cicero did as directed.  The plan, which authorized paying gestores up to $280,000 to "facilitate" a single permit, was approved with a minor change.    Mr. Rodríguezmacedo did not want the plan to mention "gestores."  He wanted them called "external service providers."

132.    Mr. Halter's team made one last discovery -- a finding that suggested the corruption might be far more extensive than even Mr. Cicero had described.

133.    In going through Walmex's database of payments, investigators noticed the Company was making hefty "contributions" and "donations" directly to governments all over Mexico -- nearly $16 million in all since 2003.  "Some of the payment descriptions indicate that the donation is being made for the issuance of a license," Mr. Ainley wrote in one report.

134.    The investigators also found a document in which a Walmex real estate executive had openly acknowledged that "these payments were performed to facilitate obtaining the licenses or permits" for new stores.  Sometimes, Mr. Cicero told *The New York Times*, donations were used hand-in-hand with gestor payments to get permits.

135.    Records show that Mr. Halter's findings were quickly elevated to the attention of the most senior executives at Wal-Mart.  The substantial evidence that Walmex, the most profitable subsidiary of Wal-Mart and the showcase of its profitability model, under instructions from rising star Mr. Castro-Wright, was extensively bribing Mexican officials was a highly material, flagrant violation of the law.  Under Wal-Mart's own internal Code of Ethics, attention from the Board of Directors was required. Accordingly, within days of arriving in Mexico, Mr. Halter began making reports to Mr. Hernandez, the Chairman of Wal-Mart's Audit Committee,

and the "Bentonville management," presumably including Messrs. Scott and Mars.  *See* Ex. C. Mr. Hernandez, as Chair of the Audit Committee, was in turn obligated to share Mr. Halter's reports with the other members of the Audit Committee, who also received reports from Mr. Mars on the subject.  In turn, the Audit Committee was obligated, under the Audit Committee Charter, to report the matter to the full Board so that it could consider how to respond to this significant matter.

## G.   Walmex Executives Blame the Whistleblower and Refuse to Cooperate with the Wal-Mart Investigation

136.   When Mr. Halter's team became ready to interview executives at Walmex, the first target was Mr. Rodríguezmacedo.  Before joining Walmex in January 2004, Mr. Rodríguezmacedo had been a lawyer for Citigroup in Mexico. Urbane and smooth, with impeccable English, he quickly won fans at Wal-Mart's corporate headquarters.  When Wal-Mart invited executives from its foreign subsidiaries for several days of discussion about the fine points of the Foreign Corrupt Practices Act, Mr. Rodríguezmacedo was asked to lead one of the sessions.  It was called "Overcoming Challenges in Government Dealings."

137.   Yet, Mr. Cicero had identified him as a participant in the bribery scheme.  In his debriefings, Mr. Cicero described how Mr. Rodríguezmacedo had passed along specific payoff instructions from Mr. Castro-Wright.  In an interview with *The New York Times*, Mr. Cicero said he and Mr. Rodríguezmacedo had discussed the use of gestores shortly after Mr. Rodríguezmacedo was hired.  "He said, 'Don't worry.  Keep it on its way.'"

138.   Mr. Halter's team hoped Mr. Rodríguezmacedo would shed light on how two outside lawyers came to be paid $8.5 million to "facilitate" permits.  Mr. Rodríguezmacedo, however, responded with evasive hostility.  When investigators asked him for the gestores' billing records, he said he did not have time to track them down.  They got similar receptions from other executives.

139.   Only after investigators complained to higher authorities were the executives more forthcoming.  Led by Mr. Rodríguezmacedo, they responded with an attack on Mr.

Cicero's credibility.  The gestor audit, they told investigators, had raised doubts about Mr. Cicero, since he had approved most of the payments.  They began to suspect he was somehow benefiting, so they asked Kroll to investigate.  It was then, they asserted, that Kroll discovered Mr. Cicero's wife was a law partner of one of the gestores.

140.  Mr. Cicero was fired, they said, because he had failed to disclose that fact.  They produced a copy of a "preliminary" report from Kroll and e-mails showing the undisclosed conflict had been reported to Wal-Mart's headquarters.

141.  Based on this behavior, Mr. Rodríguezmacedo argued, the gestor payments were in all likelihood a "ruse" by Mr. Cicero to defraud Walmex.  Mr. Cicero and the gestores, he contended, probably kept every last peso of the "facilitating payments."

142.  According to Mr. Rodríguezmacedo, bribes could not have been paid if the money was stolen first.  But investigators were skeptical, which records and interviews reviewed by *The New York Times* show.

143.  Indeed, there were several flaws in this argument.  For example, even if Mr. Rodríguezmacedo's account were true, it did not explain why Walmex's executives had authorized gestor payments in the first place, or why they made "donations" to get permits, or why they rewrote audits to keep Wal-Mart executives in the dark.

144.  Investigators also wondered why a trained lawyer who had gotten away with stealing a small fortune from Wal-Mart would now deliberately draw the Company's full attention by implicating himself in a series of fictional bribes.  Moreover, if Walmex's executives truly believed they had been victimized, why hadn't they taken legal action against Mr. Cicero, much less reported the "theft" to Wal-Mart?

145.  Moreover, there was another problem.  Documents contradicted most of the executives' assertions about Mr. Cicero.  Records showed Mr. Cicero had not been fired, but had resigned with severance benefits and a $25,000 bonus.  In fact, in a 2004 e-mail to Ms. Munich, Mr. Rodríguezmacedo himself described how he had "negotiated" Mr. Cicero's "departure." The same e-mail said Mr. Cicero had not even been confronted about the supposed undisclosed

conflict involving his wife.[4]  The e-mail also assured Ms. Munich there was no hint of financial wrongdoing.  "We see it merely as an undisclosed conflict of interest," Mr. Rodríguezmacedo wrote.

146.    There were other discrepancies.  Mr. Rodríguezmacedo said the Company had stopped using gestores after Mr. Cicero's departure.  Yet even as Mr. Cicero was being debriefed in October 2005, Walmex real estate executives made a request to pay a gestor $14,000 to get a construction permit, records showed.

147.    The persistent questions and document requests from Mr. Halter's team provoked a backlash from Walmex's executives.  After a week of work, Mr. Halter and other members of the team were summoned by Eduardo F. Solórzano Morales, the new chief executive of Walmex who replaced Mr. Castro-Wright upon Mr. Castro-Wright's promotion.

148.    Mr. Solórzano angrily chastised the investigators for being too secretive and accusatory.  He took offense that his executives were being told at the start of interviews that they had the right not to answer questions -- as if they were being read their rights.

149.    Mr. Lewis viewed the complaints as an effort to sidetrack his investigators.  "I find this ludicrous and a copout for the larger concerns about what has been going on," he wrote.

150.    Nevertheless, Defendant Craig Herkert, the chief executive for Latin America, was notified about the complaints.  Three days later, he and his boss, Director Defendant Duke, flew to Mexico City.  Although the trip had long been planned – Defendant Duke toured several stores – they also used the opportunity to reassure Walmex's unhappy executives.  They arrived just as the investigators wrapped up their work and left.

**H.    The Preliminary Report: "There is Reasonable Suspicion to Believe That Mexican and USA Laws Have Been Violated"**

151.    Wal-Mart's leaders had agreed to consider a full investigation if the preliminary inquiry found Mr. Cicero's allegations credible.  Back in Arkansas, Messrs. Halter and Ainley

---

[4]    In an interview with *The New York Times*, Mr. Cicero flatly denied that his wife had ever worked with either gestor.

wrote confidential reports to Wal-Mart's top executives in December 2005, laying out all the evidence that corroborated Mr. Cicero, including the hundreds of gestor payments, the mystery codes, the rewritten audits, the evasive responses from Walmex executives, the donations for permits, the evidence gestores were still being used.

152.   "There is reasonable suspicion," Mr. Halter concluded, "to believe that Mexican and USA laws have been violated."  *See* Ex. E.  There was simply "no defendable explanation" for the millions of dollars in gestor payments, he wrote.  This information was reported to, among others, Audit Committee Chairman Hernandez, CEO Scott, General Counsel Mars and, through these three individuals, to the entire Wal-Mart Board.

153.   Mr. Halter submitted an "action plan" for a deeper investigation that would plumb the depths of corruption and culpability at Walmex.  Among other things, he urged "that all efforts be concentrated on the reconstruction of Cicero's computer history."

154.   Mr. Cicero, meanwhile, was still offering help.  In November 2005, when Mr. Halter's team was in Mexico, Mr. Cicero offered his services as a paid consultant.  In December 2005 he wrote to Ms. Munich.  He volunteered to share specifics on still more stores, and he promised to show her documents.

155.   Mr. Halter proposed a thorough investigation of the two main gestores.  He had not tried to interview them in Mexico for fear of his safety.  Now Mr. Halter wanted Wal-Mart to hire private investigators to interview and monitor both gestores.  He also envisioned a round of adversarial interviews with Walmex's senior executives.  He and his investigators argued that it was time to take the politically sensitive step of questioning Mr. Castro-Wright about his role in the gestor payments.

156.   By January 2006, the case had reached a critical juncture.  Wal-Mart's leaders were again weighing whether to approve a full investigation that would inevitably focus on a star executive already being publicly discussed as a potential successor to Mr. Scott.  Wal-Mart's ethics policy offered clear direction. "Never cover up or ignore an ethics problem," the policy states.  And some who were involved in the investigation argued that it was time to take a stand

36

against signs of rising corruption in Wal-Mart's global operations.  Each year the Company received hundreds of internal reports of bribery and fraud, records showed.  In Asia alone, there had been 90 reports of bribery just in the previous 18 months.

157.    The situation was bad enough that Wal-Mart's top procurement executives were summoned to Bentonville that winter for a dressing down.  Mr. Menzer, Wal-Mart's vice chairman, warned them that corruption was creating an unacceptable risk, particularly given the government's stepped-up enforcement of the FCPA. "Times have changed," he said.

158.    As if to underscore the problem, Wal-Mart's leaders were confronted with new corruption allegations at Walmex even as they pondered Mr. Halter's action plan.  In January, Director Defendant Scott, Director Defendant Duke and Wal-Mart's chairman, Defendant S. Robson Walton, received an anonymous e-mail saying Walmex's top real estate executives were receiving kickbacks from construction companies.  "Please you must do something," the e-mail implored.

