IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

_____
                                                               )
IN RE WAL-MART STORES, INC.                 )    Master Docket No. 4:12-cv-4041
SHAREHOLDER DERIVATIVE                   )
LITIGATION                                             )
_____)
                                                               )
This Document Relates to:                        )
        ALL ACTIONS                                 )
_____)

## ORDER

Before the Court is a Motion to Dismiss Case for Failure to Establish Demand Futility filed by Nominal Defendant Wal-Mart and the Individual Defendants.[1] ECF No. 109. Plaintiffs have filed a response. ECF No. 114. Defendants[2] have filed a reply. ECF No. 115. The Court has reviewed the memoranda and various supplements submitted by the parties. ECF Nos. 110, 116, 119, 121, 122, 124, 125, 127, 128, 129, 131, 132, 133, 134, 135, and 136. For the reasons set forth below, the Court will grant the motion filed by Defendants.

### I. BACKGROUND

The following facts are drawn from allegations contained in Plaintiff's Consolidated Verified Shareholder Derivative Complaint ("Complaint"). ECF No. 16. The Court notes that, in this Order, page number references from ECF documents refer to the page number found in the ECF heading at the top of the filed ECF document.

Wal-Mart, a multinational retail company, is a Delaware corporation headquartered in Bentonville, Arkansas. Wal-Mart de Mexico ("Walmex") is Wal-Mart's largest and most

---

[1] The term "Individual Defendants" refers to all persons named as defendants in this action.

[2] The "Defendants" collectively refers to Nominal Defendant Wal-Mart and the Individual Defendants.

profitable subsidiary. When the fiscal year 2012 ended, Walmex had generated approximately 28% of Wal-Mart's net sales.

At the time the Amended Complaint was filed in May 2012, Wal-Mart's board of directors ("the Board") was made up of the following fifteen members (collectively referred to as "Director Defendants"):

- H. Lee Scott has served as director since 1999. He was Wal-Mart's President and CEO from January 2000 through January 31, 2009. He continued as Executive Officer of Wal-Mart and as Chairman of the Board's Executive Committee until his retirement on January 31, 2011.

- Michael T. Duke has served as a director since November 2008. He is currently President and CEO of Wal-Mart. He has served on the Board's Executive Committee since 2008. He has also served as the Vice Chairman with responsibility for Wal-Mart International and as Executive Vice President and President and CEO of Wal-Mart U.S.

- S. Robson Walton has served as a director since 1978 and as Chairman of the Board since 1992. He has served on the Board's Executive Committee since 2005. Prior to becoming Chairman of the Board in 1992, he held a variety of positions with Wal-Mart, including Senior Vice President, Corporate Secretary, General Counsel, and Vice Chairman. He is the son of Wal-Mart's founder, Sam Walton.

- Jim C. Walton has served as a director since September 28, 2005. He has served on the Board's Strategic Planning and Finance Committee since 2005. He is also the son of Sam Walton.

- James W. Breyer has served as a director since 2001. He has served on the Board's Strategic Planning and Finance Committee since 2005.

- Michelle Burns has served as a director since 2003. She served on the Board's Audit Committee between 2003 and February 20, 2006, and on the Compensation, Nominating and Governance Committee during 2007. She has served on the Strategic Planning and Finance Committee since 2007.

- Christopher J. Williams has served as a director since 2004. He has served on the Board's Audit Committee since March 4, 2005, and has been the Chairman of the Audit Committee since 2008.

- Douglas N. Daft has served as a director since January 2005. He has served on the Board's Compensation, Nominating and Governance Committee since 2005.

- Linda S. Wolf has served as a director of Wal-Mart since June 2005. She has served on the Board's Compensation, Nominating and Governance Committee since 2006.

- Gregory B. Penner has served as a director since 2008. He served on the Board's Strategic Planning and Finance Committee in 2009. From 2002 to 2005, he served as Wal-Mart's Senior Vice President and Chief Financial Officer-Japan. He is the son-in-law of S. Robson Walton.

- Aida M. Alvarez has served as a director since 2006 and a member of the Board's Audit Committee since 2007.

- James I. Cash has served as a director and a member of the Board's Audit Committee since 2006.

- Roger C. Corbett has served as a director since 2006.

