# United States Court of Appeals

## For the Eighth Circuit

_____

No. 15-1869

_____

John Cottrell, Derivatively and on behalf of Wal-Mart Stores, Inc.; Louisiana
Municipal Police Employees' Retirement System; Elizabeth Tuberville; Kathryn
Johnston Lomax; William Cottrell; Andrew Richman; Larry Emory, Derivatively
and on behalf of Wal-Mart Stores, Inc.; Nathan F. Austin

*Plaintiffs - Appellants*

v.

Michael T. Duke; Aida M. Alvarez; James W. Breyer; M. Michelle Burns; James I.
Cash, Jr.; Roger C. Corbett; Douglas N. Daft; Gregory B. Penner; Steven S.
Reinemund; H. Lee Scott, Jr.; Arne M. Sorenson; Jim C. Walton; S. Robson
Walton; Christopher J. Williams; Linda S. Wolf; Wal-Mart Stores, Inc., Nominal
*Defendant*; Eduardo Castro-Wright; Thomas A. Mars; Thomas D. Hyde

*Defendants - Appellees*

Craig Herkert; Eduardo F. Solorzano Morales; Jose Luis Rodriguezmacedo Rivera;
Lee Stucky

*Defendant*s

Roland Hernandez

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Western District of Arkansas - Texarkana

_____

Submitted: April 14, 2016
Filed: July 22, 2016

_____

Before RILEY, Chief Judge, WOLLMAN and MURPHY, Circuit Judges.

_____

RILEY, Chief Judge.

Owners of shares of Wal-Mart Stores, Inc. (Wal-Mart) sued directors and officers of the corporation, accusing them of breaking state and federal law by permitting and then covering up pervasive bribery committed on behalf of Wal-Mart's Mexican subsidiary, Wal-Mart de Mexico (Wal-Mex). Because the shareholders sought to enforce rights belonging to Wal-Mart, Federal Rule of Civil Procedure 23.1 required them to explain why they did not first ask the board of directors to cause the corporation to pursue the suit itself. The shareholders claimed it would have been futile to go to the board with such a demand. We agree with the district court[1] that the shareholders' explanation was not specific or detailed enough, and we affirm the dismissal of their complaint.

## I.     BACKGROUND

We recite the material facts taking the allegations in the shareholders' complaint as true. See, e.g., Gomes v. Am. Century Cos., 710 F.3d 811, 815 (8th Cir. 2013). In September 2005, a former Wal-Mex executive, tired of the "'pressure and stress' of participating in years of corruption" and resentful of being snubbed for a promotion, contacted the general counsel for Wal-Mart's international division and said he had information about financial "'irregularities' authorized 'by the highest levels' at Wal-Mex." Since at least 2002, he claimed, Wal-Mex had engaged in an extensive and

_____

[1] The Honorable Susan O. Hickey, United States District Judge for the Western District of Arkansas.

-2-

systematic practice of bribing Mexican officials, with most of the payoffs facilitated by fixers or middlemen called "gestores." The scheme was orchestrated by top executives, including Wal-Mex's then-CEO, Eduardo Castro-Wright—a rising star who later took over Wal-Mart's U.S. division—and general counsel, José Luis Rodríguezmacedo Rivera (Rodríguezmacedo), with the goal of clearing Mexican regulatory and bureaucratic hurdles so Wal-Mex could take over market share by expanding faster than its rivals could react.[2] After hiring a Mexico City lawyer to debrief the former executive and flying south to meet face-to-face, the general counsel of the international division sent memoranda recounting his claims to Wal-Mart's senior management.

Wal-Mart's first response was to retain an outside law firm to investigate. When the firm proposed questioning "implicated members" of Wal-Mex's board, along with anyone else who might have known about the payments, and tracing every peso Wal-Mex had paid for help getting permits over the past five years, including "any and all payments" to Mexican officials, Wal-Mart decided to have its own Corporate Investigations unit look into the allegations instead. This "Preliminary Inquiry" was expected to last about two weeks in mid-November 2005, according to a partial "Investigation and Audit Plan" attached as an exhibit to the shareholders' complaint.

Wal-Mart's investigators quickly found evidence consistent with the executive's claims, including hundreds of recorded payments to gestores, totaling millions of dollars, plus additional millions in direct "contributions" and "donations" to Mexican authorities. Three days into the investigation, on November 14, 2005, the director of corporate investigations emailed his boss, Wal-Mart's vice president for

_____

[2]According to the shareholders, when they filed their complaint in 2012 Wal-Mex had 2,100 stores and 209,000 employees—making it Mexico's largest private employer—and annual sales of 379 billion pesos, or $29 billion. Wal-Mart allegedly had a total of 10,130 stores and 2.2 million employees.

Appellate Case: 15-1869     Page: 3     Date Filed: 07/22/2016 Entry ID: 4429172

global security, aviation, and travel, to let him know, simply, "It is not looking good." Besides the payments themselves, the investigators also turned up materials suggesting complicity at the highest levels of Wal-Mex. For example, when an internal Wal-Mex audit in 2004 warned of the increasing amounts the company was paying two gestores to make "facilitating payments" for permits to open new stores, Castro-Wright's concern was not the possibility Wal-Mex owed its rapid growth to illegal payoffs but the risk of becoming overly dependent on too few intermediaries. The solution, directed by Rodríguezmacedo, was to "diversify" the pool of gestores Wal-Mex dealt with—and to scrub references to the issue from the reports that would go to Wal-Mart management.