159.    Yet at the same time, records and interviews show, there were misgivings about the budding reach and power of Corporate Investigations.  In less than a year, Mr. Lewis's beefed-up team had doubled its caseload, to roughly 400 cases a year.  Some executives grumbled that Mr. Lewis acted as if he still worked for the F.B.I., where he had once supervised major investigations.  They accused him and his investigators of being overbearing, disruptive and naïve about the moral ambiguities of doing business abroad.  They argued that Corporate Investigations should focus more on quietly "neutralizing" problems than on turning corrupt employees over to law enforcement.

160.    Wal-Mart's leaders had just witnessed the downside of that approach: in early 2005, the Company went to the F.B.I. with evidence that the disgraced former vice chairman, Mr. Coughlin, had embezzled hundreds of thousands of dollars.  The decision produced months of embarrassing publicity, especially when Mr. Coughlin claimed he had used the money to pay off union spies for Wal-Mart.

161.    Meanwhile, Walmex executives were continuing to complain about the

investigation.

162.    In January 2006, after reviewing a preliminary version of the report, Ms. Munich advised Mr. Mars of the need to conduct an extensive investigation to root out wrongdoing, stating that "the needed follow-up investigation should extend beyond the specific transactions contained in this draft report to other potentially suspect transactions not yet identified."  In addition to Mr. Mars, Ms. Munich sent a copy of her email to Martin Weinstein, a partner at Wal-Mart's external law firm, Willkie Farr and Gallagher.

163.    Despite Ms. Munich's efforts, it was abundantly clear that Defendants were not interested in making a good faith effort to fix the corruption problem and Ms. Munich submitted her resignation, effective February 1, 2006.  In one of her final acts, she drafted a memo that argued for expanding the Mexico investigation and giving equal respect to Mexican and United States laws.  "The bribery of government officials," she noted dryly, "is a criminal offense in Mexico."

164.    Ms. Munich also warned against allowing implicated executives to interfere with the investigation.  Walmex's executives had already tried to insert themselves in the case.  Just before Christmas, records show, Mr. Solórzano, the Walmex chief executive, held a video conference with Defendant Mars, Mr. Senser and Defendant Stucky to discuss his team's "hypothesis" that Mr. Cicero had stolen gestor payments.

165.    "Given the serious nature of the allegations, and the need to preserve the integrity of the investigation," Ms. Munich wrote, "it would seem more prudent to develop a follow-up plan of action, independent of Walmex management participation."

I.    **Defendant Scott Assigns Responsibility for the Investigation to One of the Accused Wrongdoers**

166.    Director Defendant Scott called a meeting for February 3, 2006, to discuss revamping Wal-Mart's internal investigations and to resolve the question of what to do about Mr. Cicero's allegations.  In the days before the meeting, records show, Mr. Senser ordered his staff to compile data showing the effectiveness of Corporate Investigations.  He assembled

statistics showing that the unit had referred relatively few cases to law enforcement agencies.  He circulated copies of an e-mail in which Mr. Rodríguezmacedo said he had been treated "very respectfully and cordially" by Mr. Senser's investigators.

167.    Along with Mr. Scott, the meeting included Mr. Hyde, Mr. Mars and Mr. Stucky. The meeting brought the grievances against Corporate Investigations into the open.  Mr. Senser described the complaints in Mr. Lewis's performance evaluation, completed shortly after the meeting.  Wal-Mart's leaders viewed Mr. Lewis's investigators as "overly aggressive," he wrote. They did not care for Mr. Lewis's "law enforcement approach," and the fact that Mr. Scott convened a meeting to express these concerns only underscored "the importance placed on these topics by senior executives."

168.    By meeting's end, Mr. Senser had been ordered to work with Mr. Mars and others to develop a "modified protocol" for internal investigations.  Mr. Scott said he wanted it done fast, and within 24 hours Mr. Senser produced a new protocol, a highly bureaucratic process that gave senior Wal-Mart executives – including executives at the business units being investigated – more control over internal investigations.  The policy included multiple "case reviews."  It also required senior executives to conduct a "cost-benefit analysis" before signing off on a full-blown investigation.

169.    Under the new protocol, Mr. Lewis and his team would only investigate "significant" allegations, like those involving potential crimes or top executives.  Lesser allegations would be left to the affected business unit to investigate.

170.    Four days after Director Defendant Scott's meeting, with the new protocol drafted, Wal-Mart's executives began to transfer control of the bribery investigation to one of its earliest targets, Mr. Rodríguezmacedo.  This transfer was clearly inappropriate.  As Ms. Munich pointed out in January 18, 2006 email to, *inter alia*, Mr. Mars, Mr. Weinstein, Mr. Ainley, the "Wisdom of assigning any investigative role to management of the business unit being investigated escapes me. Given the serious nature of the allegations, and the need to preserve the integrity of the investigation, it would seem more prudent to develop a follow-up plan of action

39

independent of WALMEX management."  *See* Ex. F

171.    Executive Defendant Mars first sent Mr. Halter's report to Mr. Rodríguezmacedo.
Then he arranged to ship Mr. Halter's investigative files that revealed criminal activity from the
U.S. to Mexico.  In an e-mail, he sought Mr. Senser's advice on how to send the files in "a
secure manner."   Mr. Senser recommended FedEx.   "There is very good control on those
shipments, and while governments do compromise them if they are looking for something in
particular, there is no reason for them to think that this shipment is out of the ordinary," he
wrote.   "The key," he added, "is being careful about how you communicate the details of the
shipment to José Luis."  He advised Defendant Mars to use encrypted e-mail.

172.    When contacted by *The New York Times*, Wal-Mart's spokesman, Mr. Tovar, said
the Company could not discuss Defendant Scott's meeting or the decision to transfer the case to
Mr. Rodríguezmacedo.   "At this point," he said, "we don't have a full explanation of what
happened.  Unfortunately, we realize that until the investigation is concluded, there will be some
unanswered questions."

173.    Wal-Mart's executives, however, had clear guidance about the propriety of letting
a target of an investigation run it.  On the same day Mr. Senser was putting the finishing touches
on the new investigations protocol, Wal-Mart's ethics office sent him a booklet of "best
practices" for internal investigations.   It had been put together by lawyers and executives who
supervised investigations at Fortune 500 companies, and stated that: "[i]nvestigations should be
conducted by individuals who do not have any vested interest in the potential outcomes of the
investigation."

174.    Moreover, the transfer appeared to violate even the "modified protocol" for
investigations.   Under the new protocol, Corporate Investigations was still supposed to handle
"significant" allegations -- including those involving potential crimes and senior executives.
When Mr. Senser asked his deputies to list all investigations that met this threshold, they came
up with 31 cases.  At the top of the list: Mexico.

175.    After the meeting with Mr. Scott, Mr. Senser had told Mr. Lewis in his

performance evaluation that his "highest priority" should be to eliminate "the perceptions that investigators are being too aggressive." He wanted Mr. Lewis to "earn the trust of" his "clients" – Wal-Mart's leaders. He wanted him to head off "adversarial interactions."

176.    The Director Defendants were responsible for the blatantly inappropriate decision to shift control of the investigation to Mr. Rodríguezmacedo, a primary target of the investigation. Though Mr. Scott gave the order, the Director Defendants were aware that Mr. Halter had uncovered significant evidence of wrongdoing by Mr. Castro-Wright and Mr. Rodríguezmacedo. Therefore, the transfer of the investigation to Mr. Rodríguezmacedo could not have happened but for the Director Defendants' acquiescence in that decision.

**J.    The Final Report is Written By One of the Targets of the Investigation**

177.    For those who had investigated Mr. Cicero's allegations, the preliminary inquiry had been just that – preliminary. In memos and meetings, they had argued that their findings clearly justified a full-blown investigation. Mr. Castro-Wright's precise role had yet to be determined. Mr. Halter had never been permitted to question him, nor had Mr. Castro-Wright's computer files been examined, records and interviews show. At the very least, a complete investigation would take months.

178.    Mr. Rodríguezmacedo, the man now in charge and one of the targets of the investigation, saw it differently. He wrapped up the case in a few weeks, with little additional investigation.

179.    "There is no evidence or clear indication," his report concluded, "of bribes paid to Mexican government authorities with the purpose of wrongfully securing any licenses or permits." That conclusion, his report explained, was largely based on the denials of his fellow executives. Not one "mentioned having ordered or given bribes to government authorities," he wrote.

180.    His report, a mere six pages long, neglected to note that he had been implicated in the same criminal conduct. That was not, however, the only omission. While his report conceded that Walmex executives had authorized years of payments to gestores, it never

explained what these executives expected the gestores to do with the millions of dollars they received to "facilitate" permits.

181.    He was also silent on the evidence that Walmex had doled out donations to get permits.  Nor did he address evidence that he and other executives had suppressed or rewritten audits that would have alerted Wal-Mart senior executives to improper payments.

182.    Instead, the bulk of Mr. Rodríguezmacedo's report attacked the integrity of his accuser.  Mr. Cicero, he wrote, made Walmex's executives think they would "run the risk of having permits denied if the gestores were not used."  But this was merely a ruse: In all likelihood, he argued, Walmex paid millions for "services never rendered."  The gestores simply pocketed the money, he suggested, and Mr. Cicero "may have benefited," too.

183.    Mr. Rodríguezmacedo, however, offered no direct proof.  Indeed, as his report made clear, it was less an allegation than a hypothesis built on two highly circumstantial pillars.

184.    First, he said he had consulted with Jesús Zamora-Pierce, a "prestigious independent counsel" who had written books on fraud. Mr. Zamora, he wrote, "feels the conduct displayed by Sergio Cicero is typical of someone engaging in fraud.  It is not uncommon in Mexico for lawyers to recommend the use of gestores to facilitate permit obtainment, when in reality it is nothing more than a means of engaging in fraud."

185.    Second, he said he had done a statistical analysis that found Walmex won permits even faster after Mr. Cicero left.  The validity of his analysis was impossible to assess; he did not include his statistics in the report.

186.    In building a case against Mr. Cicero, Mr. Rodríguezmacedo's report included several false statements.  He described Mr. Cicero's "dismissal" when records showed he had resigned.  He also wrote that Kroll's investigation of Mr. Cicero concluded that he "had a considerable increase in his standard of living during the time in which payments were made to the gestores."  The Kroll report, however, made no such assertion.

187.    His report promised a series of corrective steps aimed at putting the entire matter to rest.  Walmex would no longer use gestores.  There would be a renewed commitment to Wal-

Mart's anticorruption policy.   He did not recommend any disciplinary action against his colleagues.