3

- Steven S. Reinemund has served as a director and a member of the Board's Compensation, Nominating and Governance Committee since 2010.
- Arne M. Sorenson has served as a director and a member of the Board's Audit Committee since 2008.

These fifteen individuals constitute the Board for purposes of evaluating demand futility. Eight of these fifteen Director Defendants were on the Board in 2005-2006, which is when most of the alleged wrongful conduct in this case occurred.

Plaintiffs, who are certain shareholders of Wal-Mart, allege that, beginning in 2003, Walmex's top leaders, including its lead executive Eduardo Castro-Wright and general counsel José Luis Rodriguezmacedo, engaged in a systemic campaign of bribery throughout Mexico to ensure quick and easy approval of building permits for Walmex's new stores. This scheme was first revealed to the public on April 12, 2012, by a journalist in the article titled "Wal-Mart Hushed Up a Vast Mexican Bribery Case" published by the *The New York Times*. The primary source quoted in the article is a former Walmex in-house attorney, Sergio Cicero Zapata ("Cicero"), who had worked in Walmex's real estate department for over ten years before he retired in 2004.

On September 21, 2005, Cicero sent an email to Maritza Munich, general counsel of Wal-Mart International, which stated that he had information about irregularities authorized by individuals at Walmex, including its board chairman, general counsel, chief auditor, and top real estate executive. Munich hired a prominent attorney in Mexico City to debrief Cicero. Cicero detailed how Castro-Wright and Rodriguezmacedo, along with other top Walmex officials, had funneled millions of dollars to middlemen, known as "gestores," to bribe local government officials to approve plans to build Walmex stores. This allowed Walmex to quickly build

hundreds of new stores. The payments to gestores were masked by fabricated invoices and recorded as legitimate business expenses.

In October 2005, Munich sent memos detailing Cicero's allegations to Wal-Mart's senior management, including Wal-Mart's general counsel, Thomas Mars. On October 15, 2005, a Wal-Mart attorney sent Duke, who was Vice Chairman of the International Division, an email detailing Cicero's allegations. Wal-Mart hired an outside law firm, Willkie Farr & Gallagher, who had extensive experience in Foreign Corrupt Practices Act[3] cases, to conduct an investigation regarding the bribery allegations. Willkie Farr proposed a four-month investigation plan. The proposed investigation plan called for: (1) tracing all payments to anyone who had helped Walmex obtain permits in the past five years; (2) scrutinizing any and all payments to government officials; and (3) interviewing every person who might know about the payoffs, including implicated members of Walmex's board of directors.

Wal-Mart rejected Willkie Farr's investigation proposal. Instead, Wal-Mart assigned its own Corporate Investigations Unit to conduct a preliminary investigation. Once the preliminary investigation was completed, Wal-Mart would proceed with a full investigation if it determined that there was a likelihood that laws had been violated. The Corporate Investigations Unit was comprised of less than seventy employees, and only four of these employees specialized in corporate fraud. Ronald Halter, a former FBI agent, led the two-week investigation that commenced on November 12, 2005. Duke traveled to Mexico City to meet with Walmex officials who were unhappy that Halter was investigating the gestores payments. In a document entitled "Investigation and Audit Plan," Halter stated that he would give a progress report on the

---

[3] The Foreign Corrupt Practices Act prohibits Unites States companies from bribing foreign officials to secure improper business advantage. *See U.S. v. King*, 351 F.3d 859, 864 (8th Cir. 2003).

investigation to Bentonville management and the Chairman of the Audit Committee, Roland A. Hernandez, on November 16, 2005.

In a December 2005 report, Halter stated that "[t]here is reasonable suspicion to believe that Mexican and USA laws have been violated" and that there was "no defendable explanation" for the millions of dollars in gestores payments. The report described hundreds of gestores payments, mystery codes used to conceal those payments, and rewritten audits. According to Plaintiffs, Halter's report was presented to Wal-Mart's top management, including the CEO (Scott), the general counsel (Mars), and the 2005-2006 board of directors.