The investigation ruffled feathers at Wal-Mex, and complaints made their way to the head of Wal-Mart's international division, Michael Duke. Duke, who later became Wal-Mart's president and CEO, was in Mexico on other business just as the investigators were wrapping up their review, and Duke took the opportunity to meet with and reassure Wal-Mex executives offended by the investigators' tone and questions.

The investigators prepared a draft report, dated December 1, concluding "[t]here is reasonable suspicion to believe that Mexican and USA [sic] laws have been violated." It is unclear who saw the report. The document itself, or at least the excerpt attached to the shareholders' complaint, does not say to whom it was sent, though an introductory statement that "Wal-Mart Store's [sic] Internal Audit charter requires that the results of Internal Audit reviews be reported to *management*" (emphasis added) might suggest its intended recipients. The investigation and audit plan had called for "a progress report [to] be given to Bentonville"—Arkansas, Wal-Mart's headquarters—"management and the Chairman of the Audit Committee" on November 16 and for "[a]dditional progress reports [to] be given as appropriate." The shareholders allege, without additional detail, the investigators' findings and suspicions were reported to the chair of Wal-Mart's audit committee, Wal-Mart's

-4-

CEO, and its general counsel and, "through these three individuals, to the entire Wal-Mart Board."

Over the next two months, the investigators urged Wal-Mart to authorize a full in-house investigation based on their preliminary findings. Instead, in February 2006, Wal-Mart's then-CEO, H. Lee Scott, transferred control over the matter from the nominally independent Corporate Investigations unit to Wal-Mex itself, under the direction of Rodríguezmacedo as general counsel. Far from undertaking the sort of in-depth, exhaustive inquiry the original investigators envisioned, Rodríguezmacedo quickly wrapped up the case, clearing himself and his Wal-Mex colleagues largely based on their denials and the absence of direct evidence—the executives never "mentioned having ordered or given bribes to government authorities." Much of his six-page report was devoted to questioning the credibility of the former executive whose allegations set the investigation in motion, suggesting the former executive had tricked Wal-Mex into paying gestores "unnecessarily, or for services never rendered" and might have pocketed some of the money for himself. Wal-Mart's director of corporate investigations, although no longer running the investigation, reviewed two drafts of the report. Even after revisions, he thought it was "truly lacking." But Wal-Mart's senior executives were satisfied and closed the inquiry.

All was quiet for several years, until Wal-Mart learned the *New York Times* was conducting its own investigation into what happened at Wal-Mex in the early 2000s. Apparently the whistle-blowing former executive, dissatisfied with the company's response, had shared his story with the press as well. Facing imminent exposure, Wal-Mart resurrected its internal investigation, preemptively informed the U.S. Department of Justice and Securities Exchange Commission it was looking into possible violations of the Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1 to -3, and disclosed both responses in its next quarterly report. The *Times* article, titled "Wal-Mart Hushed Up a Vast Mexican Bribery Case," came out on April 21, 2012. Derivative lawsuits by

-5-

Wal-Mart shareholders followed within days. This case brings together eight of them.[3]

In their consolidated complaint, the shareholder plaintiffs alleged numerous Wal-Mart directors and executives, past and present, breached their fiduciary duties to the corporation by allowing Wal-Mex's bribery, covering it up, and letting the internal investigation be watered down to nothing. They also asserted the defendants were liable to Wal-Mart for violating Sections 14(a) and 29(b) of the Securities Exchange Act, 15 U.S.C. §§ 78n(a)(1), 78cc(b), see also 17 C.F.R. § 240.14a-9(a) (implementing Section 14(a)(1)), reasoning the defendants caused Wal-Mart to issue proxy statements in connection with board elections in 2010 and 2011 that were false or misleading because they said the directors up for reelection had "integrity," the incumbent board tried to ensure Wal-Mart followed the law, and the board and CEO followed Wal-Mart's internal ethical codes.[4] Although the causes of action arising from these alleged violations would have accrued to Wal-Mart, the shareholders did

---

[3]Six lawsuits were filed in federal court in the Western District of Arkansas, where the lawsuits remained. The other two lawsuits were originally filed in Arkansas state court, removed to the Eastern District of Arkansas, and then transferred to the Western District. The district court consolidated the cases as they came in. See Fed. R. Civ. P. 42(a)(2).

Lawsuits raising some of the same issues were filed in Delaware state court as well. The district court initially stayed this case to wait for the results of the Delaware litigation, but we vacated the stay and remanded for the federal case to go forward. See Cottrell v. Duke, 737 F.3d 1238, 1241, 1250 (8th Cir. 2013). After the district court's decision to dismiss in this case, while this appeal was pending, the Delaware Court of Chancery dismissed the Delaware plaintiffs' complaints, holding that under Arkansas's law of collateral estoppel they could not relitigate the same points. See In re Wal-Mart Stores, Inc. Del. Derivative Litig., No. 7455-CB, 2016 WL 2908344, at *23-24 (Del. Ch. May 13, 2016) (unpublished).

[4]The shareholders also cursorily pled contribution and indemnity claims, which they do not pursue on appeal.

Appellate Case: 15-1869     Page: 6     Date Filed: 07/22/2016 Entry ID: 4429172

not demand that the corporation, led by its current board, pursue the claims itself. Rather, they alleged circumstances that they thought demonstrated the board could not make that decision impartially, so it was pointless to go through the motions of making demands.