188.    There was, however, one person he hoped to punish.  Walmex, he wrote, would scour Mr. Cicero's records and determine "if any legal action may be taken against him."  Mr. Rodríguezmacedo submitted a draft of his report to Bentonville.

189.    In an e-mail, Mr. Lewis told his superiors that he found the report "lacking."  It was not clear what evidence supported the report's conclusions, he wrote.  "More importantly," he wrote, "if one agrees that Sergio defrauded the company and I am one of them, the question becomes, how was he able to get away with almost $10 million and why was nothing done after it was discovered?"

190.    Mr. Rodríguezmacedo responded by adding a paragraph to the end of his report: They had decided not to pursue "criminal actions" against Mr. Cicero because "we did not have a strong case."

191.    "At the risk of being cynical," Mr. Lewis wrote in response, "that report is exactly the same as the previous which I indicated was truly lacking."

192.    But it was enough for Wal-Mart, its CEO, and the Director Defendants charged with ensuring Wal-Mart's compliance with the law.  On May 10, 2006, Mr.  Rodríguezmacedo was told by senior Wal-Mart executives, to put his report "into final form, thus concluding this investigation."

**K.     *The New York Times* Tells Wal-Mart it is Investigating Mr. Cicero's Claims and the Cover Up Unravels**

193.    For many years Wal-Mart was able to keep the bribes and subsequent whitewashing under wraps.  The wrongdoers, including some of the Defendants, kept their jobs and, in many cases, were promoted.  This was not, however, the end of the story.

194.    In December 2011, after learning of *The New York Times*' investigation, Wal-Mart informed the Justice Department and SEC that it had begun an internal investigation into possible violations of the FCPA.

195.    And, on December 8, 2011, the Company filed with the SEC a 10-Q stating:

> During fiscal 2012, the Company began conducting a voluntary internal review of its policies, procedures and internal controls pertaining to its global anti-corruption compliance program. As a result of information obtained during that review and from other sources, the Company has begun an internal investigation into whether certain matters, including permitting, licensing and inspections, were in compliance with the U.S. Foreign Corrupt Practices Act. The Company has engaged outside counsel and other advisors to assist in the review of these matters and has implemented, and is continuing to implement, appropriate remedial measures. The Company has voluntarily disclosed its internal investigation to the U.S. Department of Justice and the Securities and Exchange Commission. We cannot reasonably estimate the potential liability, if any, related to these matters. However, based on the facts currently known, we do not believe that these matters will have a material adverse effect on our business, financial condition, results of operations or cash flows.

196.    Although the statement was vaguely worded, a Wal-Mart spokesman confirmed to *The New York Times* that the Company's Mexico operations – and its handling of the 2005 case – were now a major focus of its inquiry.

197.    The SEC has not commented on its investigation; however, according to some experts, the SEC will be particularly interested in the Company's current executive leadership and whether they made any serious material omissions in their Sarbanes-Oxley Act certifications during the 2005 time period. As Michael Koehler, a Butler University business law professor who writes the popular FCPA Professor blog, recently stated: "[i]f you knew that one of your highest-profile subsidiaries had problematic conduct, but you made SOX certifications that the company had effective internal controls and everything was fine there, that could easily be an area of liability for current executives." Todd Ruger, Will Wal-Mart Regret Not Disclosing Its Bribery Investigation Sooner?, *CorpCounsel*, (Apr. 2012) (available at: http://www.law.com/jsp/cc/PubArticleCC.jsp?id=1202549958532&thepage=2).

198.    Wal-Mart also faces an investigation in Mexico. In its Form 8-K filed on May 17, 2012 Wal-Mart stated:

>    The Company has been informed by the DOJ and the SEC that it is also the
>    subject of their respective investigations into possible violations of the FCPA. . . .
>    ***A number of federal and local agencies in Mexico have also recently initiated
>    investigation of these matters.  Walmex is cooperating with the Mexican
>    governmental agencies conducting these investigations.***

(Emphasis added).

L.    ***The New York Times* Breaks the Story**

199.    On April 21, 2012, after months of investigation, *The New York Times* published

an article by Pulitzer Prize winning journalist David Barstow entitled *Wal-Mart Hushed Up a

Vast Mexican Bribery Case*.  As discussed above, the *New York Times* article was based on,

among other things, 15 hours of interviews with Mr. Cicero, and the review of hundreds of

internal Company documents.

200.    On the first two days of trading after publication of the *New York Times* article,

Wal-Mart stock was pummeled, falling $4.68 – from a close of $62.45 on Friday, April 20, 2012,

to a close of $57.77 on Tuesday, April 24, 2012.  This equated to a market capitalization loss of

over $10 billion.

201.    The *New York Times* article sparked the publication of dozens of other articles,

many of which focused on the damage sustained by the Company, as well as the possible

imposition of civil and criminal penalties against individuals and the Company.

202.    On May 17, 2012, Wal-Mart reported that the scope of the internal investigation

into bribery accusations had widened, stating that the Audit Committee "is conducting an

internal investigation into, among other things, alleged violations of the [FCPA] and other

alleged crimes or misconduct in connection with foreign subsidiaries including Wal-Mart de

México, S.A.B. de C.V. ('Walmex') and whether prior allegations of such violations and/or

misconduct were appropriately handled by the Company."  Wal-Mart 8-K May 17, 2012.

203.    Also on May 17, 2012, Wal-Mart backed away from its December 2011 assertion

that the bribery scandal would not hurt the Company, admitting that "Although the Company

does not presently believe that these matters will have a material adverse effect on its business,

given the inherent uncertainties in such situations, the Company can provide no assurance that these matters will not be material to its business in the future." *Id.*

**M.   Highly Publicized History of Wal-Mart's Ineffective Internal Guidelines and Fast and Loose Manipulation of Investigations of Wrongdoing by High Level Executives**

204.   The widespread publicity in the main-line press generated following the District Court of the Northern District of California's June 2004 certification of a class of 1.6 million female Wal-Mart employees in *Dukes v. Wal-Mart*, 222 F.R.D. 137 (N.D. Cal. 2004) put the ethics and law abiding policies of Wal-Mart squarely in the public eye.   The dozens of wage and hour cases launched against Wal-Mart throughout the country also caused many critics to publicly question Wal-Mart's commitment to adhere to U.S. employment and labor laws.   *See, e.g.*, *Adcox v. Wal-Mart*, Case No. 04-cv-00633 (S.D. Tex., filed 11/9/04); *Tammy Brogan v. Wal-Mart*, Case No. 05-C-0047 (Superior Ct. of NH, Strafford County, filed 2/17/05); and *Braun/Hummel v. Wal-Mart*, Case No. 3757 (Ct. of Common Pleas, Philadelphia County, PA, filed 8/30/04).   *See also* Center for Community & Corporate Ethics, *Wal-Mart Watch: Low Prices at What Cost? Annual Report 2005*, WAL-MART WATCH (2005), found at http://walmartwatch.com/wp-content/blogs.dir/2/files/pdf/2005-annual-report.pdf.

205.   Wal-Mart's commitment to adhere to U.S. employment laws was not the only area where its compliance with the law was suspect.   What was not so well known to the general public, but was intimately known to each 2005-06 Director Defendant was Wal-Mart's lax oversight over investigations of corruption at high levels and discouragement of whistleblowers.

206.   On January 24, 2005 Vice Chairman of the Wal-Mart Board, Thomas Coughlin, retired in disgrace from his executive position at Wal-Mart and resigned from his Board position effective March 2005.   The investigation into Vice Chairman Coughlin's wrongdoing revealed that he filed false invoices, embezzled from the Company and possibly paid bribes to trade union officials not to organize at Wal-Mart locations.   Mr. Coughlin ultimately pled guilty to five counts of wire fraud and one count of filing a false income tax return related to the embezzlement during the time he sat on the Wal-Mart Board of Directors.   The 2005-06 Director

46

Defendants sat on the Board during the entire Coughlin incident.

207.    One week after Mr. Coughlin was fired, Jared Bowen, the Wal-Mart vice president who tipped off the Board about Mr. Coughlin's embezzlement and possible bribes, was himself fired.  *The Wall Street Journal* reported the reason Wal-Mart offered for Mr. Bowen's firing was "loss of confidence in associate as a company officer."  In April 2005, only five months before Mr. Cicero, the whistleblower in the Mexican bribery scandal made his allegations, Mr. Bowen in a highly visible and widely reported manner filed a whistleblower complaint with the U.S. Labor Department under the Sarbanes-Oxley Act claiming that he was fired because he reported on Mr. Coughlin's questionable payments.  Mr. Bowen's Sarbanes-Oxley Complaint against Wal-Mart alleged, *inter alia*, that within one month after informing Defendant Duke about Board member Coughlin's questionable expenses, he was summoned to Defendant Mars' office and immediately fired.  Wal-Mart hired Eugene Scalia, formerly the top lawyer at the Department of Labor, and the son of Supreme Court Justice Antonio Scalia, to defend the Sarbanes-Oxley Complaint launched by fired whistleblower, Mr. Bowen.

208.    Each of the 2005-06 Director Defendants knew about this high visibility whistleblower complaint that forced the resignation and disgrace of their colleague on the Wal-Mart Board, and each of these same Defendants knew that the adequacy of Wal-Mart's protection of its whistleblowers was at issue.

209.    In October 2005, only one month after Mr. Cicero contacted Wal-Mart headquarters to report high-level and extensive bribery in Mexico, John Menzer, Vice President of Wal-Mart International ordered the head of Wal-Mart's Corporate Investigations unit, Mr. Senser, to back off any internal investigation of Mr. Menzer's subordinates.  Mr. Senser was forced to comply, and the investigation of Mr. Menzer's subordinates was aborted.

210.    Also around the same time the Corporate Investigations unit was ordered by a Wal-Mart President in Puerto Rico to stand down on an investigation into senior executive wrongdoing.  Again, the Corporate Investigations unit was forced to comply and this investigation into senior executive wrongdoing was also scrubbed.