In February 2006, Plaintiffs allege that Scott, Mars, and these directors instituted a cover-up after hearing the evidence of bribery, which included ending the investigation into Walmex and handed control of the investigation to Rodriguezmacedo, one of the investigation's main suspects. In May 2006, Rodriguezmacedo concluded the investigation by compiling a six-page report exonerating himself and his fellow Walmex employees. Rodriguezmacedo stated in the report that there was no evidence or clear indication of bribes paid to Mexican government authorities with the purpose of wrongfully securing any licenses or permits. In 2005, Castro-Wright was promoted to senior executive in charge of all Wal-Mart stores in the United States.

Plaintiffs allege that the Individual Defendants concealed violations of the Federal Corrupt Practices Act and mislead investors concerning the bribery at Walmex with false proxy statements filed with the United States Securities and Exchange Commission ("SEC"). In December 2011, after learning of *The New York Times*' investigation, Wal-Mart informed the United States Department of Justice and the SEC that Wal-Mart had begun an internal investigation into possible violations of the Foreign Corrupt Practices Act.

On April 27, 2012, four days after *The New York Times* article was published, the first shareholder derivative action[4] was filed in the United States District Court for the Western District of Arkansas against current and former directors and officers of Wal-Mart. Seven additional shareholder actions were filed in Arkansas, and these actions have been consolidated into the present action.

Plaintiffs allege that the Individual Defendants breached their fiduciary duties of loyalty and good faith by: (1) permitting violations of foreign and federal laws and Wal-Mart's code of ethics; (2) permitting the obstruction of an adequate investigation of known potential (and/or actual) violations of foreign and federal laws; and (3) covering up (or attempting to cover up) known potential (and/or actual) violations of foreign and federal laws. ECF No. 16, ¶ 284. Plaintiffs also allege that Individual Defendants violated Sections 14(a) and 29(b) of the Exchange Act by causing Wal-Mart to make false or misleading statements in its April 2010 and April 2011 proxy materials relating to annual director elections. ECF No. 16, ¶¶ 286-296.

Defendants move to dismiss the Complaint (ECF No. 16) pursuant to Rule 23.1 of the Federal Rules of Civil Procedure. Defendants assert that Plaintiffs have failed to adequately allege demand futility as required by applicable Delaware law.

## II.  STANDARD OF REVIEW

**A.  Rule 23.1**

Federal Rule of Civil Procedure 23.1 requires a shareholder seeking to represent the interests of a corporation through a derivative suit to either demand that the corporation's directors take action or plead with particularity the futility of making such a demand. *Gomes v.*

---

[4] "The derivative form of action permits an individual shareholder to bring suit to enforce a corporate cause of action against officers, directors, and third parties." *Kamen v. Kemper Fin. Servs. Inc.*, 500 U.S. 90, 95, 111 S. Ct. 1711 (1991) (citations omitted) (internal quotations omitted). The purpose of the derivative action is "to place in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of faithless directors and managers." *Id.* (citations omitted) (internal quotations omitted).

*Am. Century Co., Inc.*, 710 F.3d 811, 815 (8th Cir. 2013). The law encourages corporations to address problems internally, and the purpose of Rule 23.1 is to "affor[d] the directors an opportunity to exercise their reasonable business judgment and waive a legal right vested in the corporation in the belief that its best interests will be promoted by not insisting on such right." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 96, 111 S. Ct. 1711 (1991). Rule 23.1 does not establish guidelines for determining whether demand would be futile; thus a court must look to the substantive law of the state of incorporation. *Id.* at 108-09.

### B. Delaware Law

In the present case, because Wal-Mart is a Delaware corporation, Delaware law governs the substantive aspects of the demand requirement. *See id.* Plaintiffs did not demand Board action before filing this lawsuit, and they assert that the demand requirement should be excused by futility. Demand is required if, in view of all the particularized allegations in the Complaint and drawing all reasonable inferences in favor of Plaintiffs, there is no reasonable doubt of the ability of a majority, here eight of the fifteen Director Defendants, to respond to demand appropriately. *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 833 A.2d 961, 977 (Del. Ch. 2003). Delaware has developed two approaches to claims of demand futility. The parties dispute which of the two should be applied to this case.

When a case alleges that the directors made a conscious business decision in breach of their fiduciary duties, courts must apply the *Aronson* test to determine whether demand was futile. *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008). This test requires a plaintiff to allege particularized facts creating a reason for the Court to doubt that "(1) the directors are disinterested and independent [or that] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Id.* (citing *Aronson v. Lewis*, 473 A.2d 805, 814 (Del.