The defendants moved to dismiss on the ground that the shareholders' allegations about the futility of demanding action from the board did not satisfy the pleading requirements of Rule 23.1. <u>See</u> <u>also</u> Fed. R. Civ. P. 12(b)(6). The district court granted the motion. The shareholders appeal, invoking our appellate jurisdiction under 28 U.S.C. § 1291.

## II. DISCUSSION

Rule 23.1(b)(3) says that shareholders seeking to enforce a corporation's rights through a derivative action must "state with particularity" "any effort" they took "to obtain the desired action from the [corporation's] directors" and "the reasons for not obtaining the action or not making the effort." On its face, that language does not make seeking action from the board a prerequisite to bringing a derivative suit, though it does "clearly *contemplate[]*" that such a requirement might apply. <u>See</u> <u>Kamen v. Kemper Fin. Servs., Inc.</u>, 500 U.S. 90, 96 (1991). We have therefore recognized Rule 23.1 as "'a rule of pleading' that 'requires that the complaint . . . allege the facts that will enable a federal court to decide whether'" derivative plaintiffs complied with such a demand requirement imposed by another source. <u>Gomes</u>, 710 F.3d at 815 (quoting <u>Halebian v. Berv</u>, 590 F.3d 195, 211 (2d Cir. 2009), <u>abrogated</u> <u>on</u> <u>other</u> <u>grounds</u> <u>by</u> <u>Espinoza ex rel. JPMorgan Chase & Co. v. Dimon</u>, 797 F.3d 229 (2d Cir. 2015)).

-7-

Here, the law of Delaware—where Wal-Mart is incorporated—provides the substantive demand requirement against which to test the shareholders' allegations.[5] See id. According to Delaware law, in cases like this, shareholders who did not make a demand on the board cannot bring a derivative suit unless their "particularized factual allegations . . . create a reasonable doubt that, as of the time the complaint [was] filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."[6] Rales v. Blasband, 634 A.2d 927, 934 (Del. 1993). One reason a board might be unable to make a disinterested decision is if a majority of the directors would face "'a substantial likelihood'" of personal liability from a lawsuit brought by the corporation. Id. at 936 (quoting Aronson, 473 A.2d at 815) ("In such circumstances, a director cannot be expected to exercise his or her independent business judgment without being influenced by the adverse personal consequences resulting from the decision.").

Wal-Mart had fifteen directors when the shareholders filed their complaint in 2012. Two of them, Duke and Scott, allegedly dealt directly with aspects of the Wal-Mex investigation in their roles as executives, and the defendants do not argue those two were disinterested. The focus of this appeal is the seven other 2012 directors who

---

[5]This is true even though some of the shareholders' claims are based on federal law, because "where a gap in the federal securities laws must be bridged by a rule that bears on the allocation of governing powers within the corporation, federal courts should incorporate *state* law into federal common law unless the particular state law in question is inconsistent with the policies underlying the federal statute," Kamen, 500 U.S. at 108, and there is no indication of inconsistency with the Exchange Act here.

[6]We agree with the district court that the practical distinction between this standard and the alternative two-pronged analysis articulated in Aronson v. Lewis, 473 A.2d 805, 814 (Del. 1984), is "blur[red]" and hard to discern in this case. Accord Guttman v. Huang, 823 A.2d 492, 500-01 (Del. Ch. 2003). On appeal the shareholders no longer argue that the Aronson test should apply instead.

-8-

were on the board at the time of the investigation in 2005 and 2006.[7] For those seven directors to face personal liability, the parties agree, they must have at least been aware of the claimed misconduct at Wal-Mex when they allegedly acquiesced in the hijacking of the internal investigation and the ongoing coverup and caused Wal-Mart to issue misleading proxy statements.[8]

The upshot, then, is that the shareholders needed to plead "particularized facts"—as distinct from "conclusory allegations"—supporting "reasonable factual inferences," see Brehm v. Eisner, 746 A.2d 244, 255 (Del. 2000), that the seven continuing board members learned of the suspected bribery before word of the *New York Times* investigation got out and Wal-Mart began scrambling to do what it allegedly should have been doing from the beginning. The shareholders advance three accounts of how that knowledge reached the board. Reviewing their allegations de novo, see, e.g., Gomes, 710 F.3d at 815, we find none of the theories persuasive.

## A. Assumption Audit Committee Chair Alerted the Board

The shareholders' first theory is that during the initial in-house investigation in late 2005, Wal-Mart's investigators reported their preliminary findings to the then-chair of the board's audit committee, Roland Hernandez, who alerted the rest of the

---

[7]The shareholders briefly suggest one of the six directors who joined the board later, Gregory Penner, was not independent because his father-in-law, S. Robson Walton, was on the old board. Cf., e.g., Grimes v. Donald, 673 A.2d 1207, 1216 (Del. 1996) (contemplating that a director's independence might be compromised by "a material . . . familial interest"). We are not convinced the shareholders developed this point sufficiently in their opening brief to preserve it, see, e.g., Koehler v. Brody, 483 F.3d 590, 599 (8th Cir. 2007), and Penner's independence would not tip the balance either way, so we decline to address the issue. The shareholders cite no reason to doubt the independence or disinterestedness of the other five directors.

[8]Because we decide the case based on this common threshold requirement, we need not address the details of the shareholders' theories of liability or the precise degree of culpability necessary for them to succeed on each claim.