47

N.    **Wal-Mart Board Turns a Deaf Ear to Investors' Complaints of Lack of Internal Controls Over Investigations and Unlawful Conduct By Executives**

211.    On May 25, 2005 three savvy and highly respected representatives of institutional investors -- New York City Comptroller, William C. Thompson, Jr., Chairman of the Illinois State Board of Investment, Edward M. Smith, and Director of Governance and Socially Responsible Investment, F&C Asset Management plc Karina Litvack -- whose clients collectively owned nearly 11.5 million Wal-Mart shares valued at nearly $550 million -- sent a letter to Defendant Hernandez, Chair of the Wal-Mart Audit Committee, expressing their grave concerns about Wal-Mart's lack of effective internal controls over legal and regulatory compliance.  Their letter stated:

> We are writing to voice our serious concerns about reports of legal and regulatory non-compliance at Wal-Mart.
>
> * * *
>
> While the Audit Committee has disclosed that Wal-Mart has adequate internal controls over financial reporting, recent reports of legal and regulatory non-compliance raise serious concerns about the adequacy of the company's controls.
>
> * * *
>
> The frequency of the reports suggests that non-compliance with internal standards, as well as with laws and regulations, may be far too commonplace at Wal-Mart.

212.    Mr. Thompson, Mr. Smith and Ms. Litvack demanded the Audit Committee appoint a "special committee of independent directors to conduct a thorough review of the company's controls." At this time, just three months before Mr. Cicero blew the whistle on the Mexican bribery scandal, both Defendant Burns and Defendant Williams were serving on the Audit Committee.  The Audit Committee charter required the Board Members who served on that Committee to, among other things: "review the Company's policies, processes, and procedures regarding compliance with applicable laws and regulations and the Statement of Ethics.  (2005 Proxy p. 8).  The Statement of Ethics, among other things, prohibited any employee or director from making bribes or interfering with a lawful investigation. *See supra* at

¶¶50-58.

213.    The May 25, 2005 Thompson/Smith/Litvack Letter cited as examples of Wal-Mart's "ineffective internal controls" and "compliance breakdowns" not only the criminal conduct of former Wal-Mart Vice Chairman Thomas Coughlin, (that may have included bribery) but of even greater concern was the fact that the vice-president who reported Mr. Coughlin's questionable transactions was himself fired, revealing serious questions about "the past and future effectiveness of the company's whistleblowing programs and Wal-Mart's ability to enforce its Statement of Ethics & Code of Ethics."

214.    Less than three weeks after the Thompson/Smith/Litvack Letter was sent, on June 13, 2005 California Controller Steve Westly, then a trustee of the California State Public Employee Retirement System (Calpers), the largest pension fund in the country, independently wrote a similar public letter to the Wal-Mart Audit Committee.

215.    In response to these demands for augmenting internal controls, received from large and reputable institutional investors, members of the Wal-Mart Board set up a meeting in New York City.  A *Bloomberg* article dated April 12, 2007[5] revealed some of what occurred at this meeting held on September 14, 2005, by obtaining a deposition transcript of Charles Holley, senior vice president for Finance at Wal-Mart and one of the attendees at the meeting. According to Holley's deposition, the representatives of Wal-Mart at the September 2005 meeting included Charles Holley, the Chairman of Wal-Mart's Audit Committee, Roland Hernandez and Defendant Christopher Williams.

216.    At the September 14, 2005 meeting, the investors repeated their demand for Wal-Mart to create an independent special committee to review and improve internal guidelines, to ensure that compliance standards are met, and the manner of conducting investigations into executive wrongdoing is improved.  According to Mr. Holley's deposition, Mr. Hernandez and

---

[5]    Margaret Cronin Fisk and Lauren Coleman-Lochner, Wal-Mart Shareholders, Rebuffed on Labor Issues, Press for vote, *Bloomberg* (Apr. 12, 2007) (available at http://www.bloomberg.com/apps/news?pid=newsarchive&sid=a0uoTK8cd0dE&refer=home).

Mr. Williams rejected an idea of a special committee arguing with the investors that it would be "redundant" because the Audit Committee already provided an independent voice for oversight.

217.    According to Mr. Holley's deposition testimony (supported by contemporaneous notes from the discussion), the representatives of the Audit Committee (Mr. Hernandez and Defendant Williams), in truth, had other reasons to be cautious.   If independent observers reviewed Wal-Mart, there was a "high risk" they could "get the issues wrong," Mr. Holley said, quoting Mr. Hernandez. In other words, Defendants Hernandez and Williams knew that Wal-Mart's internal controls were inadequate, but they rejected a special committee investigation even though it was demanded by important institutional investors, because they did not want an independent party to shed any light on matters that the Board of Directors wanted to keep buried.

218.    Two months after the meeting, on November 30, 2005, New York City Comptroller Thompson again wrote to directors Mr. Hernandez and Defendant Williams, according to court filings in the Pennsylvania wage-and-hour case.  This time, Mr. Thompson wrote, Wal-Mart's legal problems "strongly suggest a management culture of indifference." ***"This culture originates at the highest levels of management." An attachment to the letter requested a detailed account of Company policies on whistleblowers and managers who violate Company ethics standards.***  Investor Thompson, like whistleblower Mr. Cicero, was rebuffed.  Although Wal-Mart directors offered to meet again, the disgusted investors realized the futility of another meeting and Mr. Thompson's response to Mr. Hernandez was "To date, we do not feel we have received a meaningful response."

219.    Pursuant to the obligation of the Audit Committee to bring these matters to the Board's attention, each of the 2005-06 Director Defendants were certainly informed by Audit Chair Defendant Hernandez and Defendant Williams about the complaints of angry institutional investors with substantial holdings regarding Wal-Mart's ineffective internal controls over the occurrence of criminal acts like embezzlement and bribery, and its failure to effectively investigate such allegations.  They also knew and agreed to the Board's strategic response to the investors' demand for an independent special committee to investigate Wal-Mart's manner of

investigating executive malfeasance.   That response, relayed to the investors by Defendants Hernandez and Williams was to reject any independent review.   The 2005-06 Director Defendants acquiesced in their colleagues' position to quash any investigations into practices it had no intention of correcting.

220.   At the very same time the Board members were ignoring the shareholder demands to improve Board oversight over compliance with bribery and other laws and the effectiveness of the Company's whistleblowing controls (between September 2005 and February 2006), Defendant Hernandez, the Chair of the Audit Committee, was receiving Mr. Halter's reports describing substantial evidence of bribery at Walmex at the direction of Wal-Mart's star executive Mr. Castro-Wright.

**O.      The Mexico Success Story Has An Ominous Side**

221.   Wal-Mart's operations are organized into three divisions:  Wal-Mart Stores U.S., Sam's Club, and Wal-Mart International.   During years 2005-2006 the International segment of Wal-Mart's business grew as the domestic segment plateaued.   For example, Wal-Mart's March 31, 2005 10-K states:  "Our International segment consists of retail operations in eight countries and Puerto Rico.   This segment generated 19.7% of our fiscal 2005 sales."  By the March 31, 2006 10-K states:  "the International segment [grew to] 20.1% of our fiscal 2006 sales."  And in the March 27, 2007 10-K stated:  "our International segment generated 22.3% of our fiscal 2007 net sales."  Moreover, Mexico accounted for one-fourth of the sales of Wal-Mart's international segment.

222.   The most successful foreign country in its International segment by far was Mexico.   Wal-Mart's 2005 Annual Report listed the number of segment stores and other operations in each of the countries in which the International segment operates.   As the below list shows, Mexico alone accounted for over one-third of the locations in Wal-Mart's fifteen-country international division.

**Fiscal 2005 End of Year Store Count**

| Country | Discount | Supercenters | Sam's Clubs | Neighborhood Markets |
|---------|----------|--------------|-------------|----------------------|
| Argentina | 0 | 11 | 0 | 0 |
| Brazil | 118 | 17 | 12 | 2 |
| Canada | 256 | 0 | 6 | 0 |
| China | 0 | 38 | 3 | 2 |
| South Korea | 0 | 16 | 0 | 0 |
| Mexico | 529 | 89 | 61 | 0 |
| United Kingdom | 263 | 19 | 0 | 0 |
| Puerto Rico | 9 | 4 | 9 | 32 |

223.    Walmex was widely viewed as a highly successful business operation that stunned rivals with its rapid growth and success.  Indeed, in its 2006 Annual Report, Walmex states:

> [D]uring 2006 we broke a new record in both investment and the number of Grand Openings – an investment of *$839 Million dollars* and the opening of *120 new units* from all our business formats.

(Emphasis in original).

224.    The success story of Walmex was a matter of public knowledge and commentary in the 2005-2006 era.  It was not without its detractors, however, prompting headlines describing Wal-Mart's entry into the Mexico market as the "Goliath"[6] or "Leviathan"[7] that has "invade[d],[8]" "trounc[ed] the locals,"[9] "transform[ed] the Mexican market,"[10] and was decried as

---

[6]    *The Economist*, "Mexico's retail Goliath." *Business Latin America*. March 2, 2002: 4.

[7]    *Miami Herald*, International Edition.   "Wal-Mart leviathan squeezes competition." February 2, 2004.

[8]    Weiner, Tim.  "Wal-Mart invades, and Mexico gladly surrenders." *New York Times*. Sec. A 1,9 December 6, 2003.

[9]    Smith, Geri.  "Mexico: war of the superstores.  Wal-Mart is trouncing the locals, but they're not giving up." *Business Week*. Sept. 23, 2002: 60.

[10]    Luhnow, David.  "Crossover success: How NAFTA helped Wal-Mart reshape the Mexican market." *Wall Street Journal*, sec. 1. August 31, 2001.

a "threat to sovereignty."[11]   Although the matter of Walmex's stunning growth was of keen interest to all 2005-06 Director Defendants, it was particularly important to those members such as Mr. Breyer who served on the Committee on Strategic Planning, because they were charged with the direct responsibility to help develop, advise and assess the Company's strategic plans. Had the Strategic Committee members, including Defendant Breyer, performed their jobs faithfully and loyally, they would have inquired whether Wal-Mart's exponential growth in Mexico was being accomplished in compliance with the law.   Defendant Breyer already knew from the Kroll investigation into sales tax evasion that there was reason to believe that executives of Walmex were not above "shaving legal requirements" in their quest for profit and fast growth.

## VII.    THE DIRECTOR DEFENDANTS CAMPAIGN FOR RETENTION WHILE WITHHOLDING MATERIAL INFORMATION FROM SHAREHOLDERS.

225.    On April 19, 2010, the Director Defendants caused Wal-Mart to issue a false and misleading proxy statement in connection with the 2010 Annual Shareholders meeting that was held on June 4, 2010 (the "April 2010 Proxy"), at which Wal-Mart's shareholders were to vote on the election of the 15 nominees for the Board listed in the proxy, including the nine 2005-06 Director Defendants: Messrs. Scott, Duke, Robson Walton, Jim Walton, Daft, Breyer, Burns, Williams and Wolf.