8

1984) (overruled on other grounds)). If either prong of the *Aronson* test is met, demand is excused. *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 820 (Del. Ch. 2005).

On the other hand, "where the subject of a derivative suit is not a business decision of the [b]oard but rather a violation of the [b]oard's oversight duties," courts must apply the *Rales* test to determine whether demand was futile. *Wood*, 953 A.2d at 140. This test requires a plaintiff to allege "particularized facts establishing a reason to doubt that 'the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand.'" *Id*. (citing *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993)).[5]

Here, Defendants contend that the *Aronson* test does not apply because Plaintiffs do not challenge a specific board action. Defendants also contend that, under either the *Aronson* or *Rales* test, Plaintiffs have failed to plead particularized facts establishing demand futility. Plaintiffs respond that their Complaint satisfies both tests; however, they assert that the Court should apply the *Aronson* test to this case because the Board made a conscious decision not to act, which is a conscious action.

In their Complaint, Plaintiffs attempt to invoke the *Aronson* test by referencing alleged decisions made collectively by the Board and stating that these decisions "were not valid exercises of business judgment." ECF No. 16, ¶¶ 256-260. Plaintiffs conclusively allege that the Director Defendants collectively made a "decision to violate the FCPA and Mexican law," "to close the investigative case into bribery in Mexico," "to seek reelection while concealing the wrongdoing," "to reward wrongdoers through promotions and compensation," and "to conceal the wrongdoing." ECF No. 16, ¶¶ 256-260. Plaintiffs also allege that the Board made a

---

[5] The *Rales* test is essentially the first prong of *Aronson*. *See Guttman v. Huang*, 823 A.2d 492, 501 (Del. Ch. 2003). Both *Aronson* and *Rales* call upon courts to ascertain whether directors were disinterested and independent. *In re SAIC Inc. Derivative Litig.*, 948 F. Supp. 2d 366, 377 (S.D.N.Y. 2013) (applying Delaware law).

conscious decision not to take action in response to clear evidence of criminal conduct and that this is a decision reviewable under *Aronson*. ECF No. 114, p. 21.

The Complaint alleges Defendants breached their fiduciary duties to Wal-Mart and are personally liable to it for alleged losses. ECF No. 16, ¶¶ 282-285. The Complaint further alleges that the Director Defendants caused Wal-Mart to disseminate false and misleading proxy statements. ECF No. 16, ¶¶ 286-292. According to Plaintiffs, Defendant Scott was obligated to report any material violation of laws by Wal-Mart directly to the Audit Committee of the Board. ECF No. 16, ¶ 57. The Complaint identifies Defendants Burns and Williams as members of the Audit Committee and alleges that they had a duty to report to the Board any instances of Wal-Mart's non-compliance with the FCPA. ECF No. 16, ¶¶ 28-29. The Complaint consistently implies that Defendants should have or must have known about the alleged misconduct by virtue of their positions and the supposed reporting structure at Wal-Mart. ECF No. 16, ¶¶ 135, 219, 261, 265. According to Plaintiffs, "senior executives … knew about" the alleged misconduct, those "executives [were] required to regularly report to the Audit Committee of Wal-Mart's Board," and the Audit Committee, in turn, "was obligated to report on [this] to Wal-Mart's full Board." ECF No. 114, p. 30. Plaintiffs allege that, given the "inference" that information concerning bribery was reported to Wal-Mart's Board, Wal-Mart made a conscious decision not to act on this information.

Plaintiffs reference vague "decisions" made by Defendants but do not plead with particularity who made these decisions, how these decisions were made, or when the decisions were made.[6] *See La. Mun. Police Employees' Retirement Sys. v. Hesse*, 962 F. Supp. 2d 576,

---

[6] Plaintiffs conclusively refer to "decisions" by the Board to "conceal the wrongdoing" (ECF No. 16, ¶ 260), "to let Walmex 'self-investigate'" (ECF No. 114, p. 19), "to violate the FCPA and Mexican law" (ECF No. 16, ¶ 256), and "to allow then-CEO Scott to quash the investigation … and to cover up the criminal enterprise" (ECF No. 114, p. 26).