Appellate Case: 15-1869    Page: 9    Date Filed: 07/22/2016  Entry ID: 4429172

board.  We begin by observing that it takes at least two inferential steps to get to that conclusion from the shareholders' specific allegations.  To start, there are no specific facts alleged[9] that directly show Hernandez receiving a report about the possible bribery at Wal-Mex.  Rather, the shareholders rely on the asserted facts that the investigation and audit plan said Hernandez, among others, would be sent one or more progress reports and that a report finding a "reasonable suspicion to believe that . . . laws have been violated" actually was drafted.

We take the defendants' point in response, that the plan "evidenced only an *intention*" to report to Hernandez about the progress of the investigation, and intention is not action.  We also recognize the plan only specifically said Hernandez was to receive the first progress report, scheduled for November 16, while "[a]dditional progress reports" were to be "given as appropriate" to unspecified recipients.  And it is unclear from the complaint whether the December 1 draft—the only report specifically alleged—was an "[a]dditional progress report" supplementing an initial report sent sometime earlier or, instead, the planned first report was simply delayed two weeks.  Such uncertainty makes it harder to assume Hernandez was sent a copy—the language in the investigation and audit plan could be read as reflecting an expectation that while the first report would definitely go to the audit committee, it might be "appropriate" for later updates to just be sent to management—and raises questions about what an earlier report might have said.  Still, we are satisfied that the combination of the stated intention to report to Hernandez on the progress of the investigation and the preparation of such a report, as alleged by the shareholders, is enough to make it reasonable to infer that Hernandez received the report.  While contrary inferences might also plausibly be drawn from the alleged facts, that does not make the shareholders' inference unreasonable.

---

[9]That the defendants might have admitted facts touching on this point in one of the related Delaware cases, as the shareholders claim in their reply brief, is immaterial to the sufficiency of the complaint the shareholders filed in this case.

-10-

Hernandez learning about the suspected bribery is not enough for the shareholders. Their suit depends on the information also being passed to the rest of the board. The shareholders, to a degree, have changed their story of how that happened. According to their complaint—which, of course, is what really matters—Hernandez first told the rest of the audit committee and then the audit committee "was obligated . . . to 'report[]'" to the rest of the board. Elsewhere, especially in their briefs on appeal, the shareholders generally skip over the middle step and suggest Hernandez just told the whole board himself. Either way, whether there are three links in their logical chain or just two, the shareholders' inferences are based on a single fact, namely that the audit committee had a duty, formalized in its charter, to "make regular reports to the Board" about, among other things, "the compliance by the Company with legal and regulatory requirements."

To justify drawing conclusions from the audit committee's duty to report, the shareholders rely on a decision in one of the related Delaware cases, where another Wal-Mart shareholder sought access to corporate records that could help establish whether demand on the board would be futile. See Wal-Mart Stores, Inc. v. Ind. Elec. Workers Pension Tr. Fund IBEW (IBEW), 95 A.3d 1264, 1268-69 (Del. 2014). In explaining why it agreed with the Court of Chancery (and the plaintiff) that Wal-Mart needed to produce "officer-level documents from which director awareness of the WalMex Investigation may be inferred," the Delaware Supreme Court stated the plaintiff "may establish director knowledge of the WalMex Investigation by establishing that certain Wal-Mart officers were in a 'reporting relationship' to Wal-Mart directors, that those officers did in fact report to specific directors, and that those officers received key information regarding the WalMex Investigation." Id. at 1273. The shareholders insist their allegations in this case "fall squarely within the four corners of th[at] scenario." They are wrong.

In fact, comparing the shareholders' complaint to the circumstantial evidence contemplated by the Delaware Supreme Court neatly demonstrates where the

-11-

shareholders fall short.  In the Delaware court's words, the shareholders have alleged Hernandez and the audit committee "were in a 'reporting relationship' to Wal-Mart directors" and Hernandez "received key information regarding the WalMex investigation."  Id.  Conspicuously absent here, however, are specific factual allegations establishing Hernandez *did in fact report* to specific directors."  Id. (emphasis added).

The Delaware case, as we understand it, was about drawing inferences regarding *what* officers told directors when they reported to them, not *whether* they reported to the directors in the first place.  See id.  As the court recognized, when people within a corporation share information with members of the board, they do not always record or document the interaction, much less prepare detailed memoranda or presentations, even (perhaps especially) when dealing with an important or potentially sensitive topic.  So rather than limit the plaintiff to such elusive "officer-level *communications* with directors," the court reasoned that if the plaintiff could show an officer meeting with a director, the circumstances of the meeting might indirectly establish what they talked about—for example, if officers met with a director they were supposed to keep informed about an issue shortly after getting briefed on an important development.  See id.

Likewise, in the bench ruling the Delaware Supreme Court affirmed, then-Chancellor Strine (now the Chief Justice of the Delaware Supreme Court) had explained that although "[i]t would be nifty"—at least for litigation purposes—"if everyone in the world documented everything" and the plaintiff could just look for "a script for briefing the audit committee . . . or a memo to the audit committee," even without direct evidence,

> [plaintiffs] [a]re allowed to say, "Mr. Blank is the principal reporting officer to the audit committee.  On August 12th, he received a five-page report about wrongdoing at WalMex.  There are notes of a conversation he doesn't remember from three days later, with the head of the audit

-12-

committee.  We believe it's inferable that what he knew, given his role
with the audit committee, that he, in fact, discharged his duty and
communicated that to the head of the audit committee."

Key to that reasoning, like the decision on appeal, are the posited "notes of a
conversation" indicating that a specific interaction happened at which the information
could and should have been reported.