226.    In violation of Section 14(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), the April 2010 Proxy contained false and misleading statements and omissions.

227.    The April 2010 Proxy misleadingly represented that Wal-Mart's Board selected nominees for the Board that have "demonstrated . . . personal and professional integrity," stating:

---

[11]    González Amador, Roberto.  "Riesgo para la soberanía, el poder de Wal-Mart en el Mercado mexicano." *La Jornada*. P.22 July 8, 2004.

In addition to the information presented below regarding each nominee's specific experience, qualifications, attributes and skills that led the Board to conclude that he or she should serve as a director, our Board believes that each of our director nominees has demonstrated outstanding achievement in his or her professional career; broad experience; wisdom; personal and professional integrity; ability to make independent, analytical inquiries; experience with and understanding of the business environment; and willingness and ability to devote adequate time to Board duties.

This statement was false and misleading in the absence of the disclosure that nine of the nominees for Wal-Mart's Board (Defendants Scott, Duke, Robson Walton, Jim Walton, Daft, Breyer, Burns, Williams and Wolf) had exhibited a distinct lack of "personal and professional integrity" by burying credible evidence that Mr. Castro-Wright and Walmex had engaged in extensive bribery.   In particular, CEO Scott had spear-headed Wal-Mart's response to the evidence uncovered by Mr. Halter and had inappropriately decided to transfer control of Wal-Mart's investigation to Mr. Rodriguezmacedo, thereby ensuring that investigation would be buried.   The same nine 2005-06 Director Defendants had also allowed Mr. Castro-Wright to be promoted to one of Wal-Mart's top executive payments and allowed Wal-Mart to pay Mr. Castro-Wright more than $40 million in unwarranted compensation.

228.    The April 2010 Proxy misleadingly represented that Wal-Mart's Board was actively working to ensure Wal-Mart's compliance with applicable law, stating:

The Audit Committee reviews and discusses with management the company's processes and policies with respect to risk assessment and risk management, including the company's enterprise-wide risk management program. In addition, the company's risk oversight process involves the Board receiving information from management on a variety of matters, including operations, legal, regulatory, finance, reputation and strategy, as well as information regarding any material risks associated with each matter. The full Board (or the appropriate Board committee, if the Board committee is responsible for the oversight of the matter) receives this information through updates from the appropriate members of management to enable it to understand and monitor the company's risk management practices. When a Board committee receives an update, the chairperson of the relevant Board committee reports on the discussion to the full Board during the Board committee reports portion of the next Board meeting. This enables the Board and the Board committees to coordinate the risk oversight role.

This statement was false and misleading in the absence of a disclosure that Wal-Mart's Board of

Directors consciously ignored red flags concerning the existence of widespread corruption at Wal-Mart and consciously ignored the management decision to suppress the investigation into rampant bribery and attempted cover-up at the highest executive level at Walmex.  Thus, an investor could not take comfort from the existence of the reporting structure described in the April 2010 Proxy because Wal-Mart's management and directors did not care if their employees broke the law as long as they kept Wal-Mart profitable.

229.     The April 2010 Proxy misleading represented that Wal-Mart's Board of Directors operated pursuant to Wal-Mart's Statement of Ethics and that Wal-Mart's CEO operated pursuant to a Code of Ethics, stating:

> You may review Walmart's Code of Ethics for the CEO and Senior Financial Officers in the "Corporate Governance" section of the "Investors" page of our corporate website at www.walmartstores.com. Walmart's Code of Ethics for the CEO and Senior Financial Officers supplements **Walmart's Statement of Ethics, which is applicable to all directors**, Executive Officers, and Associates and is also available in the "Corporate Governance" section of the "Investors" page of our corporate website. A description of any substantive amendment or waiver of Walmart's Code of Ethics for the CEO and Senior Financial Officers or Walmart's Statement of Ethics will be disclosed in the "Corporate Governance" section of the "Investors" page of our corporate website for a period of 12 months after the date of the amendment or waiver.

These representations were false and misleading because at least nine of Wal-Mart's directors were flagrantly violating Wal-Mart's Statement of Ethics.   The Statement of Ethics clearly forbids bribery of the sort condoned by the Director Defendants:

> We believe in fair, free and open markets, and in promoting good government. **We do not tolerate, permit, or engage in bribery, corruption, or unethical practices of any kind.** Bribery of public officials in the U.S. and abroad is illegal under both U.S. law and the local law of the countries in which we operate. Walmart's policy goes beyond these legal requirements and prohibits corrupt payments in all circumstances, whether in dealings with public officials or individuals in the private sector.
>
> Specifically, the Global Anti-Corruption Policy prohibits us from paying, promising, offering, or authorizing a payment, directly, indirectly, or through a third party, money or anything of value to a government official or political party for the purpose of influencing an official act or decision in order to obtain or retain business or secure an improper advantage. The term "government official"

includes any person acting in an official capacity for or on behalf of a government or governmental agency or department, including a business with government ownership (for example, a national oil company); a public international organization (for example, the U.N. or World Bank); or a political party or candidate for political office. Even when local practices or customs allow behavior that violates our Anti-Corruption Policy, it is not acceptable for us to do so.

The nine 2005-06 Director Defendants violated this Code in that they had reason to believe that Mr. Castro-Wright had engaged in bribery and they not only tolerated that bribery, they rewarded it with a promotion and more than $40 million dollars in compensation.

230.    These false and misleading statements and omissions were an essential link in the election of the Director Defendants to the Board of Wal-Mart.  This April 2010 Proxy harmed Wal-Mart by interfering with the proper governance on its behalf that follows the free and informed exercise of the stockholders' right to vote for directors.  For example, as a result of their election to the Board, the Director Defendants continued to harm Wal-Mart by perpetuating the cover-up of bribery at Walmex and Mr. Castro-Wright's involvement and continuing to pay him lavish compensation that was unwarranted in light of his extensive law-breaking.

231.    On April 18, 2011, the Director Defendants caused Wal-Mart to issue a false and misleading proxy statement in connection with the 2011 Annual Shareholders meeting that was held on June 3, 2011 (the "April 2011 Proxy") at which Wal-Mart's shareholders were to vote on the election of the 15 nominees for the Board listed in the proxy, including the nine 2005-06 Director Defendants, Messrs. Scott, Duke, Robson Walton, Jim Walton, Daft, Breyer, Burns, Williams and Wolf.

232.    In violation of Section 14(a) of the Exchange Act, the April 2011 Proxy contained false and misleading statements and omissions.

233.    The April 2011 Proxy misleadingly represented that Wal-Mart's Board selected Board nominees for the "personal and professional integrity."  This was false and misleading for the same reasons stated in ¶227.

234.    The April 2011 Proxy misleading represented that Wal-Mart's Board of Directors

complied with Wal-Mart's Statement of Ethics.  This representation was false and misleading for the reasons stated in ¶229.

235.    These false and misleading statements and omissions were an essential link in the election of the Director Defendants to the Board of Wal-Mart.  This April 2011 Proxy harmed Wal-Mart by interfering with the proper governance on its behalf that follows the free and informed exercise of the stockholders' right to vote for directors.  For example, as a result of their election to the Board, the Director Defendants continued to harm Wal-Mart by perpetuating the cover-up of bribery at Walmex and Mr. Castro-Wright's involvement and continuing to pay him exorbitant amounts of compensation that were unwarranted in light of his extensive law-breaking.[12]

## VIII.   DAMAGES ALLEGATIONS

236.    As a direct and proximate result of the Individual Defendants' wrongdoing, Wal-Mart has suffered, and will continue to suffer a myriad of damages.

237.    The Individual Defendants' actions have, for example, caused Wal-Mart to suffer reputational damages.  As Yale School of Management corporate governance expert Jeffrey Sonnenfeld told MSNBC: "The Wal-Mart allegations will undoubtedly leave a black mark on the company's name."[13]

238.    According to Professor Sonnenfeld: "'A company's reputation is worth a lot . . . Great companies in the past – Johnson and Johnson, UPS – they know there's a great value in having this sense of cleanliness and a reputation that stands for something beyond what you think you can get away with.'"  *Id.*

239.    Moreover, reputational damages can carry very real costs.  As BMO Capital

---

[12]    The 2005-2006 Director Defendants filed similarly misleading proxies between 2006 and 2009 in order to protect their hold on the Company.

[13]    Roland Jones, *Wal-Mart Bribery Allegations Could Have Far-reaching Impact*, Market Day on MSNBC.COM (Apr. 23, 2012) (http://marketday.msnbc.msn.com/_news/2012/04/23/11350733-wal-mart-bribery-allegations-could-have-far-reaching-impact?chromedomain=bottomline last visited Apr. 23, 2012).

Markets analyst Wayne Hood said in a research note published on April 23, 2012, allegations like these could hamper the discount chain's future growth both domestically and abroad: "Articles like this will be used against the company by activists and competitors when it attempts to open stores in the U.S. and abroad." *Id.*

240.    In fact, the reaction to the accusations against Wal-Mart executives is already hurting the Company, including in New York City, a market the Company has been trying to penetrate for years.  On the same day the story broke, New York City's Public Advocate Bill de Blasio released a statement blasting the Company: "New York City cannot open its doors to a company that sanctions bribery and then covers it up as a part of doing business. . . New Yorkers should be put on notice: there is no tactic too underhanded for Wal-Mart to try in order to open here."

241.    Similarly, Manhattan Borough President Scott Stringer stated: "Once again Wal-Mart has shown itself to be a bad corporate actor and a bad neighbor, a company whose black marks already include predatory pricing and blatant disregard for the rights of working men and women."

242.    An FCPA investigation can also cost a company hundreds of millions of dollars in legal fees and fines, as well as years of wasted executive time in dealing with the allegations and clean-up of the wrongful conduct.  Legal fees for the Company and its directors in this type of investigation can grow quickly.  For instance, Avon has disclosed it was spending $95 million in 2010 dealing with a Foreign Corrupt Practices Act investigation that has been going on since 2008, and in 2008 Siemens AG, the electronics and electrical engineering company, paid a $450 million fine to resolve FCPA claims.