584 (S.D.N.Y. 2013) (relying on Delaware law and stating that *Aronson* does not apply when a plaintiff offers no facts to show that a defendant made a conscious decision to act, such as when the decision was made and the contours of the decision). Plaintiffs generally allege that the Board made a decision not to act in response to evidence of criminal conduct. ECF No. 114, p. 27. Missing from the Complaint are any particularized facts that link a majority of the Director Defendants to any actual decision. Plaintiffs point to no alleged meeting, discussion, or vote where the Board allegedly made one of these decisions. This lack of such particularized facts regarding a conscious decision about how or whether to respond to the alleged misconduct indicates that an analysis under *Aronson* is inappropriate.[7] *See South v. Baker*, 62 A.3d 1, 14 (Del. Ch. 2012) (stating that absent an allegation "that any particular director in office at the time of the filing of the complaint made a specific decision challenged in the complaint, so the more specialized two-part *Aronson* test does not apply"); *Seminaris v. Landa*, 662 A.2d 1350, 1354 (Del. Ch. 1995) ("Plaintiff does not challenge any specific board action that approved or ratified these alleged wrongdoings. Plaintiff must satisfy the one step test announced in *Rales* to demonstrate that he was excused from making a demand.").

### III. DISCUSSION

Plaintiffs set forth their reasons for failing to make a demand on the Board in paragraph 255 of the Complaint. These reasons include: "(1) the Board's actions which damaged [Wal-Mart] were the product of a valid exercise of business judgment; and/or (2) a majority of the Board is incapable of making an independent and disinterested decision about whether to

---

[7] The Court notes, however, that the difference between *Rales* and *Aronson* may blur in cases like this one, since the particularized allegations essential to creating reasonable doubt as to the substantial likelihood of personal liability for breach of fiduciary duties may also implicate the question whether the Board can avail itself of business judgment protections. *See Guttman v. Huang*, 823 A.2d 492, 501 (Del Ch 2003) (recognizing this overlap and stating that when "there are allegations that a majority of the board that must consider a demand acted wrongfully, the *Rales* test sensibly addresses concerns similar to the second prong of *Aronson*").

institute and vigorously prosecute this action." Because the Court has determined that the *Rales* test applies to this case, the Court will not consider whether the Board's actions, or conscious inaction, were a valid exercise of business judgment.[8]

Under *Rales*, these allegations must establish a reason to doubt that the Board could have properly exercised its independent and disinterested business judgment in responding to a demand. *Rales*, 634 A.2d at 934. A reasonable doubt of disinterestedness can be shown if Plaintiffs' particularized allegations, construed as true, demonstrate a "substantial likelihood" of Defendants' personal liability. *Id.* at 936 (finding a reasonable doubt of disinterestedness where the potential for liability is not a mere threat but instead may rise to a substantial likelihood).

Wal-Mart's charter immunizes its directors from liability for breaches of fiduciary duty to the fullest extend allowed by § 102(b)(7) of the Delaware General Corporation Law. ECF No. 111-1, p. 13. Thus, Wal-Mart's charter exculpates its directors from personal liability for monetary damages except "breaches of the duty of loyalty or actions or omissions not in good faith or that involve intentional misconduct or a knowing violation of law." *In re SAIC, Inc. Deriv. Litig.*, 948 F. Supp. 2d 366, 378 (S.D.N.Y. 2013) (applying Delaware law). Where directors are contractually or otherwise exculpated from liability except for claims based on fraudulent, illegal, or bad faith conduct, a plaintiff must plead particularized facts that demonstrate the directors acted with scienter, meaning that they had actual or constructive knowledge that their conduct was legally improper. *Wood*, 953 A.2d at 141.

---

[8] The Court notes that the difference between *Rales* and *Aronson* may blur in cases like this one, because the particularized allegations essential to creating reasonable doubt as to the substantial likelihood of personal liability for breach of fiduciary duties may also implicate the question whether the Board can avail itself of business judgment protections. *See Guttman*, 823 A.2d at 501 (recognizing the overlap and stating that when "there are allegations that a majority of the board that must consider a demand acted wrongfully, the *Rales* test sensibly addresses concerns similar to the second prong of *Aronson*").