Here, by contrast, the shareholders have not identified any particular meetings
or reporting between Hernandez, the audit committee, and the rest of the board, either
individually or as a whole.[10]  Instead, they ask this court first to assume that
Hernandez made such reports, because he was supposed to under the audit committee
charter, and then to rely on the same reporting obligation to draw further inferences
about what his hypothesized reports said.  That is more than the Delaware decisions
can support.

To bridge the gap, the shareholders turn to another statement seemingly
validating their position, this one from the Seventh Circuit: "Where there is a
corporate governance structure in place, we must then assume the corporate
governance procedures were followed and that the board knew of the problems and

---

[10]We decline the defendants' invitation to fault the shareholders for not
"plead[ing] facts director-by-director."  While it is true individualized allegations are
often necessary in derivative complaints to let courts evaluate the independence and
disinterestedness of each director at the necessary level of particularity, see, e.g., In
re Citigroup Inc. S'holder Derivative Litig., 964 A.2d 106, 134 (Del. Ch. 2009), here
the shareholders' theory of the case was that the relevant directors all learned about
the investigators' suspicions of bribery in the same way and faced liability for the
same reasons, so the same facts demonstrated why each could not consider a demand
impartially.  If the shareholders had pled sufficient facts to support their theory, we
see nothing that would have been gained by demanding that they repeat the same
allegations "director-by-director" in their complaint.  Cf. Rosenbloom v. Pyott, 765
F.3d 1137, 1151 n.13 (9th Cir. 2014).

-13-

decided no action was required." In re Abbott Labs. Derivative S'holders Litig., 325 F.3d 795, 806 (7th Cir. 2003).[11] The shareholders take that line out of context and, as a result, focus on the wrong part and read too much into it. The quoted language comes from the court's discussion of which standard to use to evaluate the plaintiffs' argument about the futility of making a demand on the board before filing their derivative suit. In particular, it directly follows a lengthy explanation of the court's understanding that the standard from Rales v. Blasband, 634 A.2d 927—the standard governing this case—would only apply if the plaintiffs' position were that the directors faced personal liability based on "'unconsidered' inaction." See In re Abbott Labs., 325 F.3d at 804-06 (quoting In re Caremark Int'l Inc. Derivative Litig., 698 A.2d 959, 968 (Del. Ch. 1996)). In light of that focus on conscious decision-making by the board, we think it is clear that what ultimately mattered to the court in the quoted sentence was not "that the board knew of the problems"—the portion the shareholders rely on—but rather "that the board . . . *decided* no action was required." Id. at 806 (emphasis added).

To be sure, the reference to the board's knowledge was not just surplusage. The court's conclusion that the board must have consciously decided not to act (assuming the plaintiffs' allegations were true) was based in large part on its determination that the board knew of the problems underlying the complaint. Id. But the court did not simply infer that knowledge based on the "assum[ption]" that "corporate governance procedures were followed," as the shareholders' quotation might suggest in isolation. Id. To the contrary, the court repeatedly listed other specific factual allegations

---

[11]Technically, Abbott was decided under Illinois law, but the Seventh Circuit based its analysis largely on Delaware decisions, explaining "Illinois case law follows Delaware law in establishing demand futility requirements." In re Abbott Labs., 325 F.3d at 803. The court later confirmed Abbott reflects its understanding of Delaware, as well as Illinois, law by relying on it in a derivative case involving a Delaware corporation. See Westmoreland Cty. Emp. Ret. Sys. v. Parkinson, 727 F.3d 719, 725-29 (7th Cir. 2013).

-14-

establishing the directors' awareness, including that the corporation's regulatory violations had given rise to years of warning letters, ongoing government inspections, and meetings with regulators, the directors had signed off on disclosure forms acknowledging the compliance issues, and a *Wall Street Journal* article had made the corporation's problems public knowledge years earlier. Id. at 799-800, 806. When the Seventh Circuit addressed the directors' knowledge again in the course of applying the standard it chose and deciding whether demand actually was excused—the portion of the decision directly analogous to this case—it relied on the same catalog of alleged facts, an "extensive paper trail," not just the existence of procedures that would have required information to be reported to the board. Id. at 808-09.

The shareholders' references to Saito v. McCall, an unpublished decision of the Delaware Court of Chancery, are similarly unavailing. Saito v. McCall, No. Civ. A. 17132-NC, 2004 WL 3029876 (Del. Ch. Dec. 20, 2004) (unpublished), overruled on other grounds by Lambrecht v. O'Neal, 3 A.3d 277, 293 (Del. 2010). In Saito, the court rejected a "head in the sand" defense and decided it could reasonably infer that directors who knew of their company's accounting problems shared that information with their colleagues on the board. Id. at *7 nn.68, 71. Despite some broad language in the decision, other Delaware courts have not adopted the broad reading of Saito the shareholders urge on us. See Desimone v. Barrows, 924 A.2d 908, 943 (Del. Ch. 2007) ("Saito did not lay down any universally applicable rule about knowledge imputation."). Rather, later Delaware cases have treated the decision as "merely involv[ing] the drawing of reasonable inferences from well-pled facts," emphasizing the plaintiffs' allegations "establish[ing] that the accounting problems . . . were openly discussed by the directors." Id. We find Desimone's fact-bound interpretation compelling, particularly because it brings the Saito case in line with our understanding of the other Delaware cases discussed above, insofar as it suggests that the inference the shareholders seek here might well be justified if their complaint included "well-pled facts" showing Hernandez talking about Wal-Mex with members of the audit committee or other directors. Cf. IBEW, 95 A.3d at 1273.