243.    In addition to huge legal costs and fines, the culture of corruption fostered by the Individual Defendants may also lead to criminal prosecutions.  According to an article on MSNBC.COM:

> "We could easily see criminal prosecutions," said Jacob Frenkel, a former official of the Securities and Exchange Commission.

> "The fact that it's a U.S. company working through a Mexican subsidiary does not give the U.S. company protection," Frenkel told CNBC, adding that anyone who is found to have their fingerprints on the alleged wrongdoings "has potential liability, civilly and criminally."
>
> Frenkel said he wouldn't rule out potential jail time for Wal-Mart executives and estimated that the financial consequences of the *Times* report, if accurate, could cost Wal-Mart $1 billion in settlements and internal investigations.

Roland Jones, Wal-Mart Bribery Allegations Could Have Far-reaching Impact, Market Day on MSNBC.COM (Apr. 23, 2012).

244.   The fact that the Individual Defendants chose to cover up the wrongdoing, instead of coming forward, will only increase the potential penalties.  As one FCPA expert told *The Wall Street Journal*:

> If federal authorities conclude that Wal-Mart violated the law, the Justice Department "will levy as large a fine as possible in a case like this, because it has repeatedly counseled companies that companies will be looked on with great favor if they do come forward," said Kevin T. Abikoff, chairman of the anti-corruption practice at law firm Hughes Hubbard & Reed LLP.  "You either pay a small price early or a huge amount later."

Miguel Bustillo, Wal-Mart Faces Risk in Mexican Bribe Probe, *The Wall Street Journal* (Apr. 23, 2012).

245.   The same applies to the potential for jail time: "If federal investigators found any evidence of a cover-up, they could bring criminal charges against individual executives at the company."[14]

246.   In terms of additional immediate damages, the Company has admitted that it has already met with the DOJ and the SEC to "self-disclose" the ongoing investigation of this matter, and that it has retained outside legal and accounting experts to conduct an internal investigation. On May 17, 2012, the Company confirmed that "The Company has been informed by the DOJ and the SEC that it is also the subject of their respective investigations into possible violations of

---

[14]      Miguel Bustillo, Wal-Mart Faces Risk in Mexican Bribe Probe, *The Wall Street Journal* (Apr. 23, 2012).

the FCPA." Accordingly, Wal-Mart is now incurring significant monetary costs in dealing with an investigation that experts estimate will take "two to four years."[15]

247.     Further, the Director Defendants caused Wal-Mart to pay Mr. Castro-Wright at least $40 million dollars in compensation that was illegitimate waste in light of the fact that Mr. Castro-Wright is a criminal who orchestrated a bribery campaign in violation of Mexican and U.S. law. Mr. Castro-Wright was allowed to conduct his crimes under the protection of disloyal officers and directors who conspired to silence any meaningful investigation into the criminal enterprise.

248.     Damage to the Company may also extend to Wal-Mart's political relations, both here and abroad. On April 23, 2012, two Democratic U.S. lawmakers, Elijah Cummings and Henry Waxman, announced they were launching an investigation into the matter and sent a letter to Defendant Duke requesting a meeting.

249.     On that same day, Consumer Edge Research analyst Faye Landes acknowledged potential damage to Wal-Mart's overseas expansion plans. Ms. Landes wrote in a research note: "Entering additional countries is a cornerstone of Wal-Mart's growth strategy," and "[w]e can foresee the authorities in some key countries, notably India, becoming dramatically less welcoming to Wal-Mart following the release of the allegations."

250.     On April 23, 2012, *The Washington Post* reported that the DOJ has been conducting a criminal probe of Wal-Mart for allegations of systematic bribery in Mexico. According to *The Washington Post*, "the probe was launched in December 2011, and is continuing."

251.     The Company also faces investigations in Mexico. On April 23, 2012, the Federal comptroller – the government's anti-corruption watchdog, announced that it would begin an investigation, including, but not limited to, a review of the permits granted to the Company by the environmental ministry.

---

[15]     Miguel Bustillo, Wal-Mart Faces Risk in Mexican Bribe Probe, *The Wall Street Journal* (Apr. 23, 2012).

252.    On April 26, 2012, *The New York Times* reported that Mexico's Attorney General would begin an investigation of Wal-Mart and Walmex:  "The investigators will gather evidence about the company's executives as well as public officials."  Wal-Mart confirmed in its May 17, 2012 8-K that a number of federal and local agencies in Mexico had begun a probe into the Company's violations of Mexican law.

## IX.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

253.    Plaintiffs were shareholders at the time of the conduct complained of herein and have continuously held shares of Wal-Mart to the present.  Plaintiffs will continue to remain as shareholders of Wal-Mart throughout the pendency of this action. Plaintiffs will adequately and fairly represent the interests of Wal-Mart and its shareholders in enforcing its rights.

254.    Plaintiffs repeat, reallege, and incorporate by reference each and every allegation set forth above as though fully set forth herein.  In addition to those allegations, demand on the current Board (comprised of Defendants Scott, Duke, S. Robson Walton, Jim C. Walton, Breyer, Burns, Williams, Daft, Wolf, Penner, Alvarez, Cash, Corbett, Reinemund, and Sorenson) would have been a futile act for at least the following reasons as set forth below.

255.    Such a demand would be a futile and useless act because there is a reasonable doubt that:  (1) the Board's actions which damaged the Company were the product of a valid exercise of business judgment; and/or (2) a majority of the Board is incapable of making an independent and disinterested decision about whether to institute and vigorously prosecute this action.

### A.    The Board's Actions Were Not Valid Exercises Of Business Judgment

256.    The Board's decision to violate the FCPA and Mexican law by engaging in bribery of Mexican officials as a means to grow its business was not a valid exercise of business judgment.

257.    The Board's decision to close the investigative case into bribery in Mexico even though the in-house investigation corroborated the whistleblower's information was not a valid

exercise of business judgment.

258.    The Board's decisions during the Relevant Period to seek re-election while concealing the wrongdoing, of which they were aware, were not valid exercises of business judgment.

259.    The Board's decisions to reward wrongdoers through promotions and compensation were not valid exercises of business judgment.

260.    The Board's decisions to conceal the wrongdoing until *The New York Times* publicized the results of its investigation were not valid exercises of business judgment.

**B.    Demand is Futile Because the Complaint Alleges Facts Creating a Reasonable Doubt That a Majority of the Board is Independent and Disinterested For Purposes of Considering a Demand.**

261.    A majority of the Board has a strong interest in refusing to bring the claims asserted by Plaintiffs in order to protect themselves against prosecution for violating the FCPA that disqualifies them from considering demand.   Nine directors on Wal-Mart's 15-member Board, including Defendants Scott, Duke, S. Robson Walton, Jim Walton, Breyer, Burns, Daft, Williams and Wolf, either sat on the Wal-Mart Board and/or served as a high-ranking executive officer during the relevant period and knew about the wrongful conduct described herein at the time it was occurring.   Each of these nine directors knew of the wrongdoing and cover-up and either actively participated in it or acquiesced in it. Accordingly, each of these current directors faces a substantial likelihood of liability for allowing Wal-Mart to violate the FCPA in its Mexican operation.

262.    The DOJ is responsible for all criminal enforcement of the FCPA, and for civil enforcement of the anti-bribery provisions with respect to domestic concerns and foreign companies and nationals.   The SEC is responsible for civil enforcement of the anti-bribery provisions with respect to publicly traded companies.

263.    While in criminal cases the DOJ has statutory guidelines for imposing penalties for violations of the FCPA's anti-bribery provisions, penalties for large scale commissions of

bribery typically fall under the Alternative Fines Act, 18 U.S.C.A. §3571. Under that statute, the actual fine may be up to twice the benefit that the defendant gained by making the illegal payment. ***Fines to an individual may not be paid by his or her employer***. Further, a person or company found in violation of the FCPA may be barred from doing business with the federal government.

264.   In civil cases, such as an SEC enforcement action, a court may impose, in addition to statutory fines, a fine equaling the gross amount of the pecuniary gain to the defendant as a result of the violation.

265.   To establish criminal liability under the FCPA, the Department of Justice need not prove that the director knew that bribes were being paid. It is sufficient to establish a criminal conviction that the director believed there was a "high probability" that bribes were being paid but "consciously and intentionally avoided confirming that fact." *See United States v. Kozeny*, 667 F.3d 122, 132 (2d. Cir. 2011). At minimum, there is a substantial likelihood that the DOJ could meet this burden of proof against the nine Director Defendants who served during the Relevant Period. These individuals were provided with a wealth of evidence giving rise to a "reasonable suspicion" of widespread bribery and then intentionally covered up that evidence by permitting one of the main suspects in the bribery scheme, Mr. Rodriguezmacedo, to take over the investigation, thereby "consciously. . . avoid[ing] confirming" the bribery. There is documentary evidence that the results of Mr. Halter's investigation, implicating Mr. Castro-Wright and Mr. Rodriguezmacedo in widespread bribery throughout Mexico, was delivered to Mr. Hernandez, Chair of the Audit Committee, in November 2005. Mr. Hernandez and the other Audit Committee members, Messrs. Burns and Williams, would have to reveal to the entire Board, for its consideration, what they had learned from the Halter report. These acts were particularly egregious in light of the exponential growth of Wal-Mart's operations in Mexico, the Defendants' knowledge of the inadequacy of Wal-Mart's guidelines to ensure compliance with anti-bribery policy, their refusal to take measures to shore up those known inadequate internal controls, the recent instances of sabotage of internal investigations by high level executives, and

the common knowledge that bribery is a frequent occurrence in Mexico.   Accordingly, these nine individuals are disqualified from hearing demand and demand is excused.

266.    The Department of Justice has made clear that it will not look only to corporations for enforcement of the FCPA.  Lanny Breuer, Assistant Attorney General for the DOJ's Criminal Division in speeches in November 2009 and again in February 2010 stated: "The prospect of significant prison sentences for individuals should make clear to every corporate executive [and] ***every board member*** . . . that we will seek to hold you personally accountable for FCPA violations.  (Emphasis added).  Violations of the FCPA under the 2002 amendment are classified as "public corruption offences" which under the Federal Statutory Guidelines carry a range of 10 months to 5 years prison time per offense before any enhancements.  Factors which tend to reduce the severity of the punishment of the corporation and any individuals liable under the FCPA, such as a robust internal compliance procedure and voluntary self reporting, would not be available to the Director Defendants here.