### A. Substantial Likelihood of Liability for Participation in the 2005-2006 Events

Plaintiffs allege that Defendants breached their fiduciary duties to Wal-Mart by permitting its directors and officers to violate foreign and federal laws, by permitting the obstruction of an adequate investigation of these violations, and by covering up these violations. Plaintiffs further allege that a majority of the Director Defendants have a strong interest in refusing to bring the claims asserted by Plaintiffs because a majority of the Director Defendants face a substantial likelihood of personal liability stemming from a majority of the Director Defendants' active participation in the 2005-2006 events. According to Plaintiffs, nine Director Defendants[9] knew about the wrongful conduct in 2005-2006 (the alleged bribery in Mexico and the internal investigation that allegedly concealed the wrongdoing) and either actively participated in it or acquiesced in it. Defendants argue that Plaintiffs have failed to sufficiently plead that a majority of the Board knew about or consciously ignored the alleged wrongful conduct in 2005-2006 and therefore cannot show that a majority of the Director Defendants face a substantial likelihood of personal liability. The Court agrees.

Nothing in the Complaint suggests any particularized basis to infer that a majority of the Board had actual or constructive knowledge of the alleged misconduct, let alone that they acted improperly with scienter. *See Guttman*, 823 A.2d at 504. Plaintiffs' allegations do not provide the particulars for what each Director Defendant knew, how he or she learned of the information, or when he or she learned of the information. Thus, as discussed below, Plaintiffs have failed to plead with particularity that at least eight Director Defendants face a substantial likelihood of personal liability so that their ability to consider a demand impartially would be compromised.

---

[9] Plaintiffs identify these nine Director Defendants as Scott, Duke, S. Robson Walton, Jim Walton, Breyer, Burns, Daft, Williams, and Wolf.

### 1. Director Defendants Breyer, Burns, Daft, Williams, and Wolf

Breyer, Burns, Daft, Williams, and Wolf were on the Board during the alleged 2005-2006 misconduct. Plaintiffs allege in a conclusory fashion that these five Director Defendants must have had knowledge because they were "either directly informed of the wrongdoing or were informed through the proper operation of the Board's governance and [Wal-Mart's] reporting systems." ECF No. 16, ¶ 278. According to Plaintiffs, these five Director Defendants must have known about the alleged Walmex events merely because "Scott had an obligation to report" them to the Audit Committee and, in turn, "the Audit Committee was required … to report" them "to the full Board of Directors." ECF No. 114, p. 17.

Notably, Plaintiffs do not allege that Scott actually reported the Walmex events to the Audit Committee. Plaintiffs have alleged no facts to support the allegation that this group of five Director Defendants were "directly informed" of any wrongdoing. Instead, Plaintiffs rely on group-wide conclusory allegations about what the Board must have known based on an imputation of knowledge theory. This theory, however, is flawed.

First, Plaintiffs' allegations that these five Director Defendants should have been informed of the wrongdoing "through the proper operation of the Board's governance and [Wal-Mart's] reporting systems" are not sufficiently particular to show that these Director Defendants had constructive knowledge of wrongdoing. Courts may not impute knowledge of wrongdoing to directors simply because they serve on the board or because the corporate governance structure requires that notice of the wrongdoing reach the board. *Gulbrandsen v. Stumpf*, 2013 WL 6406922, at *6 (N.D. Cal. Dec. 6, 2013) (applying Delaware law); *In re Citigroup Inc. v. S'holder Derivative Litig.*, 964 A.2d 106, 135 (Del. Ch. 2009) ("[D]irector liability is not measured by the aspirational standards established by the internal documents detailing a

company's oversight system."); *Wood*, 953 A.2d at 142; *Desimone v. Barrows*, 924 A.2d 908, 943, n.121 (Del. Ch. 2007) (Directors cannot be charged with knowledge of information simply because they served on a board with a director who may have known such information).

Second, Plaintiffs allege that, because these five Director Defendants served on various committees during 2005-2006, they should be presumed to have been aware of the allegedly illegal conduct in Mexico and the alleged cover-up.[10] Delaware law, however, does not allow plaintiffs to presume a director's knowledge based on his or her committee membership. *See South*, 62 A.3d at 17 & n.6 ("As numerous Delaware decisions make clear, an allegation that the underlying cause of a corporate trauma falls within the delegated authority of a board committee does not support an inference that the directors on that committee knew of and consciously disregarded the problem for purposes of Rule 23.1."); *Wood*, 953 A.2d at 16 ("[T]he assert[ion] that membership on the Audit Committee is a sufficient basis to infer the requisite scienter … is contrary to well-settled Delaware law.").