-15-

Having found little support for the shareholders' position in the key decisions they cite, we return to the basic question: Was the audit committee's obligation to report to the board enough, under Delaware law, to make it reasonable to infer the board learned what Hernandez allegedly read in the in-house investigators' draft progress report?  The answer, in our view, is no.

Numerous cases from Delaware courts, as well as other courts applying Delaware law, have time and again held that "an allegation that the underlying cause of a corporate trauma falls within the delegated authority of a board committee does not support an inference that the directors on that committee knew of and consciously disregarded the problem for purposes of Rule 23.1." South v. Baker, 62 A.3d 1, 17 (Del. Ch. 2012); see also, e.g., Wood v. Baum, 953 A.2d 136, 142 (Del. 2008) (holding the assertion "that membership on the Audit Committee is a sufficient basis to infer the requisite scienter . . . is contrary to well-settled Delaware law").  The shareholders do not disagree with that general proposition.  Rather, they argue it does not govern their case, which, they say, is unlike the others because it does not rely on "'cookie cutter' allegations that the Board 'must have' or 'should have' learned about a problem merely because a company had some internal report systems and some corporate trauma occurred 'under the watch' of the Board."  As distinguishing features, the shareholders identify Hernandez's receipt of the draft report and his duty to report regularly to the board.

We grant that the shareholders' position here is not quite as weak as the plaintiffs' in some other cases, because their allegations at least put the relevant information in the hands of someone, Hernandez, only a degree or two removed from the directors whose knowledge is at issue.  Cf., e.g., South, 62 A.3d at 17.  But that still leaves the crucial question of why we should think the rest of the board knew what Hernandez knew.  Notwithstanding the shareholders' vague references to a "plethora" of unspecified "corroborating facts," we discern no particularized allegations supporting that conclusion other than the audit committee charter requiring

-16-

"regular reports to the Board."[12]  The shareholders' position thus boils down to the same logic Delaware courts have consistently rejected, namely the inference that directors must have known about a problem because someone was supposed to tell them about it.  In the context of a derivative suit involving a Delaware corporation, we refuse to assume so much.

### B.  Assumption Anyone Else Told the Board

The shareholders' other accounts of how the Wal-Mart board members learned of the allegations of misconduct at Wal-Mex merit less discussion.  The shareholders' second theory is that other senior officers at Wal-Mart, besides Hernandez, told the board.  We do not doubt that the shareholders' particularized allegations established a handful of officers—though not the "small army" the shareholders claim—including Duke and Scott, as well as Wal-Mart's general counsel, received reports about the alleged bribery scheme at Wal-Mex, were involved to different degrees in making decisions about the investigation, and had duties to report wrongdoing within the corporation.  Other than those reporting obligations, the shareholders did not plead any facts supporting the inference that the officers actually shared their knowledge.  There are no specific allegations showing any of the identified officers met with the board, talked to board members, or otherwise made reports about Wal-Mex.  Cf. IBEW, 95 A.3d at 1273; Desimone, 924 A.2d at 943; Saito, 2004 WL 3029876, at *7.

---

[12]The shareholders assert their inference is "further strengthen[ed]" by allegations that in the fall of 2005, during the initial Wal-Mex investigation, institutional investors raised concerns about reports of unrelated legal and regulatory violations at Wal-Mart.  Hernandez rejected the investors' demand that Wal-Mart create a special independent committee to strengthen its internal safeguards, insisting the audit committee provided enough independent oversight.  The shareholders' conjecture that because Hernandez was thus "particularly sensitized" to compliance issues relating to internal investigations he was more likely to report what he learned about Wal-Mex is simply too attenuated and unspecific to provide meaningful support for the allegations here.

-17-

This argument thus fails for the same reasons as the shareholders' theory about Hernandez and the audit committee.[13]

## C. Assumption the Board Must Have Known

The shareholders' third argument is that the bribery at Wal-Mex was so enormous and egregious, and the threat it posed to Wal-Mart so massive, that the board must have known about it. Without minimizing the alleged wrongdoing here (or drawing factual conclusions about what really happened), we reject the shareholders' legal premise. The cases they cite—notably, none from a Delaware court—do not establish that the severity of the misconduct committed at a corporation, by itself, can be enough to infer board knowledge. To the contrary, these cases generally stand for the weaker, unremarkable proposition that "the magnitude and duration of the alleged wrongdoing" can be "relevant" and, when combined with other specific factual allegations, can help support or confirm an inference of board awareness. McCall v. Scott, 239 F.3d 808, 823 (6th Cir.), amended on denial of rehearing on other grounds, 250 F.3d 997 (6th Cir. 2001); see also Rosenbloom, 765 F.3d at 1154; In re Abbott Labs., 325 F.3d at 809 (citing McCall for this point); In re Pfizer Inc. S'holder Derivative Litig., 722 F. Supp. 2d 453, 460 (S.D.N.Y. 2010) (citing Abbott).[14] As explained in a case the shareholders declined to cite, "[t]o be

---

[13]We also observe that, as alleged, the duties identified by the shareholders obliged the officers to report to the audit committee, not the board as a whole. So even if the officers did what they were supposed to do, the shareholders' case still depends on an inference the audit committee in turn relayed the information to the rest of the board. That is precisely the inference we already rejected in the context of Hernandez's alleged duty to report.