267.    Each of the nine 2005-06 Director Defendants has a disabling interest in evaluating this derivative action because any additional factual investigation into their awareness of the 2005-2006 investigation into bribes in Walmex, or the cover-up of that investigation increases their risk of criminal prosecution.

**C.    Demand Is Futile Because a Majority of the Board Faces a Substantial Likelihood of Liability for Breaching Their Fiduciary Duty to Wal-Mart**

268.    The same nine directors who face violation under the FCPA also face a substantial likelihood of liability for breaching their fiduciary duty to Wal-Mart.  These nine individuals had an obligation to ensure that Wal-Mart complied with the law that they actively shirked.  Faced with clear evidence that Walmex, Mr. Castro-Wright, Mr. Rodriguezmacedo and others were violating the FCPA and Mexican bribery laws, these nine Defendants moved to smother the investigation into the wrongdoing and promoted the culprit, Mr. Castro-Wright, to a senior position in Wal-Mart.   Based on these facts, there is a substantial likelihood that Plaintiffs will be able to prove that these nine individuals breached their fiduciary duties of loyalty and

good faith.  Accordingly, these nine individuals are disqualified from evaluating a demand and demand is futile.

**D.     Demand Is Futile Because a Majority of Wal-Mart's Board Faces a Substantial Likelihood of Liability for Violating Section 14(a) of the Exchange Act**

269.    As described above, nine culpable Director Defendants caused Wal-Mart to disseminate two false and misleading proxies, the April 2010 Proxy and the April 2011 Proxy, in violation of Section 14(a) of the Exchange Act.  These Proxies harmed Wal-Mart by interfering with the proper governance of the Company that would have followed a fully informed shareholder vote.  Based on these facts, there is a substantial likelihood that Plaintiffs will be able to prove that these nine individuals are liable under Section 14(a) of the Exchange Act. Accordingly, these nine individuals are disqualified from hearing demand and demand is futile. Director Defendants Alvarez, Cash, Corbett, Reinemund and Sorenson also face a substantial likelihood of liability for the false proxies.

**E.     Additional Demand Futility Allegations**

**H. Lee Scott Jr.**

270.    Defendant Scott has served on the Board of Directors since 1999 and was Wal-Mart's President and Chief Executive Officer from January 2000 to January 2009.  Defendant Scott is disabled from deciding a demand because he was integrally involved in the wrongful activity described in this Complaint.  Defendant Scott knew about the widespread bribery at the highest levels of Wal-Mart de Mexico and instead of rooting out the wrongdoing, he proceeded to squelch the investigation and bury the results.  On or about February 3, 2006 Defendant Scott met with Wal-Mart's internal Corporate Investigations unit, pretextually accused the investigators of being overly aggressive, ordered them to redraft a protocol for a more limited investigation and allowed the investigation to be directed by Defendant Rodriguezmacedo, a primary target of the investigation.  Once the investigation overseen by a target concluded, not surprisingly, with a finding of "no wrongdoing," Defendant Scott authorized the investigation to

be closed and the wrongdoing to be covered up for the succeeding six years.  Defendant Scott faces a strong likelihood of civil and criminal liability under the anti-bribery sections of the Foreign Corrupt Practices Act of 1977, as amended, 15 U.S.C. §§78dd-1, *et seq*. ("FCPA") and other laws and thus is disqualified from deciding a demand.  Mr. Scott is designated as a so-called "inside director" by Wal-Mart.  Mr. Scott is currently a defendant in a putative securities class action in the District Court for the Middle District of Tennessee alleging that Mr. Scott made misstatements and omissions concerning the existence of bribery at Walmex.  *See City of Pontiac General Employees Retirement System v. Walmart Stores Inc., et al.,* No. 12-457 (M.D. Tenn.).  Mr. Scott is not "independent" under the NYSE Listed Company Rules.

**Michael T. Duke**

271.    Defendant Duke has served on the Wal-Mart Board of Directors since 2008 and was employed by Wal-Mart since 1995.  In the 2005-2006 period Defendant Duke's position was Vice Chairman of the International Division and he was charged with overseeing international operations, including those in Mexico.  Defendant Duke is disabled from deciding a demand because he was one of the primary wrongdoers.  For example, on October 15, 2005, a Wal-Mart attorney sent Mr. Duke an e-mail containing a detailed description of whistleblower Mr. Cicero's allegations.  In November 2005, Mr. Duke traveled to Mexico City to reassure Walmex officials who were unhappy that Mr. Halter was investigating the gestor payments.  He was made expressly aware of the details of the allegations of rampant bribery throughout Mexico by the highest executive level of Walmex and suppressed any meaningful investigation into such unlawful practices.  He then participated in covering it up for the next six years.  Defendant Duke faces a substantial likelihood of liability under the anti-bribery sections of the FCPA and other laws and thus is disqualified from deciding a demand.  Moreover, Defendant Duke, who as Wal-Mart's current CEO earns over $18 million dollars per year, has strong financial incentives not to pursue an action against himself.

272.    Defendant Duke is designated as a so-called "inside director" by Wal-Mart.  Mr. Duke is currently a defendant in a putative securities class action in the District Court for the

Middle District of Tennessee alleging that he made misstatements and omissions concerning the existence of bribery at Walmex. *See City of Pontiac General Employees Retirement System v. Walmart Stores Inc., et al.,* No. 12-457 (M.D. Tenn.).

**S. Robson Walton**

273.     Defendant S. Robson Walton is a son of founder Sam Walton and has served on the Board continuously since 1978.  He knew that serious corruption and bribery was almost certainly occurring in Walmex by early 2006 at the latest.  Along with Defendants Scott and Duke, Defendant S. Robson Walton received an anonymous email stating that Walmex's top real estate executives were receiving kickbacks from construction companies.  Although the e-mail sender begged Defendant S. Robson Walton "please you must do something," Defendant S. Robson Walton suppressed the email and did nothing to investigate the wrongdoing, despite his position of authority on the Board.  Furthermore, as a member of the Executive Committee during 2005 and 2006, he was responsible to act on behalf of the Board between Board meetings, a managerial role that necessitated his being aware of the problems at Walmex, which was Wal-Mart's largest subsidiary and accounted for twenty percent of its stores.  As such, Defendant S. Robson Walton faces a substantial likelihood of civil and criminal liability under the anti-bribery sections of the FCPA, and other laws and thus is disqualified from deciding a demand. Defendant S. Robson Walter is not "independent" under the NYSE Listed Company Rules.

274.     Additionally, Defendant S. Robson Walton is the brother of Defendant Jim Walton and is the father-in-law of Defendant Penner.  These familial ties disqualify him from considering demand.

**Jim C. Walton**

275.     Defendant Jim Walton served on the Board since 2005.  He is the son of the founder of the Company, Sam Walton, and younger brother of co-Defendant S. Robson Walton. Jim C. Walton is designated as a so-called "inside director" by Wal-Mart.  Between September 2005 and May 2006, Jim C. Walton learned about the credible evidence that Mr. Castro-Wright and other Walmex executives were engaged in widespread bribery through multiple sources.  As

a member of the Board, he received regular reports from Wal-Mart's Audit Committee.  (*See supra* at ¶¶62-64).  Beginning on November 16, 2005 and continuing thereafter, Mr. Halter made reports on his investigation to the Chairman of Wal-Mart's Audit Committee, Mr. Hernandez, and therefore the Audit Committee reports to the Board included the information about the serious allegations against Mr. Castro-Wright and the extensive evidence of wrongdoing compiled by Mr. Halter's investigation.   Therefore, Jim Walton was aware of Mr. Halter's conclusion in December 2005 that "There is reasonable suspicion to believe that Mexican and USA laws have been violated" and "no defendable explanation" for the millions of dollars in gestor payments.  Jim Walton would have also learned about the evidence of bribery at Walmex from CEO Scott and General Counsel Mars, both of whom were directly involved in covering up the evidence of wrongdoing.   Yet despite being aware of the clear evidence of serious wrongdoing, Jim Walton acquiesced in the transfer of the Walmex investigation to Mr. Rodriguezmacedo which was designed to and did shut down the inquiry.   Jim Walton also acquiesced to the 2008 promotion of Mr. Castro-Wright to Vice Chairman of Wal-Mart.

**Gregory Penner**

276.    Defendant Gregory Penner is married to Carrie Walton, the daughter of S. Robson Walton and granddaughter of founder Sam Walton.  From 2002 to 2004 Defendant Penner was the Senior Vice President and Chief Financial Officer at Wal-Mart.  From 2000 to 2002 Mr. Penner was Senior Vice President of Finance and Strategy for Wal-Mart.com.   Defendant Penner, who comes from a middle class background lives a very lavish lifestyle with his wife and four children that is due to the wealth of the Walton family. A son-in-law, who is dependent on his wife's family's wealth, is disabled from making a decision on a shareholder demand that exposes his father-in-law and fellow Board member to a substantial likelihood of civil or criminal liability.

**M. Michele Burns, Douglas N. Daft, Christopher J. Williams, James Breyer and Linda S. Wolf**

277.    Each of the above directors sat on the Board in the 2005 to 2006 period, serving

on various committees, and each of these long-standing Board members intentionally and in bad faith acquiesced in the violation of civil and criminal laws of the United States and Mexico and the Company's own internal Code of Conduct, obstruction of a sensitive investigation into criminal corruption at the highest levels of Walmex and cover-up of the criminality uncovered by the investigation.

278.    Each of these individuals were either directly informed of the wrongdoing  or were informed through the proper operation of the Board's governance and the Company's reporting systems, which have been attested to in various filings with the SEC and exemplified by documents cited to and quoted by *The New York Times* in its investigatory reporting on the bribery scandal.

279.    In choosing to cover up the bribery scandal, these individuals sought to evade potential personal liability for violations of the Foreign Corrupt Practices Act, for potential personal liability for breaches of their fiduciary duties of loyalty, for potential personal liability for violations of the Securities Exchange Act of 1934, and for contribution and indemnification.

280.    Moreover, in choosing year after year to cover up the bribery scandal, these individuals sought from shareholders pursuant to false and misleading proxy statements their continued service and remuneration as directors of the Company.

281.    Demand is futile because a majority of the Board is not independent and disinterested for purposes of considering a demand.  With respect to independence, five members of the current fifteen-member Board (Messrs. Scott, Duke, S. Robson Walton, Jim C. Walton, and Penner) are not independent under the NYSE Listed Company Rules.