The Complaint is devoid of particularized facts on a director-by-director basis that would support that these five Director Defendants had knowledge of the alleged misconduct. Thus, Plaintiffs' allegation that the Board made a conscious "decision to condone and cover up criminal activity at the company" (ECF No. 114, p. 8) must fail because a conscious decision requires knowledge. Without showing knowledge, Plaintiffs cannot show that these five Director Defendants face a substantial likelihood of personal liability stemming from the 2005-2006 events.

---

[10] Plaintiffs allege that Breyer served on the Committee on Strategic Planning, and therefore that he "would have inquired whether Wal-Mart's exponential growth in Mexico was being accomplished in compliance with the law." ECF No. 16, ¶ 224. Plaintiffs allege that Burns and Williams served on the Audit Committee, and therefore they must have received reports regarding the investigation. ECF No. 16, ¶ 28-29 and 135.

15

### 2. Directors Alvarez, Cash, Corbett, Reinemund, and Sorenson

Alvarez, Cash, Corbett, Reinemund, and Sorenson joined the Board in recent years and were not on the Board during the alleged misconduct in 2005-2006. They are each mentioned by name in the lengthy Complaint only three times. ECF No. 16, ¶¶ 33-37, 254, and 269. Plaintiffs offer no reason why these five Director Defendants would face a substantial likelihood of personal liability stemming from the 2005-2006 conduct. Accordingly, Plaintiffs have not given the Court a reason to doubt that the ten Director Defendants discussed above—a majority of the Board—are capable of exercising a disinterested and independent business judgment.

### B. Substantial Likelihood of Liability for Plaintiffs' *Caremark* Claim

Plaintiffs allege that certain Director Defendants breached their fiduciary duty of loyalty by not acting in good faith to ensure Wal-Mart's compliance with the law.[11] This special type of breach of loyalty claim is known as a *Caremark* claim,[12] and it is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 372 (Del. 2006). "The essence of a *Caremark* claim is a breach of the duty of loyalty arising from a director's bad-faith failure to exercise oversight over the company." *Rich ex rel. Fuqi Int'l, Inc. v. Yu Kwai Chong*, 66 A.3d 963, 980-82 (Del Ch. 2013). Bad faith "in the corporate fiduciary of loyalty context" includes "a failure to act in the face of a known duty to act, which demonstrates a conscious disregard of one's duties." *Gatz Properties, LLC v. Auriga Capital Corp.*, 59 A.3d 1206, 1216-17 (Del. 2012). "Under *Caremark* and its progeny, liability for such a failure to oversee requires a showing that the

---

[11] Plaintiffs state that they "have pled this theory of liability as an alternative to their theory that Defendants deliberately violated the law." ECF No. 114, p. 39.

[12] *In re Caremark Int'l Inc. Derivative Litig.* held that a "sustained or systematic failure of the board to exercise oversight—such as an utter failure to attempt to assure a reasonable information and reporting system exists—will establish the lack of good faith that is a necessary condition to liability." 698 A.2d 959, 971 (Del. Ch. 1996).

16

directors knew they were not discharging their fiduciary obligations or that they demonstrated a conscious disregard for their duties." *In re Intel Corp. Derivative Litig.*, 621 F. Supp. 2d 165, 174 (D. Del. 2008). Here, Plaintiffs have not alleged particularized facts sufficient to show a substantial likelihood of liability under this high standard. *See Rales*, 634 A.2d at 936.

According to Plaintiffs, demand is excused under *Rales*, because at least nine Director Defendants face a substantial likelihood of liability arising out of their conscious disregard of evidence of illegality.[13] Plaintiffs allege that certain Director Defendants received evidence of the alleged Walmex bribery scheme, and faced with this "red flag," consciously chose to ignore it. ECF No. 16, ¶ 228. Although the Complaint alleges that the Director Defendants knew of and ignored evidence of wrongdoing, the Complaint nowhere alleges with particularity what exactly the Director Defendants were told about the alleged misconduct or when they were told. Again, Plaintiffs charge most of the Director Defendants with constructive notice of the alleged red flag. The Court, however, has already rejected this theory and determined that Plaintiffs have not pled with particularity that a majority of the Board were put on notice of the alleged 2005-2006 misconduct. If a Director Defendant has no knowledge of the alleged misconduct (or "red flag"), he or she could not have consciously ignored it and disregarded any duty to act on it. Plaintiffs' allegations, therefore, are not sufficient to establish a substantial likelihood of liability giving rise to demand futility.