[14]We recognize that one federal district court, in an unreported decision, has said "[w]hen a derivative plaintiff alleges a particularized scheme of substantial magnitude and duration that allegedly occurred when a majority of a board served as directors, courts infer that the board had notice of the scheme for purposes of assessing demand futility." In re Abbott Depakote S'holder Derivative Litig., No. 11 C 8114, 2013 WL 2451152, at *9 (N.D. Ill. June 5, 2013). The court did not actually

Appellate Case: 15-1869    Page: 18    Date Filed: 07/22/2016 Entry ID: 4429172

sure, magnitude and duration may be *probative* of whether the Board knew or should have known about a violation of the law, though these factors will rarely suffice in their own right to satisfy Rule 23.1's requirement in this context that plaintiffs allege with particularity actual or constructive board knowledge." In re SAIC Inc. Derivative Litig., 948 F. Supp. 2d 366, 387 (S.D.N.Y. 2013) (citation omitted); cf. In re Citigroup Inc. S'holders Litig., No. 19827, 2003 WL 21384599, at *3 (Del. Ch. June 5, 2003) (unpublished) ("The fact of . . . losses"—even "substantial losses" caused by "involvement in . . . scandals"—"is not alone enough for a court to conclude that a majority of [a] corporation's board of directors is disqualified from considering a demand that [the corporation] bring suit against those responsible.").

### D. Any Other Basis for Inferring Board Knowledge

That brings us to the shareholders' fallback position, that their various allegations are complementary and it is a mistake to consider each theory of board knowledge in isolation. According to the shareholders, the fact Hernandez and other high-ranking people at Wal-Mart knew about and were involved in the investigation of possible bribery at Wal-Mex shows how egregious and significant the issue was, just as the severity of the misconduct makes it more likely at least one of them did what they were supposed to do and told the board. We agree it would be a mistake to consider the shareholders' alleged facts piecemeal. See Harris v. Carter, 582 A.2d 222, 229 (Del. Ch. 1990). And undoubtedly the allegations "buttress each other" in the sense that they all support the shareholders' general conviction that "[i]t simply makes sense that the Board would know about a blatant and serious wrong that

---

rely on that inference to establish board knowledge, instead adding an alternative justification for its conclusion, namely that the U.S. Department of Justice had subpoenaed documents from the board itself, after informing the company it was under investigation. See id. at *10. We do not find the decision persuasive, because the only support for the court's statement was a citation to the same line of cases the shareholders cite here, see id. at *9, which we do not believe can bear the weight of the proposed assumption.

Appellate Case: 15-1869     Page: 19     Date Filed: 07/22/2016 Entry ID: 4429172

persists for many years." The reason the shareholders' theories fail is not that we think they are unbelievable or do not make sense, but because the shareholders have not pled the sort of concrete facts Delaware law requires to substantiate enough of the details. See Brehm, 746 A.2d at 254. And because their accounts of what happened all lack particularized allegations about the same key point, namely how concerns that bribery was endemic at Wal-Mex reached Wal-Mart's board, viewing the complaint as a whole cannot fill in the missing pieces.

A few more ancillary points remain, but they give us little pause. We are wholly unpersuaded by the shareholders' suggestion that their reliance on the audit committee charter is justified by rules of evidence recognizing that "[e]vidence of . . . an organization's routine practice" can be used "to prove that on a particular occasion the . . . organization acted in accordance with the . . . routine practice." Fed. R. Evid. 406; accord Del. R. Evid. 406. Even assuming a clause in a corporate governance document (as opposed to testimony about a history of doing what such a clause requires) constitutes relevant evidence of a "routine practice"—a proposition we find doubtful and for which the shareholders cite no support—evidence relevance is a low bar. Although the existence of the committee charter might tend to increase, by some degree, the likelihood that information was reported to the board, see Fed. R. Evid. 401(a); Del. R. Evid. 401, such a charter provision alone does not provide a reasonable basis to infer the information actually was conveyed to the board.

Similarly inapposite is Delaware's presumption that corporate directors perform their duties in good faith. See, e.g., Aronson, 473 A.2d at 812. That presumption generally comes into play when discerning questions of *why* directors did something, not *what* they did. See, e.g., In re Synthes, Inc. S'holder Litig., 50 A.3d 1022, 1033 (Del. Ch. 2012). We decline to endorse the shareholders' attempt to repurpose the doctrine as a basis for assuming directors took certain affirmative actions their duties supposedly required, especially when the shareholders cite no Delaware cases adopting such an approach.

-20-

Last, the shareholders' related argument that in dismissing their complaint the district court relied on an unspoken, defendant-friendly inference that Hernandez and the others chose to violate their duties and keep the board in the dark—both factually implausible, according to the shareholders, and legally improper on a motion to dismiss, see, e.g., Creason v. City of Washington, 435 F.3d 820, 823 (8th Cir. 2006)—rests on a misunderstanding of the district court's decision. Holding that the shareholders' allegations were not enough to support an inference the board *was* told—the district court's (and our) answer to the question actually presented—is not the same as inferring the board *was not* told. Cf. Guttman, 823 A.2d at 507 ("I am, of course, not opining that NVIDIA's directors actually implemented an adequate system of financial controls. What I am opining is that there are not well-pled factual allegations—as opposed to wholly conclusory statements—that the NVIDIA independent directors committed any culpable failure of oversight."). Simply put, the district court never got to the point of deciding, yes or no, whether someone reported to the board about what was going on at Wal-Mex, because the shareholders did not plead particularized facts that justified letting them take the case that far.