## FIRST CLAIM FOR RELIEF

(*Breach of Fiduciary Duty*)

282.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

283.    The Defendants each owe (or owed) Wal-Mart and its shareholders fiduciary duties of loyalty, good faith, candor, trust and due care in managing the Company's affairs.

284.   As detailed above, the Defendants breached their fiduciary duties of loyalty and good faith by:

   a.   permitting Wal-Mart, its directors and officers to violate foreign and federal laws and Wal-Mart's own code of ethics;

   b.   permitting the obstruction of an adequate investigation of known potential (and/or actual) violations of foreign and federal laws; and

   c.   covering up (or attempting to cover up) known potential (and/or actual) violations of foreign and federal laws.

285.   As a direct and proximate result of the Defendants' breaches of their fiduciary duties, Wal-Mart has been damaged, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, the cost of defending Wal-Mart against government investigations and the penalties, fines and other liabilities and expenses associated with those investigations.

**SECOND CLAIM FOR RELIEF**

(*Violation of Section 14(a) of the Exchange Act*)

286.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

287.   SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides:

No solicitation subject to this regulation shall be made by means of any proxy statement form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

288.   The Director Defendants exercised control over Wal-Mart and caused Wal-Mart to disseminate the false and misleading April 2010 Proxy and April 2011 Proxy.  These Proxies

materially misrepresented the manner in which nominees for Wal-Mart's Board of Directors were selected, the effectiveness of the Board's oversight of compliance issues at Wal-Mart and the Board's compliance with Wal-Mart's Statement of Ethics.

289.    As stated herein, these Proxies contained untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of §14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.   These false statements and omissions were essential links in the election of the Director Defendants to Wal-Mart's Board of Directors and the continued illegal management of Wal-Mart.

290.    The written communications made by the Defendants described herein constitute violations of Rule 14a-9 and §14(a) because such communications were materially false and/or misleading and were provided in a negligent manner.

291.    At all relevant times to the dissemination of the materially false and/or misleading Proxies, Defendants were aware of and/or had access to the true facts concerning Wal-Mart's operation.

292.    Wal-Mart has been severely injured by this conduct and is entitled to damages and equitable relief.

## THIRD CLAIM FOR RELIEF

(*Violation of §29(b) of the Exchange Act*)

293.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

294.    Individual Defendants each received incentive compensation and fees, including stock awards, while engaging in conduct that violates §14(a) of the Exchange Act.   The Individual Defendants' incentive compensation and fees should be rescinded under §29 of the Exchange Act because Individual Defendants violated §14 by issuing false and misleading reports to Wal-Mart shareholders regarding the nature of, and responsibility for FCPA violations. All of the payments Defendants received are therefore voidable by Wal-Mart under §29(b) of the Exchange Act.

295.   Wal-Mart is in privity with the Individual Defendants with respect to the incentive compensation and fees provided by Wal-Mart to Individual Defendants.    Individual Defendants have engaged in prohibited conduct in violation of the securities laws as alleged herein.

296.   Wal-Mart has been severely injured by the misconduct of the Individual Defendants.    Accordingly, Wal-Mart is entitled to damages, *i.e.*, recession of the incentive and compensation and fees granted to Individual Defendants.

## FOURTH CLAIM FOR RELIEF

### (*Contribution and Indemnity*)

297.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

298.   Wal-Mart is alleged to be liable to various persons, entities and/or classes by virtue of the same facts and circumstances as are alleged herein which gives rise to the Individual Defendants' liability to Wal-Mart.

299.   Wal-Mart's alleged liability on account of the wrongful acts and practices related to the misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of the Individual Defendants in connection with all such claims that have been, are, or may be in the future asserted against Wal-Mart by virtue of the Individual Defendants' misconduct and breaches of fiduciary duty.    Plaintiffs on behalf of Wal-Mart have no adequate remedy at law.

300.   As a result of the foregoing, certain Directors and Officers liable, jointly and severally, for contribution and/or indemnification to the Company, including Defendants Castro-Wright, Scott, Duke, S. Robson Walton, Jim Walton, Breyer, Burns, Williams, Daft, Wolf, Hernandez, Mars and Hyde.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.    A judgment finding that a shareholder demand on the Wal-Mart Board would have been a futile and useless act;

72

B.      A judgment finding that the Individual Defendants have breached their fiduciary duties to the Company and violated the federal securities laws;

C.      A judgment against each of the Individual Defendants in favor of Wal-Mart for the amount of damages sustained by Wal-Mart as a result of the breaches of fiduciary duties by each Individual Defendant as alleged herein, jointly and severally, in an amount to be determined at trial, together with pre- and post-judgment interest at the maximum legal rate allowable by law;

D.      A judgment requiring the Individual Defendants to return to Wal-Mart all compensation and remuneration of whatever kind paid to them by Wal-Mart during the time that they were in breach of the fiduciary duties they owed to Wal-Mart;

E.      Directing the Individual Defendants to establish, maintain, and fully fund effective corporate governance and compliance programs to ensure that Wal-Mart's directors, officers and employees do not engage in wrongful and illegal practices;

F.      Granting appropriate equitable and/or injunctive relief to remedy the Individual Defendants' misconduct; as permitted by law;

G.      Awarding to Plaintiffs the costs and disbursements of this consolidated action, including reasonable attorneys' and experts' fees and expenses;

H.      Granting any such other further relief as the Court may deem just and proper

## JURY DEMAND

Plaintiffs demand a trial by jury.


DATED:  May 31, 2012                    Respectfully Submitted,

                                        **WYLY ~ ROMMEL, PLLC**
                                        James C. Wyly
                                        Arkansas Bar No. 90158
                                        jwyly@wylyrommel.com
                                        Sean F. Rommel
                                        Arkansas Bar No. 94158
                                        srommel@wylyrommel.com
                                        4004 Texas Blvd.
                                        Texarkana, TX  75503

(903) 334-8646 (Telephone)
(903) 334-8645 (Facsimile)

**LIASON COUNSEL FOR PLAINTIFFS**

**EMERSON POYNTER LLP**
John. G. Emerson
jemerson@emersonpoynter.com
830 Apollo Lane
Houston, TX 77058
(281) 488-8854 (Telephone)
(281) 488-8867 (Facsimile)

Scott E. Poynter
scott@emersonpoynter.com
William T. Crowder
wcrowder@emersonpoynter.com
Corey D. McGaha
cmcgaha@emersonpoynter.com
500 President Clinton Ave., Ste. 305
Little Rock, AR 72201
(501) 907-2555 (Telephone)
(501) 907-2556 (Facsimile)

/s/ Judith S. Scolnick.

**SCOTT+SCOTT LLP**
Joseph P. Guglielmo
jguglielmo@scott-scott.com
Judith S. Scolnick
jscolnick@scott-scott.com
Donald A. Broggi
dbroggi@scott-scott.com
Joseph Cohen
jcohen@scott-scott.com
Thomas L. Laughlin
Tlaughlin@scott-scott.com
500 Fifth Avenue, 40th Floor
New York, NY 10110
(212) 223-6444 (Telephone)
(212) 223-6334 (Facsimile)

**CO-LEAD COUNSEL FOR PLAINTIFF**

74

**JIGARJIAN LAW OFFICE**
Robert A. Jigarjian
jigarjianlaw@gmail.com
128 Tunstead Avenue
San Anselmo, CA 94960
Tel: (415) 341-6660

**MURRY FRANK LLP**
Brian P. Murray
Gregory B. Linkh
275 Madison Avenue, 8th Floor
New York, NY 10016
Tel: (212) 682-1818
Fax: (212) 682-1892

**ADDITIONAL COUNSEL FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 31, 2012, I electronically submitted the foregoing document with the clerk of the court for the U.S. District Court, Western District of Arkansas, using the electronic case files system of the Court.  The electronic case files system sent a "Notice of Electronic Filing" to individuals who have consented in writing to accept this Notice as service of this document by electronic means.  All other counsel of record not deemed to have consented to electronic service were served with a true and correct copy of the foregoing by first class mail today.

/s/ Judith S. Scolnick
Judith S. Scolnick

76

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
## TEXARKANA DIVISION

|  |  |  |
|---|---|---|
| IN RE WAL-MART STORES, INC. SHAREHOLDER DERIVATIVE LITIGATION | ) ) ) ) | Master Docket No. 4:12-cv-4041 SOH |
| This Document Relates To: ALL ACTIONS | ) ) ) ) ) |  |

## **VERIFICATION OF JOHN COTTRELL**

1.     I am a co-lead plaintiff in the above-entitled action, have read the foregoing Consolidated Verified Shareholder Derivative Complaint ("Complaint"), and believe it to be true and correct, and the same is true as to my own knowledge, except as to the matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true.

2.     I have not received, been promised or offered and will not accept any form of compensation, directly or indirectly, for prosecuting or serving as a representative party in this shareholder derivative action except for (i) such damages or other relief as the Court may award me, (ii) such fees, costs or other payments as the Court expressly approves to be paid to me, or (iii) reimbursement, paid by my attorneys, of actual and reasonable out-of-pocket expenditures incurred directly in connection with the prosecution of this shareholder derivative action.

3.     I have been a Wal-Mart Stores, Inc. ("Wal-Mart") shareholder during relevant periods alleged in the Complaint and I continue to hold my shares. I confirm that the action is not a collusive one and that I am capable and willing to fairly and adequately represent the interests of shareholders who are similarly situated in enforcing the rights of Wal-Mart.

4.     I hereby authorize the filing of the Complaint.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 31st day of May, 2012 at ___Dallas___, Texas.

_____

John Cottrell

## VERIFICATION

I, R. Randall Roche, on behalf of Louisiana Municipal Police Employees'

Retirement System ("LAMPERS") hereby declare and verify that LAMPERS is currently

an owner of Wal-Mart Stores. Inc. ("Wal-Mart") stock and has continuously been an

owner of Wal-Mart stock since at least September, 2005.

I have reviewed the allegations of the Consolidated Verified Shareholder

Derivative Complaint and confirm that the action is not collusive and that LAMPERS is

capable and willing to fairly and adequately represent the interests of shareholders who

are similarly situated in enforcing the right of the corporation.

I declare under penalty of perjury that the foregoing is true and accurate.

Executed this 30th day of May, 2012, at Baton Rouge, Louisiana

LOUISIANA MUNICIPAL POLICE
EMPLOYEES' RETIREMENT
SYSTEM

R. Randall Roche

Title: General Counsel