**C. Substantial Likelihood of Liability for Filing False Proxy Statements**

Plaintiffs allege that the Director Defendants "allow[ed] Wal-Mart to file false proxy statements in April 2010 and April 2011 in violation of Section 14 of the Exchange Act." ECF

---

[13] Plaintiffs allege that certain Director Defendants "learned that Wal-Mart internal investigators had confirmed the existence of widespread criminal bribery, but they allowed the investigation to be turned over to a culpable participant, Rodriguezmacedo, and buried it for six years." ECF No. 114, p. 40-41.

No. 114, p. 33. According to Plaintiffs, demand is excused under *Rales*,[14] because a majority of the Board face a substantial likelihood of liability arising out of their alleged filing of false proxy statements. *See Rales*, 634 A.2d at 936. Plaintiffs allege that the Director Defendants materially represented the effectiveness of the Board's oversight of compliance issues at Wal-Mart. ECF No. 16, ¶ 288. This claim, however, fails because it rests on the same impermissible and unsupported inferences as Plaintiffs' other theories: the inference that the Board allowed the filing of the proxy statements *despite knowing they were false*. *See SEC v. Shanahan*, 646 F.3d 536, 546 (8th Cir. 2011) (holding that knowledge is the requisite state of mind for Section 14(a) claims, at least as to outside directors). Plaintiffs again rely on the same imputation of knowledge theory that the Court has discussed above, and the Court again rejects this imputation theory as it relates to the Section 14(a) claims.

Further, the Complaint does not contain specific factual allegations that reasonably suggest that a majority of the Director Defendants were involved in the preparation or approval of the proxy statements. *See In re Bank of N.Y. Mellon Corp. Forex Transactions Litig.*, 991 F. Supp. 2d 457, 463 (S.D.N.Y. 2013) (applying Delaware law). There are no allegations explaining any process by which the Board actively or purposefully made a decision to omit the allegedly missing information. Other than pointing to language appearing on the notices of the annual shareholders' meetings declaring that the notices were issued "By the Order of the Board of Directors," Plaintiffs do not allege what specific actions any Defendant Director took to approve or ratify the alleged wrongdoings. Instead, Plaintiffs conclusively state that the Board "caused Wal-Mart to disseminate" the proxy statements. ECF No. 16, ¶ 269. The Court,

---

[14] The Court finds that the *Rales* standard is applicable here, because the conclusory references to the Board's failure to disclose are insufficiently particularized to allege a specific board decision to omit the information from the proxy statement. *See In re Morgan Stanley Der. Litig.*, 542 F. Supp. 2d 317, 322 (S.D.N.Y. 2008) (applying Delaware law).

therefore, cannot conclude that demand is excused based on the theory that a majority of the Board face a substantial likelihood of liability arising out of their filing false proxy statements.

## IV.  CONCLUSION

For the reasons discussed above, the Court finds that Plaintiffs' conclusory allegations fail to satisfy the requirements for pleading demand futility.  Accordingly, Defendants' Motion to Dismiss Case for Failure to Establish Demand Futility (ECF No. 109) is **GRANTED**, and this case is **DISMISSED**.[15]

**IT IS SO ORDERED**, this 31st day of March, 2015.

/s/ Susan O. Hickey
Susan O. Hickey
United States District Judge

---

[15] In their response (ECF No. 114, p. 41), Plaintiffs request leave to address any pleading deficiencies in an amended complaint, in the event the Court finds the Complaint deficient.  Plaintiffs, however, fail to advise the Court of how an amendment would cure the defects in the Complaint.  Thus, the Court has no idea of what Plaintiffs' amendment might look like or what additional facts may entitle them to relief.  Accordingly, the Court concludes that granting leave to amend is inappropriate and Plaintiffs' request for leave to amend is denied.