## III.  CONCLUSION

The specific facts alleged in the shareholders' complaint do not give rise to a reasonable inference that Wal-Mart's board of directors learned of the suspected bribery by Wal-Mex while the alleged bribery was being covered up and the internal investigation quashed. So the allegations do not establish "with particularity" that the threat of personal liability rendered a majority of Wal-Mart's 2012 board incapable of fairly considering whether to pursue the corporate causes of action the shareholders seek to enforce in this case, as required by Rule 23.1 and Delaware's heightened

-21-

pleading threshold for derivative lawsuits.  We therefore affirm the district court's judgment dismissing the case.[15]

_____

[15]The district court denied the shareholders permission to amend their complaint.  The shareholders do not challenge that ruling on appeal.

-22-

# United States Court of Appeals
### *For The Eighth Circuit*
Thomas F. Eagleton U.S. Courthouse
111 South 10th Street, Room 24.329
## St. Louis, Missouri 63102

**VOICE (314) 244-2400**
**FAX (314) 244-2780**
**www.ca8.uscourts.gov**

Michael E. Gans
*Clerk of Court*

July 22, 2016

Ms. Judith Scolnick
SCOTT & SCOTT
40th Floor
40th Floor
405 Lexington Avenue
New York, NY 10174

     RE: 15-1869 John Cottrell, et al v. Michael Duke, et al

Dear Counsel:

     The court has issued an opinion in this case. Judgment has been entered in accordance with the opinion. The opinion will be released to the public at 10:00 a.m. today. Please hold the opinion in confidence until that time.

     Please review Federal Rules of Appellate Procedure and the Eighth Circuit Rules on post-submission procedure to ensure that any contemplated filing is timely and in compliance with the rules. Note particularly that petitions for rehearing and petitions for rehearing en banc <u>must</u> be received in the clerk's office within 14 days of the date of the entry of judgment. Counsel-filed petitions must be filed electronically in CM/ECF. Paper copies are not required. No grace period for mailing is allowed, and the date of the postmark is irrelevant for pro-se-filed petitions. Any petition for rehearing or petition for rehearing en banc which is not received within the 14 day period for filing permitted by FRAP 40 may be denied as untimely.

                         Michael E. Gans
                         Clerk of Court

MDS

Enclosure(s)

cc:     Mr. Jess Askew III
       Mr. Theodore J. Boutrous Jr.
       Mr. Donald Broggi
       Mr. George H. Brown
       Mr. James Allen Carney
       Mr. William Thomas Crowder
       Mr. Jonathan C. Dickey
       Mr. John Givens Emerson
       Mr. Joseph P. Guglielmo

Mr. Robert A. Jigarjian
Mr. Jerry Kelly
Mr. Thomas Livezey Laughlin IV
Mr. Joey Paul Leniski Jr.
Mr. Brian M. Lutz
Mr. Corey D McGaha
Mr. Alexander Kosta Mircheff
Mr. Brian Murray
Mr. Walter W. Noss
Mr. Mark Andrew Perry
Mr. Scott E. Poynter
Mr. Randall Keith Pulliam
Mr. Allen P. Roberts
Mr. Sean F. Rommel
Mr. David R. Scott
Mr. James G. Stranch III
Mr. Alexander Graham Streett
Mr. James Albert Streett
Mr. Stephen Teti
Ms. Teresa Wineland
Mr. James Clark Wyly
Mr. Douglas F. Young

   District Court/Agency Case Number(s):   4:12-cv-04041-SOH

# United States Court of Appeals
### For The Eighth Circuit
Thomas F. Eagleton U.S. Courthouse
111 South 10th Street, Room 24.329
### St. Louis, Missouri 63102

Michael E. Gans
*Clerk of Court*

**VOICE (314) 244-2400**
**FAX (314) 244-2780**
**www.ca8.uscourts.gov**

July 22, 2016

West Publishing
Opinions Clerk
610 Opperman Drive
Building D D4-40
Eagan, MN 55123-0000

RE:  15-1869  John Cottrell, et al v. Michael Duke, et al

Dear Sirs:

A published opinion was filed today in the above case.

Counsel who presented argument on behalf of the appellant was Judith Scolnick, of New York, NY. The following attorney(s) appeared on the appellant brief;  Scott E. Poynter, of Little Rock, AR.,  John Givens Emerson, of Houston, TX.,  Corey D McGaha, of Little Rock, AR.,  William Thomas Crowder, of Little Rock, AR.,  Thomas L. Laughlin, IV, of New York, NY.

Counsel who presented argument on behalf of the appellee was Theodore J. Boutrous, Jr., of Los Angeles, CA. The following attorney(s) appeared on the appellee brief;  Teresa Wineland, of Little Rock, AR.,  Jess Askew, III, of Little Rock, AR.,  Mark Andrew Perry, of Washington, DC.,  Brian M. Lutz, of New York, NY.,  Alexander Kosta Mircheff, of Los Angeles, CA.,  George H. Brown, of Palo Alto, CA.,  Jonathan C. Dickey, of New York, NY.

The judge who heard the case in the district court was Honorable Susan O. Hickey. The judgment of the district court was entered on April 7, 2015.

If you have any questions concerning this case, please call this office.

Michael E. Gans
Clerk of Court

MDS

Enclosure(s)

cc:  MO Lawyers Weekly

District Court/Agency Case Number(s):  4:12-cv-04041-SOH